## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
| PWM Property Management LLC, *et al.*,[1] | ) Case No. 21-11445 (MFW) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |
|  | ) |

## DECLARATION OF MOHSIN Y. MEGHJI,
## CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN
## SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Mohsin Y. Meghji, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of each of the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"). I also am a Managing Partner at M3 Advisory Partners, LP, which is the Debtors' proposed restructuring advisor in these chapter 11 cases.

2.      I submit this declaration (this "**Declaration**") to assist the United States Bankruptcy Court for the District of Delaware (the "**Court**") and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of: (a) certain of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtors have requested from the Court pursuant to certain of the motions and applications described herein (collectively, the "**First Day Pleadings**").

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number (if available) are: PWM Property Management LLC; 245 Park Avenue Property LLC (9531); HNA 245 Park Ave JV LLC (5043); 245 Park JV LLC (2417); 245 Park Avenue Mezz C LLC (5276); 245 Park Avenue Mezz B LLC (4961); 245 Park Avenue Mezz A LLC (4673); 181 West Madison Holding LLC (2346); and 181 West Madison Property LLC (3759). The debtors' service address for purposes of these cases is 245 Park Avenue, Floor 40, New York, New York 10167.

3.      The First Day Pleadings seek relief necessary to avoid immediate and irreparable harm to the Debtors by allowing them to continue their operations and minimize disruptions to their business that could otherwise result from the commencement of these chapter 11 cases.

4.      As Chief Restructuring Officer, I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge; my discussions with members of the Debtors' external advisors; my review of relevant documents and information concerning the Debtors' operations and financial affairs; and my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition.  In making this Declaration, I have relied in part on information and materials that the Debtors, my colleagues at M3 Advisory Partners, LP, and the Debtors' other external advisors have, as applicable, gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my benefit in preparing this Declaration.  Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change, but is accurate to the best of my knowledge.  Such information is presented on a consolidated basis for the Debtors, except where specifically noted.  If called as a witness, I could and would testify competently to  the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

5.      To assist the Court in familiarizing itself with the Debtors, their business, and the initial relief sought by the Debtors to stabilize operations and facilitate their restructuring, this Declaration is organized into three sections.  Section I provides background information with respect to the Debtors' history, business operations, and corporate structure, as well as a summary of the Debtors' prepetition capital structure.  Section II describes the circumstances leading to the

commencement of these chapter 11 cases.  Section III provides an overview of certain of the First Day Pleadings.

## PRELIMINARY STATEMENT

6.      The Debtors constitute a business enterprise that owns premium commercial real estate properties and related assets.  Specifically, the Debtors own commercial office towers located at:  (a) 245 Park Avenue in New York City ("**245 Park Avenue**"); and (b) 181 West Madison Street in Chicago, Illinois ("**181 West Madison**," and, together with 245 Park Avenue, collectively, the "**Properties**").  The Properties are managed by third-party property managers (the "**Property Managers**").  Most of the Properties' corporate functions are provided by the Property Managers, who supply the on-site personnel and engage the majority of the vendors and third-party contractors at the Properties.  Consequently, the Debtors do not have any employees of their own and have a limited number of trade creditors.

7.      The Debtors acquired 245 Park Avenue—a 44-story commercial office tower that includes over 1,778,000 square feet of net rentable area—for approximately $2.21 billion in May 2017.  The Debtors acquired 181 West Madison—a 50-story commercial office tower that includes over 945,000 square feet of net rentable area and is located in Chicago's historic Loop— for approximately $359 million in March 2017.  In February 2021, in the midst of the COVID-19 pandemic, 245 Park Avenue was appraised for $2.05 billion (i.e., approximately $282 million in excess of its prepetition funded indebtedness, excluding the Preferred Equity Contribution (as defined herein))[2] and 181 West Madison was appraised for $391 million (i.e., approximately $151

---

[2]      Even including the amount of the Preferred Equity Contribution in the amount of the 245 Park Avenue Debtors' prepetition indebtedness, the appraised value of 245 Park Avenue would exceed its debt by $122 million.

million in excess of its prepetition funded indebtedness).  The Debtors therefore believe that each Property is worth significantly more than the funded indebtedness that it secures.

8.      The COVID-19 pandemic has had an unprecedented effect on the overall economy and, by extension, commercial real estate markets.  The pandemic has facilitated a shift to remote work, sparking a global conversation about making permanent changes to the traditional office model and causing many employers to re-evaluate their office space needs.  Moreover, with many commercial tenants experiencing liquidity pressure based on the effect of the pandemic on their own businesses, rent collections in the commercial real estate sector have been adversely affected and the value of commercial real estate has fallen.  The Properties have been adversely affected by the economic turmoil that reduced travel and business and consumer spending through this period, in addition to reducing demand for traditional office space.

9.      While the pandemic has affected both of the Properties, 245 Park Avenue has also suffered because its conflict-riddled property manager has failed to do its job.  S.L. Green Management Corp. ("**SLG Manager**"), 245 Park Avenue's Property Manager, has consistently failed to identify new tenants, remedy billing errors, or take other steps necessary for 245 Park Avenue to succeed in the competitive Midtown Manhattan commercial real estate market.

10.     SLG Manager's substandard and self-interested performance is illustrated by its failure to replace one of 245 Park Avenue's anchor tenants, Major League Baseball ("**MLB**"), despite having years to prepare for the planned termination of MLB's lease.  In October 2016, MLB announced its intention to relocate its corporate headquarters, years before its scheduled lease expiration date of November 1, 2022.

11.     SLG Manager's failure to identify a replacement for MLB will have dire consequences for the Property.  More specifically, as of November 1, 2021, one year prior to the

scheduled end date of MLB's lease, 245 Park Avenue's mortgage lenders are permitted under the prepetition mortgage loan documents to exercise cash dominion over its bank accounts, unless (i) MLB renews its lease, (ii) a replacement tenant acceptable to the mortgage lenders assumes occupancy of 90% of MLB's premises at full contractual rent, or (iii) 245 Park Avenue remits cash of $19 million to an escrow account for the benefit of the mortgage lenders.  Potential cash sweeps by 245 Park Avenue's mortgage lenders would deprive 245 Park Avenue of any excess cash for the foreseeable future, giving rise to significant long-term consequences for 245 Park Avenue.

12.    The impending cash dominion event would exacerbate 245 Park Avenue's other capital structure challenges, including liquidity constraints, a large funded debt burden, and the mandatory redemption on June 30, 2022 of certain preferred equity issued to SLG Manager's affiliate, 245 Park Member LLC (the "**SLG Member**").  Without access to excess cash flows from the monthly rents that 245 Park Avenue generates, 245 Park Avenue cannot make quarterly dividend payments to the SLG Member, which will result in an accelerated mandatory redemption of the preferred equity as soon as December 31, 2021.  Failure to redeem the preferred equity at that time would expose, in turn, 245 Park Avenue to the imminent risk of a "forced sale" by the SLG Member.  Given current market conditions, the SLG Member would likely be able to acquire 245 Park Avenue at a significant discount.  Such a forced sale would be value-destructive and would result in a windfall to the SLG Member at the expense of the Debtors and their other constituents.

13.    Additionally, the bankruptcy of Debtor 181 West Madison Holding LLC, which guarantees all of 245 Park Avenue's funded indebtedness and owns the equity of 181 West Madison's property owner, may enable 245 Park Avenue's creditors to seize 181 West Madison, which would further impair stakeholder value.

14.      To protect and preserve their business and assets from disruption and deterioration of value, the Debtors, in consultation with their advisors and independent fiduciaries, Alan J. Carr and Vik Jindal, decided to commence these chapter 11 cases.   Additionally, to maximize the value of 245 Park Avenue and alleviate the conflict of interest that is undermining the property's performance, the Debtors are seeking to promptly replace SLG Manager by rejecting its property management agreement under section 365 of the Bankruptcy Code.

15.      The Debtors remain confident in the prospects of their business on a going-forward basis.  Indeed, 181 West Madison has performed exceptionally well notwithstanding the impact of the COVID-19 pandemic and is currently 90.4% occupied.  Moreover, its major tenant, which leases approximately half of the available floor space in the building, is under contract until 2025. 245 Park Avenue's tenants consist of reputable businesses that are primarily in the financial services sector with the lease maturity of its remaining anchor tenants staggered in their expiration through 2032.  Thus, there is significant value in the Properties and the Debtors are focused on reorganizing their business, improving the efficiency of the Properties' management and operations, and positioning the Properties to better compete with their peer group.  This will place them in a strong position to attract desirable tenants and command competitive rents when the market recovers.

16.      The Debtors have filed a set of first-day pleadings that will allow them to operate the Properties in the ordinary course and minimize disruptions to their businesses.  The Debtors are confident that they will be able to consummate an expeditious, comprehensive restructuring of their obligations that will maximize the value of the Debtors' estates for the benefit of all constituents.

I.      **The Debtors' Operations, Corporate Structure and Capital Structure**

A.      **Company Business and Overview**

17.      As noted above, the Properties are managed by the Property Managers who are responsible for their day-to-day management and operations.

18.      More specifically, 245 Park Avenue is managed by SLG Manager, which serves as the exclusive management and leasing agent under a Property Management and Leasing Agreement, dated as of December 1, 2018, by and between Debtor 245 Park Avenue Property LLC and S.L. Green Management Corp. (as amended from time to time, the "**Park Avenue Management Agreement**"). 181 West Madison is managed by MB Real Estate Services Inc. (the "**West Madison Manager**"), which also serves as 181 West Madison's exclusive leasing manager. As noted herein, subject to Court approval of the Debtors' motion to reject the Park Avenue Management Agreement, the Debtors have selected the West Madison Manager as replacement Property Manager for 245 Park Avenue.

19.      The Property Managers are each responsible for all day-to-day functions related to management, maintenance, and operation of the Properties.  They select, employ, pay and supervise all employees and personnel that work at the Properties and contract with the majority of vendors that provide goods and services to the Properties.  Consequently, the Debtors themselves do not have any employees or many trade creditors.[3]  The Property Managers are also responsible for collecting rents from the tenants that lease the Properties and enforce the tenants'

---

[3]      Upon information and belief, all personnel employed in connection with the Properties are provided by the Property Managers.  Accordingly, the Debtors have not filed any motion seeking relief concerning employee wages, benefit plans or other related relief.  However, the Debtors reserve the right to seek such additional relief during the pendency of these chapter 11 cases.

compliance with the terms of their leases. The Property Managers also make the required payments in respect of the Debt Obligations (as defined below) as and when they become due.

20.    As exclusive leasing agents, the Property Managers are responsible for performing all marketing and leasing functions in connection with the Properties, including using all commercially reasonable efforts and due diligence to secure tenants and keep rentable space within 245 Park Avenue and 181 West Madison fully rented to desirable tenants on terms and conditions approved by the Property Owning Entities (as defined below).

21.    The Debtors generate and receive cash from operation of the Properties by leasing office space to third-party tenants (collectively, the "**Rent**"). The Rent collected at each Property is received by the applicable Property Manager and deposited into certain accounts, including depository and operating accounts (the "**Operating Accounts**"), which are held by the respective Property Owning Entities. While the Property Managers are charged with responsibility for all of the day-to-day tasks associated with operating and managing the Properties, it is the Operating Accounts that fund the majority of the Properties' operating costs. Additionally, as required by the terms of their prepetition indebtedness, the Debtors contribute certain Reserve Funds (defined below) to accounts (the "**Reserve Accounts**") established and maintained by the Park Avenue Servicers on account of obligations such as insurance, taxes, and anticipated repairs in respect of the Properties. The Debtors periodically request and receive disbursements from certain of the Reserve Accounts to make such payments.

22.    Prior to the Petition Date, after payment of Properties' operating costs, management fees to the Property Managers, and reserves for working capital, the Debtors used remaining net Rent to pay the Debtors' other obligations. These obligations included debt service on the Mortgage Loans (as defined below) and the Mezzanine Loans (as defined below).

23.     As of September 30, 2021, the Debtors' financial statements reflect consolidated assets totaling approximately $2.53 billion and consolidated liabilities totaling approximately $2.19 billion.  Consolidated 2020 annual revenues were approximately $220.87 million.

**B.      The Debtors' Corporate History and Organizational Structure**

24.     Debtor PWM Property Management LLC ("**PWM**") is the ultimate indirect equity owner of each Debtor.  PWM is not a borrower or guarantor under any of the Debtors' prepetition funded debt obligations.

25.     Certain Debtors indirectly owned by PWM own the land, buildings, and improvements located on, or appurtenant to, the Properties.  Debtor 245 Park Avenue Property LLC (the "**Park Avenue Owner**") owns the property at 245 Park Avenue, and Debtor 181 West Madison Property LLC (the "**West Madison Owner**" and together with the Park Avenue Owner, the "**Property Owning Entities**") owns the property at 181 West Madison.  The Property Owning Entities each lease floor space located at their respective Properties to third-party tenants in accordance with certain lease agreements.  The Property Owning Entities have engaged the Property Managers to operate the applicable Properties pursuant to management agreements.

26.     The Park Avenue Owner is the borrower under a mortgage loan in the original principal amount of $1.2 billion that is secured by 245 Park Avenue (the "**Park Avenue Mortgage Loan**"); the Park Avenue Mortgage Loan is guaranteed by Debtor 181 West Madison Holding LLC ("**West Madison Holding**").  West Madison Holding does not guarantee the mortgage obligations with respect to 181 West Madison.

27.     Certain Debtors (each, a "**Mezzanine Borrower**" and, collectively, the "**Mezzanine Borrowers**")[4] that are directly or indirectly owned by Debtor 245 Park JV, LLC ("**Park Avenue JV**") are borrowers or guarantors with respect to different tranches of mezzanine loan indebtedness in the outstanding aggregate principal amount of $568 million (the "**Mezzanine Loans**"). The Mezzanine Loans are also guaranteed by West Madison Holding. Each Mezzanine Borrower pledged to the respective lenders, as security for the Mezzanine Loans, the equity that each Mezzanine Borrower owns. None of the Mezzanine Borrowers, other than 245 Park Avenue Mezz A LLC, which owns the equity of the Park Avenue Owner, have any assets other than the equity of the Mezzanine Borrower owned by each such Mezzanine Borrower. The West Madison Owner does not guarantee the Park Avenue Mortgage Loan or any of the Mezzanine Loans.

28.     The West Madison Owner is the borrower under a mortgage loan in the original principal amount of $240 million that is secured by 181 West Madison (the "**West Madison Mortgage Loan**"). West Madison Holding owns 100% of the equity interests in the West Madison Owner. As set forth above, West Madison Holding does not guarantee the West Madison Mortgage Loan.

29.     Debtor Park Avenue JV owns, directly and indirectly, as applicable the equity in the Park Avenue Owner and the Mezzanine Borrowers. The Park Avenue JV, the Park Avenue Owner and the Mezzanine Borrowers, are referred to herein as the "**Park Avenue Debtors**." Park Avenue JV is operated as a joint venture between HNA 245 Park Avenue JV LLC (the "**Owner Member**") and the SLG Member under the terms of a Second Amended and Restated Limited Liability Company Agreement dated as of November 19, 2018 (the "**LLC Agreement**"). The

---

[4]     The Mezzanine Borrowers are: 245 Park Avenue Mezz A LLC; 245 Park Avenue Mezz B LLC; and 245 Park Avenue Mezz C LLC.

Owner Member holds 51.131% of the limited liability company interests in the Park Avenue JV. The SLG Member, an SLG Manager affiliate, owns 48.869% of the limited liability company interests in Debtor Park Avenue JV.

30.    A simplified diagram of the Debtors' organizational structure, with capital structure overlay, is below.



SIMPLIFIED ORGANIZATIONAL CHART OF THE DEBTORS

C.    **The Debtors' Capital Structure**[5]

31.    As of the Petition Date, the Debtors were liable for approximately $2.17 billion in aggregate funded debt obligations (the "**Debt Obligations**").  The table below summarizes the group's prepetition capital structure.

| Facility | Approximate Amount Outstanding (as of the Petition Date) |
|---|---|
| **245 Park Avenue** | |
| Park Avenue Mortgage Loan | $1.2 billion |
| Mezzanine A | $236.5 million |
| Mezzanine B | $221 million |
| Mezzanine C | $110.5 million |
| Preferred Equity Contribution | $160 million |
| ***Total (245 Park Avenue)*** | $1.93 billion |
| **181 West Madison Avenue** | |
| West Madison Mortgage Loan | $240 million |
| ***Total (All Properties)*** | $2.17 billion |

---

[5]    The descriptions of the Debtors' prepetition debt facilities and the collateral securing those facilities provided herein does not constitute, and should not be construed as, an admission by the Debtors regarding the validity, priority, enforceability, perfection, or amount of any obligation, claim, guarantee, lien, mortgage, pledge, or other security interest, or any other fact with respect thereto, and the Debtors reserve all rights to challenge or dispute any of the foregoing on any basis whatsoever.

*(i)     The Park Avenue Mortgage Loan*

32.      The Park Avenue Owner is the Borrower under a Loan Agreement dated as of May 5, 2017 (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Park Avenue Mortgage Loan Agreement**," and together with other documents executed in connection therewith, the "**Park Avenue Mortgage Loan Documents**") by and among the Park Avenue Property Owner, JPMorgan Chase Bank, National Association, Natixis Real Estate Capital LLC, Société Générale, and Deutsche Bank AG, New York Bank, and Barclays Bank PLC (together with their successors in interest and permitted assigns, the "**Park Avenue Mortgage Originators**") under which the Park Avenue Mortgage Originators extended financing to the Park Avenue Owner in the aggregate principal amount of $1.2 billion.  Cash interest at the rate of is 3.66940% per annum is payable in respect of the Park Avenue Mortgage Loan, which is scheduled to mature on June 1, 2027.

33.      The Park Avenue Mortgage Loan is secured by a first priority mortgage (the "**Park Avenue Mortgage**") on 245 Park Avenue, and the products and proceeds thereof, including the leases of office and retail space at 245 Park Avenue and the Rent generated by those leases.  The Park Avenue Mortgage Loan is structured with a hard lockbox and springing cash management. The Park Avenue Property Owner was required at loan origination to deliver a tenant direction letter to each existing tenant at 245 Park Avenue, directing each tenant to remit its rent checks directly to the lender-controlled lockbox (the "**Lockbox Account**").  The Park Avenue Property Owner is also required to deliver a tenant direction letter to each future tenant.  So long as no Cash Sweep Event (as defined in the Park Avenue Mortgage Loan Documents) exists, all funds deposited into the Lockbox Account are required to be transferred on each business day to or at the direction of the Park Avenue Property Owner.  Upon the occurrence of a Cash Sweep Event,

all funds in the Lockbox Account are swept to a Lender-controlled cash management account (the "**Cash Management Account**") on a daily basis and are thereafter applied and disbursed for payment of taxes, insurance premiums, operating expenses, debt service, reserves and other amounts payable in accordance with the Park Avenue Mortgage Loan Documents.  All excess cash flow funds (the "**Excess Cash Flow**") remaining in the Lockbox Account after the application of such funds in accordance with the Park Avenue Mortgage Loan Documents are swept to the Cash Management Account and are required to be held by Park Avenue Mortgage Lenders as additional collateral.  Upon the occurrence and during the continuance of an Event of Default (as defined in the 245 Park Avenue Mortgage Loan Documents), the Park Avenue Mortgage Lenders may apply the Excess Cash Flow to the Park Avenue Mortgage Loan.

34.     West Madison Holding guarantees the obligations of the Park Avenue Property Owner under the Park Avenue Mortgage Loan.

35.     Following the closing of the Park Avenue Mortgage Loan, the Park Avenue Property Owner and the Park Avenue Mortgage Originators agreed that the Park Avenue Mortgage Loan would be split into various separate promissory notes (the "**Park Avenue Trust Notes**"). The Park Avenue Mortgage Originators subsequently deposited the Park Avenue Trust Notes into trusts (the "**Park Avenue Trusts**"), each established by a Depositor (the "**Park Avenue Depositor**").  Certain investors (the "**Park Avenue Mortgage Lenders**") bought the interests in the Park Avenue Trusts.  The Park Avenue Mortgage Lenders were then issued certificates (the "**Park Avenue Certificates**") representing their beneficial interests in the Park Avenue Trusts. There are various classes of Park Avenue Certificates.  The rights of the Park Avenue Mortgage Lenders are governed by a Trust and Servicing Agreement (the "**Park Avenue Trust and Servicing Agreement**, collectively with the documents executed therewith, the "**Park Avenue**

**Securitization Documents**").  On information and belief, the Servicer and Special Servicer of the Park Avenue Mortgage Loan is Wells Fargo Bank, N.A. (the "**Park Avenue Mortgage Servicers**").

36.     As of the Petition Date, the aggregate principal amount outstanding under the 245 Park Avenue Mortgage Loan is approximately $1.2 billion.

> *(i)     The Preferred Equity Contribution*

37.     SLG Member made a preferred equity investment in Debtor Park Avenue JV.  Park Avenue JV is obligated to redeem that amount plus any accrued but unpaid interest (the "**Preferred Equity Contribution**").   As of the Petition Date the Preferred Equity Contribution was approximately $160 million.  SLG Member's Preferred Equity Contribution must be redeemed by no later than June 30, 2022.  Additionally, Park Avenue JV's obligation to redeem the Preferred Equity Contribution will accelerate to December 31, 2022 if Park Avenue JV does not remit any quarterly dividend payments to SLG Member.  If the SLG Member's preferred equity interests are not timely redeemed in full, a Forced Sale (as defined in the LLC Agreement) would occur. Certain affiliates of the Owner Member have jointly and severally guaranteed to the SLG Member the punctual and complete payment in full of certain obligations of the Owner Member under the LLC Agreement, including the timely redemption in full of the SLG Member's preferred equity investment in Park Avenue JV.

> *(ii)     The Mezzanine Loans*

38.     As set forth above, each of the Mezzanine Borrowers is the Borrower under a separate Mezzanine Loan Agreement dated as of May 5, 2017 2017 (each a "**Mezzanine Loan Agreement**," and collectively the "**Mezzanine Loan Agreements**") by and among JPMorgan Chase Bank, National Association, Natixis Real Estate Capital LLC, Société Générale, and

Deutsche Bank AG, New York Bank, and Barclays Bank PLC (each, together with their successors in interest and permitted assigns a "**Mezzanine Lender**," collectively, the "**Mezzanine Lenders**")[6] and West Madison Holding, as guarantor.  Under the Mezzanine Loan Agreements, the Mezzanine Lenders extended an aggregate principal amount of $568 million (the "**Mezzanine Loans**") to the Mezzanine Borrowers.  The Mezzanine Loans consist of:

(a)    245 Park Avenue Mezz A LLC is the Mezzanine Borrower in respect of a Mezzanine Loan in aggregate principal amount of $236,500,000 (the "**Mezzanine A Loan**") pursuant to which cash interest is payable at the rate of 5% per annum,

(b)    245 Park Avenue Mezz B LLC is the Mezzanine Borrower in respect of a Mezzanine Loan in aggregate principal amount of $221,000,00 (the "**Mezzanine B Loan**"), pursuant to which cash interest is payable at the rate of 5.7% per annum; and

(c)    245 Park Avenue Mezz C LLC is the Mezzanine Borrower in respect of a Mezzanine Loan in aggregate principal amount of $110,500,000 (the "**Mezzanine C Loan**") pursuant to which cash interest is payable at a rate of 6.85% per annum.

39.    As described above, the Mezzanine Loans are secured by pledges of the equity interests each Mezzanine Borrower owns in its directly held subsidiary, and liens over certain Reserve Funds (as defined in the Mezzanine Loan Agreements) held in accounts maintained by the 245 Park Avenue Servicers.  The Mezzanine Loans are not secured by 245 Park Avenue or any of the other collateral securing the 245 Park Avenue Mortgage Loan.  The Mezzanine Loans are scheduled to mature on June 1, 2027.  The Mezzanine Loans provide that the Mezzanine Lenders may appoint one or more servicers, or special servicers to service the Mezzanine Loans (the "**Mezzanine Servicers**").

---

[6]    On information and believe, as of the Petition Date the Mezzanine Lenders were as follows: (i) certain funds managed by Apollo Global Management hold 50% of the Mezzanine A Loans, and Nonghyup Bank, as Trustee for Meritz Private Real Estate Fund V, a Korean trust, holds the remaining 50%, (ii) certain funds managed by Nuveen hold 50% of the Mezzanine B Loans, and Nonghyup Bank, as Trustee for Meritz Private Real Estate Fund VII, holds the remaining 50%, and (iii) 245 Park Avenue Mezz Funding LLC, an affiliate of SL Green Realty Corp holds a portion of the Mezzanine C Loans, and Nonghyup Bank, as Trustee for Meritz Private Real Estate Fund VI, a Korean trust, holds the remaining portion.

40.    Additionally, through three separate Guaranty Agreements, each dated as of May 5, 2017, West Madison Holding has provided unsecured guarantees of the obligations of each of the Mezzanine Borrowers under the respective Mezzanine Loans.

41.    On information and belief, as of the Petition Date, an affiliate of SL Green Realty Corp held a portion of the Mezzanine C Loans.

42.    As of the Petition Date, the outstanding aggregate principal balance under the Mezzanine Loans is approximately $568 million.

*(i)    The West Madison Mortgage*

43.    The West Madison Owner is the Borrower under a Loan Agreement dated as of November 26, 2019 (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**West Madison Loan Agreement**," and together with other documents executed in connection therewith, the "**West Madison Mortgage Loan Documents**"), by and among the 181 Property Owning Entity and JPMorgan Chase Bank, National Association, as Lender (together with their successors in interest and permitted assigns, the "**West Madison Mortgage Originator**"), under which the West Madison Mortgage Originator extended financing in aggregate principal amount of $240 million (the "**West Madison Mortgage Loan**").  The interest on the West Madison Mortgage Loan is payable in cash at the rate of 3.9% per annum.  The West Madison Mortgage Loan is scheduled to mature on December 1, 2026.

44.    The West Madison Mortgage Loan is secured by a first priority mortgage (the "**West Madison Mortgage**") on 181 West Madison, and the products and proceeds thereof, including the leases of 181 West Madison and the Rent generated by those leases.  The West Madison Mortgage Loan is structured with a hard lockbox and springing cash management in substantially the same fashion as set forth above in respect of the Park Avenue Mortgage Loan.

45.    Following the closing of the West Madison Mortgage Loan, the West Madison Property Owner and the West Madison Mortgage Originator agreed that the West Madison Mortgage Loan would be split into various separate promissory notes (the "**West Madison Trust Notes**").  The West Madison Mortgage Originator subsequently deposited the West Madison Trust Notes into trusts (the "**West Madison Trusts**"), each established by a Depositor (the "**West Madison Depositor**").  Certain investors (the "**West Madison Certificate Holders**") bought the interests in the West Madison Trusts.  The West Madison Certificate Holders were then issued certificates (the "**West Madison Certificates**") representing their beneficial interests in the West Madison Trusts.  There are various classes of West Madison Certificates.  The rights of the West Madison Certificate Holders are governed by a Trust and Servicing Agreement (the "**West Madison Trust and Servicing Agreement**, collectively with the documents executed therewith, the "**West Madison Securitization Documents**" and further with the Park Avenue Mortgage Loan Documents, the Park Avenue Securitization Documents, and the Mezzanine Loan Agreements, the "**Prepetition Loan Documents**").  The Servicer and Special Servicer of the West Madison Mortgage Loan is Keybank (the "**West Madison Mortgage Servicers**").

46.    As of the Petition Date, there was approximately $240 million in principal outstanding on account of the West Madison Mortgage Loan.

## II.    Events Leading to These Chapter 11 Cases and the Purpose of the Chapter 11 Cases

47.    A number of factors have contributed to the decline in the Park Avenue Debtors' earnings and liquidity one of which is the COVID-19 pandemic, which has significantly impacted the global economy and the Debtors' businesses and made these chapter 11 cases a necessary step to maximize the value of the Debtors' estates.

48.     The Debtors acquired 245 Park Avenue in May 2017 for $2.21 billion.    The property was appraised at $2.25 billion at the end of 2018.  While, the appraised value fell to $2.21 billion at the end of 2019, and then to $2.05 billion at the end of 2020, even based on its most recent valuation, the 245 Park Avenue still has significant equity value.  Large, dense commercial office markets like New York City have been disproportionately affected by pandemic-driven market conditions, and market researchers expect that this sector will likely be among the slowest to recover.[7]  The pandemic has facilitated a shift to remote work, sparking a global conversation about making permanent changes to the traditional office model and causing many employers to re-evaluate their office space needs.   As many businesses that have traditionally occupied commercial real estate continue to consider and implement hybrid or fully-remote workplace strategies, office space needed per-employee will likely continue to decline.[8]  Moody's previously forecasted a rise in the vacancy rate of commercial office space to approximately 19.4% nationwide for the year 2021,[9] and, consistent with this prediction, the New York Times reported a record-high office space vacancy rate of approximately 18.7% in Manhattan in July 2021.[10]

49.     Moreover, with many commercial tenants experiencing liquidity pressure based on the impact of the pandemic on their own businesses, rent collections in the commercial real estate sector have been adversely impacted and the value of commercial real estate has fallen.  High vacancy rates have resulted in a more tenant-friendly market, giving struggling commercial tenants

---

[7]     U.S. Real Estate Market Outlook 2021, CBRE; *see also Moody's Analytics: US Office Rents Won't Reach Pre-Pandemic Rates Until 2026*, MOODY'S ANALYTICS (Feb. 2, 2021); PwC and the Urban Land Institute: *Emerging Trends in Real Estate® 2022*. Washington, D.C.: PwC and the Urban Land Institute, 2021.

[8]     PwC and the Urban Land Institute: *Emerging Trends in Real Estate® 2022*. Washington, D.C.: PwC and the Urban Land Institute, 2021.

[9]     Moody's Analytics: US Office Rents Won't Reach Pre-Pandemic Rates Until 2026, MOODY'S ANALYTICS (Feb. 2, 2021).

[10]     M. Haag, Office Vacancies Soar in New York, a Dire Sign for the City's Recovery, THE NEW YORK TIMES (Jul. 1, 2021).

leverage to seek lease concessions which drive down net effective rents.[11]  In fact, Moody's further

predicted an office rent decline of approximately 8.9% in New York over the course of 2021, with

rents likely to reach a low point in late 2022.[12]  The combination of vacancies and depressed rents

has resulted in drastically reduced operating income for many commercial real estate owners.[13]

50.     But the problems at 245 Park Avenue are not entirely due to the pandemic.  They

have also been caused by SLG Manager's failure to properly perform its primary job:  retaining

and recruiting world-class tenants for the Property.  As noted above, one of 245 Park Avenue's

long-standing anchor tenants, MLB, determined not to renew its lease beyond November 1, 2022.

Moreover, MLB's departure within one year of its lease's expiration on November 1, 2022 is a

"Tenant Trigger Event" under the 245 Park Avenue Mortgage Loan.  A "Tenant Trigger Event"

will permit the Park Avenue Servicer, as of November 1, 2021, to sweep certain excess cash flows

described above into an account established for the Park Avenue Mortgage Lenders' benefit (the

"**Cash Dominion Rights**").  Given the impending occurrence of the Tenant Trigger Event, the

Debtors anticipated that, in the absence of filing these chapter 11 cases, the Park Avenue Mortgage

Lenders would imminently exercise such rights.

51.     The potential exercise of the Cash Dominion Rights by the Park Avenue Mortgage

Lenders would starve the Park Avenue Debtors of access to their excess cash flows, leaving the

Park Avenue Debtors without the means to make quarterly dividend payments to the SLG Member

or to satisfy the Preferred Equity Contribution in favor of the SLG Member, which may be

accelerated and become due as soon as December 31, 2021.  The failure to redeem the Preferred

---

[11]     *See id.*; see also G. Vaibhav, et al., Commercial real estate must do more than merely adapt to coronavirus, MCKINSEY & COMPANY (April 9, 2020).

[12]     Moody's Analytics: US Office Rents Won't Reach Pre-Pandemic Rates Until 2026, MOODY'S ANALYTICS (Feb. 2, 2021).

[13]     G. Vaibhav, et al., Commercial real estate must do more than merely adapt to coronavirus, MCKINSEY & COMPANY (April 9, 2020).

Equity Contribution when it is due, in turn, will trigger a Forced Sale under the LLC Agreement, requiring that Park Avenue JV or the Owner Member divest its interests in 245 Park and/or its subsidiaries, in each case, to the SLG Member or a third party buyer.  Moreover, the LLC Agreement provides the SLG Member with the sole and absolute discretion to determine the identity of the purchaser, the sale price, timing and all other terms and conditions of the Forced Sale, which need not be commercially reasonable.  While the Debtors approached the SLG Member to seek an extension of the maturity of the Preferred Equity Contribution, none was granted.  Indeed, SLG Member did not engage; it did not even respond to a markup of a pre-negotiation agreement it demanded the Debtors execute.  Given current market conditions, the Debtors consider that a Forced Sale would be value-destructive and would likely represent a windfall to the SLG Member at the expense of the estates.

52.     SLG Manager's failures are not limited to MLB, it has not signed any new tenants for 245 Park Avenue since it assumed the Property Manager role in November 2018.  This is particularly concerning because SLG Manager has conflicts of interest arising from its status as an affiliate of both the SLG Member and a holder of a portion of the Mezzanine C Loans.  By virtue of its position as Property Manager, SLG Manager is empowered to drive down the value of the property for the benefit of the SLG Member by failing to procure new tenants and renew existing leases, including by directing tenants to one of the many nearby properties it manages.

53.     There is significant equity value in the Properties and the Debtors are focused on reorganizing their business, improving the efficiency of their management and operations and positioning the Properties to better compete with their peer group.  For example, the Debtors are in the midst of a $20 million modernization project in respect of 245 Park Avenue that commenced in 2019 and is due to be completed in 2022, which consists of elevator modernization, turnstile

and roof replacement and cooling tower upgrades. The improvements will allow the property to command higher rents and the Debtors project revenue growth in respect of 245 Park Avenue of up to $222 million by 2030.

54.    Additionally, through these chapter 11 cases, the Debtors intend to reject the 245 Property Management Agreement and replace SLG Manager as soon as practicable following the Petition Date. The replacement of SLG Manager will put management of the property into the hands of a non-conflicted manager that is motivated to maximize the Property's performance. It will also reduce the management fees currently paid for the Property. The Debtors remain confident in the prospects of their business on a going-forward basis.

55.    In light of these circumstances, on the Petition Date, each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to provide the Debtors with the opportunity to restructure their debt in an orderly and value-maximizing manner under the auspices of a chapter 11 proceeding. The Debtors believe that these chapter 11 cases will result in a successful restructuring of the Debtors' balance sheet and business operations that will serve to maximize the value of the Debtors' enterprise for the benefit of all stakeholders.

III.    **Relief Sought in the Debtors' First Day Pleadings**

56.    The Debtors have filed a number of First Day Pleadings in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet. The relief requested in the First Day Pleadings is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases. A list of the First Day Pleadings is set forth below.

### A.    Administrative Motions

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration; and (II) Granting Related Relief*

- *Debtors' Application for Entry of an Order Appointing Omni Agent Solutions as Claims and Noticing Agent, Effective as of the Petition Date*

### B.    Substantive Motions

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System and Bank Accounts; (II) Continued Use of Business Forms; (III) Continuance of Intercompany Transactions; and (IV) Payment of Related Prepetition Obligations*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Policies and (B) Pay All Pre- and Post-Petition Amounts Due Under Insurance Policies and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers; (II) Establishing Procedures for Resolving Objections by Utility Providers; and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services*

- *Debtors' Motion for Entry of an Order Authorizing the Rejection of the Property Management and Leasing Agreement Between 245 Park Avenue Property LLC and S.L. Green Management Corp., Effective as of the Debtors' Petition Date*

57.    The Debtors have narrowly tailored the relief requested in the First Day Pleadings to meet their goals of: (a) continuing their current operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of their vendor, customer, employee, franchisee, and other key constituencies; and (c) establishing procedures for the efficient administration of these chapter 11 cases.

58.    I have reviewed each of the First Day Pleadings (including their exhibits) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate

reliance on corporate officers, employees, and advisors.  I incorporate by reference the factual statements in each of the First Day Pleadings as though set forth herein.

59.     I believe that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtors' efforts to maximize the value of their estates.  It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the maintenance of the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

60.     The success of these chapter 11 cases depends upon the Debtors' ability to preserve their operations while they restructure their financial obligations.  The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

61.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 31, 2021

By:     _/s/ Mohsin Y. Meghji_
Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer