## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| PWM Property Management LLC, *et al.*,[1] | Case No. 21-11445 (MFW) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Docket Nos. 1296, 1300 & 1362** |

### NOTICE OF PROPOSED SALE OF THE MEMBERSHIP INTERESTS IN 181 WEST MADISON PROPERTY LLC AND SALE HEARING

**PLEASE TAKE NOTICE THAT** PWM Property Management LLC and 181 West Madison Property LLC (together, the "**West Madison Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), on October 31, 2021 in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has entered the *Order (I)Modifying Bidding and Auction Procedures Relating to the Submission of Transaction Proposals for 181 West Madison and (II) Granting Related Relief* dated April 5, 2023 [Docket No. 1300] (the "**Initial West Madison Bidding Procedure Order**") and *Order (I) Authorizing Certain Clarifications and Modifications to the West Madison Bidding Procedures and (II) Granting Related Relief* dated July 5, 2023 [Docket No. 1362] (together, the "**West Madison Bidding Procedures Orders**"), approving certain bidding procedures (the "**West Madison Bidding Procedures**") that govern the sale of the West Madison Debtors' assets, as described in the motion requesting such relief [Docket No. 1190] (the "**West Madison Bidding Procedures Motion**").

**PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has entered an order [Docket No. 1296] (the "**Confirmation Order**") approving the *Second Amended Joint Chapter 11 Plan of Reorganization of the West Madison Debtors* [Docket No. 1258] (the "**Plan**") with respect to the West Madison Debtors.  The Plan provides, among other things, that if the West Madison Debtors are unable to satisfy the conditions precedent to the effectiveness of the West Madison Mortgage Loan Amendment (unless such deadline is extended by the West Madison

---

[1]    The remaining debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  PWM Property Management LLC (2514) and 181 West Madison Property LLC (3759).  The service address of the debtors for purposes of these chapter 11 cases is c/o M3 Partners, LLC, 1700 Broadway, 19th Floor, New York, NY 10019.  The chapter 11 cases of HNA 245 Park Ave JV LLC (5043); 245 Park JV LLC (2417); 245 Park Avenue Mezz C LLC (5276), 245 Park Avenue Mezz B LLC (4961), 245 Park Avenue Mezz A LLC (4673); and 181 West Madison Holding LLC (2346) were closed as of September 27, 2022. *See* Docket No. 1050.

Debtors with the consent of the West Madison Mortgage Lender) on or before May 31, 2023, the West Madison Debtors would conduct an additional marketing and auction process with respect to transaction proposals for the West Madison Debtors' assets in accordance with the terms of the Plan, the West Madison Bidding Procedures Orders, and the West Madison Bidding Procedures (collectively, the "**Sale Documents**").

**PLEASE TAKE FURTHER NOTICE** that, on June 1, 2023, the West Madison Debtors filed that certain *Notice of Commencement of Sale Process for 181 West Madison* [Docket No. 1326], which notified parties in interest of the West Madison Debtors' intent to solicit bids for 181 West Madison[2] in accordance with the West Madison Bidding Procedures Orders.

**PLEASE TAKE FURTHER NOTICE** that the West Madison Debtors received only one Qualified Bid by the Bid Deadline and accordingly cancelled the Auction. The Debtors seek to transfer 100% of the membership interests in the West Madison Owner to SinOceanic I Limited (the "**Purchaser**") pursuant to the Membership Interest Purchase Agreement attached hereto as **Exhibit A** (the "**Sale Agreement**").[3]

**PLEASE TAKE FURTHER NOTICE** that the West Madison Debtors will seek approval of the Sale Agreement at a hearing scheduled for **August 29, 2023 at 2:00 p.m. (ET)** (the "**Sale Hearing**"), or at such other time as may be scheduled by the Bankruptcy Court. A copy of the proposed order approving the Sale Agreement is attached hereto as **Exhibit B** (the "**Sale Order**").

**PLEASE TAKE FURTHER NOTICE** that any objections to the Sale Agreement or the relief requested in connection with the Sale Agreement (a "**Sale Objection**"), must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (ET) on August 22, 2023** (the "**Sale Objection Deadline**"); and (e) be served upon the following: (i) counsel to the West Madison Debtors, (a) White & Case LLP, 111 South Wacker Drive, Suite 5100, Chicago, IL 60606, Attn: Bojan Guzina (bojan.guzina@whitecase.com) and White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, FL 33131, Attn: Fan B. He (fhe@whitecase.com), and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton (emorton@ycst.com) and Allison S. Mielke (amielke@ycst.com); and (ii) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Casey (Linda.Casey@usdoj.gov)). If a Sale Objection is not filed on or before the Sale Objection Deadline in accordance with the foregoing requirements, the objecting party may be barred from objecting to the Sale Agreement and being heard at the Sale Hearing, and the Bankruptcy Court may enter the Sale Order without further notice to such party.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the West Madison Bidding Procedures Orders, the West Madison Bidding Procedures, the West Madison Bidding Procedures Motion, the Membership Interest Purchase Agreement, or the Plan (each as defined herein), as applicable.

[3]    For the convenience of the Court and parties in interest, attached hereto as **Exhibit C** is a blackline comparing the Sale Agreement with the form of stock purchase agreement attached as Exhibit 4 to the Initial West Madison Bidding Procedures Order.

Copies of the Bidding Procedures Motion, the Sale Documents, the any other documents referenced herein, and all other documents filed with the Court may be obtained at the West Madison Debtors' restructuring website:  https://cases.omniagentsolutions.com/pwm.

Dated: August 8, 2023

Respectfully submitted,

/s/ *Allison S. Mielke*

Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
Allison S. Mielke (No. 5934)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
emorton@ycst.com
kenos@ycst.com
amielke@ycst.com

Thomas E Lauria (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
WHITE & CASE LLP
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
(305) 371-2700
tlauria@whitecase.com
fhe@whitecase.com

Bojan Guzina (admitted *pro hac vice*)
Jason N. Zakia (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
WHITE & CASE LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
(312) 881-5400
bojan.guzina@whitecase.com
jzakia@whitecase.com
gregory.pesce@whitecase.com

*Counsel to the West Madison Debtors and
West Madison Debtors-in-Possession*

## EXHIBIT A

**Sale Agreement**

*Execution Version*

**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

**BY AND AMONG**

**SINOCEANIC I LIMITED,**

**PWM PROPERTY MANAGEMENT LLC,**

**AND**

**181 WEST MADISON PROPERTY LLC**

**DATED AUGUST __, 2023**

## TABLE OF CONTENTS

Page

**ARTICLE I** DEFINITIONS ...........................................................................1

    **Section 1.1**    Definitions...................................................................1
    **Section 1.2**    Construction................................................................10
    **Section 1.3**    Exhibits and Schedules ...............................................11
    **Section 1.4**    Knowledge ..................................................................11

**ARTICLE II** THE CLOSING .........................................................................12

    **Section 2.1**    Sale of Membership Interests......................................12
    **Section 2.2**    Delivery of Funds .......................................................12
    **Section 2.3**    Closing; Closing Deliverables ....................................12
    **Section 2.4**    Deposit Escrow ...........................................................13

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF THE COMPANY.................14

    **Section 3.1**    Due Organization, Good Standing and Power ............14
    **Section 3.2**    Authorization; Enforceability .....................................14
    **Section 3.3**    Capitalization..............................................................14
    **Section 3.4**    No Conflict; Required Filings and Consents ..............15
    **Section 3.5**    Absence of Certain Changes .......................................16
    **Section 3.6**    Compliance with Laws ...............................................16
    **Section 3.7**    Permits .......................................................................16
    **Section 3.8**    Litigation....................................................................16
    **Section 3.9**    Employee Benefit Plans ..............................................16
    **Section 3.10**    Sole Owner .................................................................16
    **Section 3.11**    Tax Matters ................................................................16
    **Section 3.12**    Transactions with Affiliates .......................................18
    **Section 3.13**    Broker's or Finder's Fee ............................................18
    **Section 3.14**    Material Contracts......................................................18
    **Section 3.15**    Environmental Matters................................................18
    **Section 3.16**    Real Property .............................................................18
    **Section 3.17**    Exclusivity of Representations ...................................19

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF SELLER ..............................20

    **Section 4.1**    Due Organization, Good Standing and Power ............20
    **Section 4.2**    Authorization; Enforceability .....................................20
    **Section 4.3**    No Conflict; Required Filings and Consents ..............21
    **Section 4.4**    Ownership of Membership Interests............................21
    **Section 4.5**    Broker's or Finder's Fee ............................................21
    **Section 4.6**    Exclusivity of Representations ...................................21

**ARTICLE V** REPRESENTATIONS AND WARRANTIES OF PURCHASER......................22

    **Section 5.1**    Due Organization, Good Standing and Power ............22
    **Section 5.2**    Authorization; Enforceability .....................................22
    **Section 5.3**    Consents and Approvals .............................................23

30646430

(i)

| | | |
|---|---|---|
| **Section 5.4** | Broker's or Finder's Fee | 23 |
| **Section 5.5** | Financing | 23 |
| **Section 5.6** | Solvency | 23 |
| **Section 5.7** | Litigation | 23 |
| **Section 5.8** | Investment Intent | 24 |
| **Section 5.9** | Investigation by Purchaser; Company's Liability | 24 |
| **Section 5.10** | OFAC | 25 |
| **Section 5.11** | Exclusivity of Representations | 26 |

**ARTICLE VI** COVENANTS ... 26

| | | |
|---|---|---|
| **Section 6.1** | Access to Information Concerning Properties and Records | 26 |
| **Section 6.2** | Confidentiality | 28 |
| **Section 6.3** | Conduct of the Business of the Company Pending the Closing | 28 |
| **Section 6.4** | Reasonable Best Efforts | 29 |
| **Section 6.5** | Indemnity; Directors' and Officers' Insurance; Fiduciary and Employee Benefit Insurance | 29 |
| **Section 6.6** | Public Announcements | 30 |
| **Section 6.7** | Transfer Taxes | 31 |
| **Section 6.8** | Submission for Bankruptcy Court Approval | 31 |
| **Section 6.9** | Use of Proceeds | 32 |
| **Section 6.10** | Competing Bids | 32 |
| **Section 6.11** | Contract Rejections | 34 |
| **Section 6.12** | Support for the Transactions | 34 |
| **Section 6.13** | Negative Covenants | 35 |
| **Section 6.14** | Title Insurance; Survey | 36 |
| **Section 6.15** | Tenant Estoppels | 36 |
| **Section 6.16** | Deliverables | 36 |
| **Section 6.17** | Further Assurances | 37 |

**ARTICLE VII** CONDITIONS PRECEDENT ... 37

| | | |
|---|---|---|
| **Section 7.1** | Conditions to the Obligations of Each Party | 37 |
| **Section 7.2** | Conditions to the Obligations of Purchaser | 38 |
| **Section 7.3** | Conditions to the Obligations of Seller | 38 |
| **Section 7.4** | Frustration of Closing Conditions | 39 |

**ARTICLE VIII** TERMINATION ... 39

| | | |
|---|---|---|
| **Section 8.1** | Consensual Termination | 39 |
| **Section 8.2** | Termination by Purchaser. | 39 |
| **Section 8.3** | Termination by the Company or Seller | 40 |
| **Section 8.4** | Effect of Termination | 41 |

**ARTICLE IX** MISCELLANEOUS ... 42

| | | |
|---|---|---|
| **Section 9.1** | Fees and Expenses | 42 |
| **Section 9.2** | Extension; Waiver | 42 |
| **Section 9.3** | Notices | 42 |
| **Section 9.4** | Entire Agreement | 44 |
| **Section 9.5** | Non-Recourse | 44 |

30646430

(ii)

**Section 9.6**   Binding Effect; Benefit; Assignment .................................................44
**Section 9.7**   Survival .................................................................................................44
**Section 9.8**   Amendment and Modification ..............................................................45
**Section 9.9**   Counterparts .........................................................................................45
**Section 9.10**  Applicable Law .....................................................................................45
**Section 9.11**  Severability ...........................................................................................46
**Section 9.12**  Specific Enforcement ...........................................................................46
**Section 9.13**  Waiver of Jury Trial .............................................................................47
**Section 9.14**  Rules of Construction ...........................................................................47
**Section 9.15**  Interpretation ........................................................................................47
**Section 9.16**  Time of the Essence ..............................................................................49
**Section 9.17**  Control of Attorney-Client and All Other Privileges......................49

**<u>Exhibits</u>**

**Exhibit A – Form of Sale Order**

**Exhibit B – Form of Estoppel Certificate**

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is dated August ___, 2023, by and among SinOceanic I Limited, a limited company organized under the Laws of Bermuda ("**Purchaser**"), PWM Property Management LLC, a limited liability company organized under the Laws of Delaware ("**Seller**"), and 181 West Madison Property LLC, a limited liability company organized under the Laws of Delaware (the "**Company**").

## W I T N E S S E T H:

WHEREAS, the West Madison Debtors (as defined herein) commenced voluntary cases under the Bankruptcy Code in the Bankruptcy Court on October 31, 2021 (the "**Petition Date**") and such cases are being jointly administered for procedural purposes under the lead case *In re PWM Property Management LLC, et al.*, Case No. 21-11445 (MFW) (collectively, the "**Bankruptcy Cases**");

WHEREAS, Seller indirectly owns 100% of the membership interests of 181 West Madison Holding LLC, a limited liability company organized under the Laws of Delaware ("**West Madison Holding**"), such membership interests representing all of the issued and outstanding equity interests of West Madison Holding;

WHEREAS, West Madison Holding directly owns 100% of the membership interests of the Company (the "**Membership Interests**"), such Membership Interests representing all of the issued and outstanding equity interests of the Company;

WHEREAS, Seller desires to, directly or indirectly, sell the Membership Interests, and Purchaser desires to purchase the Membership Interests, on the terms and subject to the conditions set forth herein and in the Plan (as defined herein); and

WHEREAS, it is the intention of the parties hereto that following the entry of the Sale Order finding the Purchaser as the prevailing bidder at the Auction (if any),  upon the consummation of the purchase and sale of the Membership Interests pursuant to this Agreement and the Plan, Purchaser shall own directly all of the issued and outstanding equity interests of the Company, free and clear of any Liens other than Liens created or imposed by Purchaser, or under applicable securities Laws or any Reinstated Indebtedness pursuant to the Plan.

NOW, THEREFORE, in consideration of the premises and of the representations, warranties, covenants and agreements herein contained, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I

### DEFINITIONS

**Section 1.1**    Definitions.  When used in this Agreement, the following terms shall have the respective meanings specified therefor below.

30646430

"**Action**" shall mean any action, hearing, claim (including any cross-claim or counterclaim), charge, demand, litigation, Order, mediation, audit, inquiry, investigation, suit, arbitration or other proceeding, whether civil or criminal, at law or in equity, by or before any Governmental Entity.

"**Affiliate**" of any Person shall mean any Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided, further, that in no event shall M3 Advisory Partners, LP or any of its personnel (including Mohsin Y. Meghji) be considered an Affiliate of the Company.

"**Agreement**" shall have the meaning given to it in the Preamble.

"**Alternative Transaction**" shall mean any transaction with respect to a plan of reorganization or liquidation, dissolution, winding up, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity interests of the Company, or any other restructuring involving the West Madison Debtors without the prior written consent of Purchaser that renders the Transactions or the Plan unable to be consummated on the terms set forth in the Plan and this Agreement.

"**Alternative Transaction Proposal**" shall have the meaning given to it in Section 6.10(e).

"**Auction**" shall have the meaning given to it in Section 6.10(a).

"**Back-Up Bidder**" shall have the meaning given to it in Section 6.10(c).

"**Bankruptcy Cases**" shall have the meaning given to it in the Recitals.

"**Bankruptcy Code**" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as it may be amended from time to time.

"**Bankruptcy Court**" shall have the meaning given to it in the Plan.

"**Bidding Procedures**" shall mean the bidding procedures attached to the Bidding Procedures Order as Schedule 1.

"**Bidding Procedures Order**" shall mean (a) the *Order (I) Modifying Bidding and Auction Procedures Relating to the Submission of Transaction Proposals for 181 West Madison and (II) Granting Related Relief* [Docket No. 1300] approving, among other matters the Bidding Procedures and authorizing the West Madison Debtors to take any and all actions necessary or appropriate to implement the Bidding Procedures, as further modified by the (b) the Order (I) Authorizing Certain Clarifications and Modifications to the West Madison Bidding Procedures and (II) Granting Related Relief [Docket No. 1362].

30646430

"**Business Day**" shall mean any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York.

"**Chief Restructuring Officer**" shall mean Mohsin Y. Meghji.

"**Closing**" shall have the meaning given to it in Section 2.3(a).

"**Closing Date**" shall have the meaning given to it in Section 2.3(a).

"**Code**" shall mean the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated and the rulings issued thereunder.

"**Company**" shall have the meaning given to it in the Preamble.

"**Competing Bid**" shall mean any bid, offer or proposal contemplating an Alternative Transaction.

"**Confidentiality Agreement**" shall have the meaning given to it in Section 6.2.

"**Confirmation Order**" shall mean that certain Order (I) Confirming *Second Amended Joint Chapter 11 Plan of Reorganization of the West Madison Debtors* and (II) Granting *Related Relief* [Docket No. 1296] (i) confirming the Plan pursuant to section 1129 of the Bankruptcy Code and (ii) authorizing the transactions contemplated under this Agreement, including the sale of the Membership Interests under sections 365, 1123 and 1141 of the Bankruptcy Code pursuant to the Plan.

"**Contract**" shall mean any legally enforceable written agreement, contract, indenture, note, bond, loan, lease, license, purchase and sale order, conditional sales contract, mortgage, instrument, or other arrangement or instrument including all amendments and modifications thereto.

"**Contracting Parties**" shall have the meaning given to it in Section 9.5.

"**COVID-19**" shall mean SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof or related or associated epidemics, pandemic or disease outbreaks.

"**Deal Communications**" means all communications (whether before, at or after the Closing and whether in writing, electronic or other form) between internal or external legal counsel and the Seller or any of its Affiliates or any of their respective Representatives that relate in any way to the Transactions or the Bankruptcy Cases that are entitled to any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege.

"**Deposit**" shall have the meaning given to it in Section 2.4(a).

"**Disclosure Schedules**" shall have the meaning given to it in Article III.

"**Due Diligence Materials**" shall have the meaning given to it in Section 5.9.

"**Emergency Event**" means any Order, event, circumstance, development, state of facts, occurrence, change, effect, incident or accident of the type referred to in any of clauses (f), (g), (h), (i) or (j) of the definition of "Material Adverse Effect".

"**Emergency Response**" means any emergency or immediate remedial or protective action taken or determined or committed to be taken by Seller, the Company, West Madison Holding or any of their Affiliates, in their good faith reasonable determination in the best interests of the Company in response to any Emergency Event.

"**End Date**" shall have the meaning given to it in Section 8.1(b)(ii).

"**Environmental Law**" shall mean any Law, Order or other requirement of Law, relating to pollution, public or worker health or safety to the extent public or worker health or safety relates to exposure to hazardous materials, or the protection of the environment.

"**ERISA**" shall have the meaning given to it in Section 3.9.

"**Escrow Agent**" means Citibank, N.A.

"**Estoppel Certificates**" shall have the meaning given to it in Section 6.15.

"**Event**" shall mean any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exhibits**" shall have the meaning given to it in Section 1.3.

"**Final Order**" shall have the meaning given to it in the Plan.

"**Fraud**" shall mean, with respect to any party, an actual and intentional fraud with respect to any material statement in any representation or warranty set forth in Article III, Article IV or Article V (as applicable); provided, however, that such actual and intentional fraud of such party shall only be deemed to exist if, with respect to the Company or the Seller, the individuals listed on Section 1.04 of the Disclosure Schedules, had (a) actual knowledge (as opposed to imputed or constructive knowledge) on the date hereof that such representations and warranties (as qualified by the Disclosure Schedules) were actually and materially breached on the date hereof, (b) the express intention that the other party would rely on such breached representations and warranties to its detriment and (c) the actual intent to deceive a party to this Agreement and to receive a material benefit from such deception.  Under no circumstances shall "Fraud" include any equitable fraud, negligent misrepresentation, promissory fraud, unfair dealings, extra-contractual fraud or any other fraud or torts based on recklessness or negligence.

"**Fundamental Representations**" means the representations and warranties set forth in Section 3.1 (Due Organization, Good Standing and Corporate Power) (other than the last two sentences thereof), Section 3.2 (Authorization; Enforceability), Section 3.3 (Capitalization), Section 3.4(a)(i) (No Conflicts), Section 4.1 (Due Organization, Good Standing and Corporate Power), Section 4.2 (Authorization; Enforceability) and Section 4.4 (Ownership of Membership Interests).

"**GAAP**" shall mean generally accepted accounting principles of the United States of America consistently applied, as in effect from time to time on or prior to the Closing Date.

"**Governmental Entity**" shall mean any domestic or foreign court, arbitral tribunal, administrative agency or commission or other governmental or regulatory agency or authority or any securities exchange, as well as any arbitral body.

"**Indemnified Persons**" shall have the meaning given to it in <u>Section 6.5</u>.

"**Independent Agent**" shall mean Alan J. Carr and Vikram Jindal, in their capacities as independent agents of Seller or West Madison Holding.

"**Knowledge of the Company**" shall have the meaning given to it in <u>Section 1.4</u>.

"**Law**" shall mean any statute, law, code, Order, common law, ordinance, rule or regulation of any Governmental Entity.

"**Liabilities**" shall mean any and all debts, liabilities and obligations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured or determined or determinable.

"**Liens**" shall have the meaning given to it in the Plan.

"**Material Adverse Effect**" shall mean any change, development, effect, event or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of the Company; <u>provided</u>, <u>however</u>, that none of the following events, changes, conditions, circumstances, developments or effects (or the results thereof) shall be deemed to constitute a "Material Adverse Effect" and shall not be taken into account, individually or in the aggregate, in determining whether a Material Adverse Effect has occurred or would be reasonably likely to occur:  (a) the execution, announcement or pendency of this Agreement (including any action or inaction by the customers, suppliers, landlords and employees of the Company and its Affiliates as a result thereof) and compliance with the express provisions of this Agreement or the consummation of the Transactions, including the initiation of litigation or other administrative proceedings by any Person with respect to this Agreement or any of the Transactions, (b) actions or omissions taken or not taken by or on behalf of the Company or any of its Affiliates at the request of, or with the prior written consent of, Purchaser or its Affiliates, (c) actions taken by Purchaser or its Affiliates, (d) failure of the Company or its Affiliates to meet any internal or published projections, forecasts, estimates or predictions (<u>provided</u>, that this <u>clause (d)</u> shall not prevent a determination that any change, event, circumstance or effect underlying such failure has resulted in a Material Adverse Effect, unless such change, event, circumstance or effect is otherwise excepted by this definition), (e) any promulgation or enactment of, change in, implementation of, enforcement or change in interpretation, implementation or enforcement of GAAP or Law, (f) volcanoes, tsunamis, effects of climate change, earthquakes, floods, storms, hurricanes, tornadoes, fires, epidemics, pandemics, disease, outbreak, public health crises or acts of god or natural disasters or man-made disasters, (g) any action required to be taken under any Law or Order or any existing Contract relating to the business of the Company by which the Company (or any of its properties) is bound, (h) disruptions to the energy market or changes in

general economic conditions, currency exchange rates or United States or international securities, currency, debt or equity markets, (i) general trends, events or conditions generally affecting the industry, markets or geographic areas in which the Company operates, including changes in customer, supplier or regulator behavior, (j) local, regional, national or international political or social conditions or any national or international hostilities, acts of terror, cyberterrorism, police action, civil unrest, sabotage, war (whether or not declared) or any escalation or worsening of any such conditions, hostilities or acts, (k) the existence of the Bankruptcy Cases; provided, however, that, in the case of clauses (e), (f), (h), (i), and (j), such events, changes, conditions, circumstances, developments or effects shall be taken into effect in determining whether any such material adverse effect has occurred to the extent that any such events, changes, conditions, circumstances, developments or effects have a material and disproportionate adverse effect on the business of the Company relative to similar businesses, operating in the industry or markets in which the Company operates. For the avoidance of doubt, a "Material Adverse Effect" shall be measured only against past performance of the Company, and not against any forward-looking statement, projections or forecasts of the Company or any other Person.

"**Material Contract**" shall have the meaning given to it in Section 3.14.

"**Membership Interests**" shall have the meaning given to it in the Recitals.

"**Nonparty Affiliates**" shall have the meaning given to it in Section 9.5.

"**Order**" shall mean any judgment, order, injunction, decree, writ, permit or license of any Governmental Entity or any arbitrator.

"**Organizational Documents**" shall mean, with respect to any entity, (a) the certificate or articles of incorporation and the by-laws, the certificate of formation and partnership agreement or operating agreement (as applicable), and (b) any organizational or governing documents comparable to those described in clause (a) as may be applicable to such entity pursuant to any applicable Law.

"**Owned Real Property**" shall have the meaning given to it in Section 3.16.

"**Permits**" shall have the meaning given to it in Section 3.7.

"**Permitted Lien**" shall mean (a) statutory Liens or other Liens arising by operation of law securing payments not yet due or which are being contested in good faith, including Liens of warehousemen, mechanics, suppliers, materialmen and repairmen and for which adequate reserves have been established in accordance with GAAP, (b) Liens for Taxes not yet due and payable or which are being contested in good faith and for which adequate reserves have been established in accordance with GAAP or the nonpayment of which is permitted or required by the Bankruptcy Code where such Lien will be released from the assets of the Company pursuant to the Bankruptcy Code at Closing or otherwise upon the transfer of the Membership Interests pursuant to this Agreement, (c) Liens affecting the real property set forth in Section 3.16(a) or Section 3.16(b), including (i) easements, rights of way, servitudes, permits, licenses, surface leases, ground leases to utilities, municipal agreements, railway siding agreements and other real property rights, (ii) conditions, covenants or other similar restrictions, (iii) easements for streets, alleys, highways, telephone lines, gas pipelines, power lines, railways and other easements and

rights of way of public record on, over or in respect of any such real property, (iv) encroachments and other matters that would be shown in an accurate survey or physical inspection of such real property, (v) all matters which would be reflected on current title reports/commitments and (vi) any other such Liens, including irregularities of title that are non-monetary in nature provided that none of the matters set forth in the foregoing clauses (i) through (v) would reasonably be expected to materially impair the current use of the affected real property, (d) Liens in favor of the lessors under the Real Property Leases or encumbering the interests of the lessors in such real property, (e) zoning, entitlement, building and other land use regulations imposed by Governmental Entities having jurisdiction over any Owned Real Property or any real property leased by the Company, (f) Liens incurred or deposits made in connection with workers' compensation, unemployment insurance or other types of social security, (g) any other Liens not described in clauses (a) through (f) above created by this Agreement or connected with the transactions contemplated hereby or by the actions of Purchaser or any of its Affiliates, (i) Liens that do not materially and adversely interfere with the current operation of the business of the Company, (j) Liens in respect of the Reinstated Indebtedness, (k) Liens established or reinstated pursuant to the Plan, and (l) Liens set forth in Section 1.1(b) of the Disclosure Schedules.

"**Person**" shall mean and include an individual, a partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, a trust, an association, an unincorporated organization, a group and a Governmental Entity or other entity.

"**Plan**" shall mean the *Second Amended Joint Chapter 11 Plan of Reorganization of PWM Property Management LLC and Its Debtor Affiliates* (including the Plan Supplement and all exhibits hereto and thereto) [Docket No. 1296-1], as the same may be amended, modified, supplemented or amended and restated from time to time.

"**Plan Supplement**" shall mean the compilation of documents and forms of documents, schedules, and exhibits to the Plan, filed with the Bankruptcy Court [Docket No. 889], each of which shall be in form and substance materially consistent with the Plan, this Agreement, and otherwise reasonably acceptable to the Company and Purchaser, as may be amended, modified, or supplemented from time to time.

"**Pre-Closing Equityholder Group**" shall mean Seller, each direct and indirect beneficial owner of Seller, and their respective Affiliates or Representatives.

"**Prohibited Person**" shall mean, at any time, (a) any Person that is the subject of any Sanctions administered or enforced by OFAC, the U.S. Department of State, the U.S. Department of Justice, the U.S. Department of Commerce, the United Nations Security Council, or any other relevant Sanctions Authority; (b) any Person operating, organized or resident in a Sanctioned Jurisdiction; (c) any Person owned, directly or indirectly, or controlled by any such Person or Persons described in the foregoing clauses (a) or (b); or (d) any person that is otherwise the subject of Sanctions ("subject of Sanctions" signifying a Person with whom a U.S. Person or person subject to the jurisdiction of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business, or other activities).

"**Purchase Price**" shall mean an amount equal to $2,000,000 taken together with the aggregate amount of Reinstated Indebtedness.

30646430

"**Purchaser**" shall have the meaning given to it in the Preamble.

"**Purchaser Default Termination**" shall have the meaning given to it in Section 2.4(b).

"**Qualified Bid**" shall have the meaning given to it in the Bidding Procedures.

"**Real Property Leases**" shall have the meaning given to it in Section 3.16.

"**Reinstated Indebtedness**" shall mean the West Madison Mortgage Loan (as defined in the Plan) as it may be modified with the consent of the West Madison Mortgage Lender (as defined in the Plan).

"**Rent Roll**" shall have the meaning given to it in Section 3.16(b).

"**Representatives**" of any Person shall mean such Person's directors, managers, officers, employees, agents (including, in the case of the West Madison Debtors, the Independent Agents), attorneys, consultants, advisors or other representatives.

"**Return**" shall mean any returns, statements, forms, reports, declarations, estimates, information statements or disclosures supplied or required to be supplied to a Governmental Entity with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Sale Hearing**" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"**Sale Order**" shall mean the Final Order entered by the Bankruptcy Court authorizing the transactions contemplated under this Agreement, including the sale of the Membership Interests pursuant to the Plan, in each case, in accordance with the terms of this Agreement, substantially in the form of Exhibit A (as modified or amended (i) by the Seller for de minimis or non-substantive changes, (ii) with the written consent of the Seller and Purchaser or (iii) as otherwise agreed to by the Seller and Purchaser on the record at any hearing, including the Sale Hearing, before the Bankruptcy Court).

"**Sanctioned Jurisdiction**" shall mean, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the Crimea region of Ukraine, the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine, Cuba, Iran, North Korea, and Syria).

"**Sanctions**" shall mean (a) economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, the U.S. Department of Justice, the U.S. Department of Commerce or any other U.S. government authority or department; and (b) any other applicable sanctions laws and regulations.

"**Sanctions Authority**" shall mean OFAC, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"), the U.S. Department of Justice, the U.S. Department of

State, or any other Governmental Entity or agency administering laws, regulations, or restrictive measures relating to Sanctions.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Seller**" shall have the meaning given to it in the <u>Preamble</u>.

"**Solvent**" shall mean, with respect to any Person, that (a) the property of such Person, at a present fair saleable valuation, exceeds the sum of its debts (including contingent and unliquidated debts); (b) the present fair saleable value of the property of such Person exceeds the amount that will be required to pay such Person's probable Liability on its existing debts as they become absolute and matured; (c) such Person has adequate capital to carry on its business; and (d) such Person does not intend or believe it will incur debts beyond its ability to pay as such debts mature.  In computing the amount of contingent or unliquidated Liabilities at any time, such Liabilities will be computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become actual or matured Liabilities.

"**Subsidiary**", with respect to any Person, shall mean (a) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more subsidiaries of such Person and (b) any limited liability company, partnership, association, joint venture or other entity in which such Person directly or indirectly through one or more subsidiaries of such Person has more than a fifty percent (50%) equity interest.

"**Superior Proposal**" shall have the meaning given to it in <u>Section 6.10(e)</u>.

"**Superior Transaction**" shall mean a transaction that the Independent Agents determine in good faith, based on the advice of the Seller's financial and legal advisors: (x) would be in the best interests of the Company and its creditors and equity holders as a whole, and (y) would reasonably be expected to be superior to the Company and its creditors and equity holders in comparison to the transactions contemplated under this Agreement and the Plan.

"**Tax**" or "**Taxes**" shall mean (a) all United States federal, state, local, foreign and other taxes, assessments, charges, duties, fees, levies or other governmental charges including all income, franchise, profits, gross receipts, capital gains, capital stock, transfer, sales, use, value added, ad valorem, occupation, property, excise, severance, windfall profits, stamp, license, goods and services, payroll, withholding, social security, and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding), and all estimated taxes, deficiency assessments, additions to tax, penalties and interest with respect thereto and (b) any Taxes of another Person pursuant to Treasury Regulations Section 1.1502-6 (or any analogous or similar state, local, or foreign law), as a transferee or successor, by contract or otherwise.

"**Title Company**" shall mean Old Republic National Title Insurance Company or Royal Abstract.

"**Title Policy**" shall have the meaning given to it in Section 6.14.

"**Transaction Documents**" shall mean this Agreement and any other Contract to be entered into by Purchaser and any other West Madison Debtor, in connection with the Transactions or the Plan.

"**Transactions**" shall mean the transactions contemplated by this Agreement, the Plan and the other Transaction Documents, including the purchase and sale of the Membership Interests.

"**Transfer Taxes**" shall have the meaning given to it in Section 6.7.

"**West Madison Debtors**" shall mean the Seller and the Company.

"**West Madison Sale Effective Date**" shall have the meaning given to it in the Plan.

"**West Madison Holding**" shall have the meaning given to it in the Recitals.

**Section 1.2**    Construction.    In this Agreement, unless the context otherwise requires:

(a)    references in this Agreement to "writing" or comparable expressions include a reference to electronic transmission or comparable means of communication (including electronic mail); provided, that the sender complies with Section 9.3;

(b)    the phrases "delivered" or "made available", when used in this Agreement, shall mean that the information referred to has been physically or electronically delivered to the relevant parties (including, in the case of "made available" to Purchaser, material that has been posted, retained and thereby made available to Purchaser through the on-line "virtual data room" established by the Company and / or its Representatives);

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)    references to Articles, Sections, Exhibits, Schedules, the Preamble and Recitals are references to articles, sections, exhibits, schedules, the preamble and recitals of this Agreement;

(e)    the descriptive headings of the several Articles, Sections and Schedules of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(f)     references to "day" or "days" are to calendar days and whenever any action must be taken under this Agreement on or by a day that is not a Business Day, then that action may be validly taken on or by the next day that is a Business Day;

(g)     the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any provision of this Agreement;

(h)     this "Agreement" or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented;

(i)     "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import;

(j)     references to any Governmental Entity or Law shall mean and include any successor or replacement Governmental Entity or Law to the referenced one;

(k)     the words "ordinary course of business" means acting or refraining from acting in a manner materially consistent with how a similarly situated company in the same industry acting reasonably could reasonably be expected to act or refrain from acting under similar circumstances and reasonably informed by the past practice of the Company (including recent past practice in light of the current pandemic, epidemic or disease outbreak (taking into account any event, change or circumstance, in each case, to the extent related to COVID-19 that occurs following the date of this Agreement), and any action taken or omitted to be taken, that relates to or arises out of such pandemic, epidemic or disease outbreak shall be deemed to be in the "ordinary course of business"); and

(l)     references to "Dollars", "dollars" or "$" without more are to the lawful currency of the United States of America and all payments hereunder shall be made in United States dollars.

**Section 1.3**   Exhibits and Schedules.   The exhibits (the "**Exhibits**") and the schedules to this Agreement are incorporated into and form an integral part of this Agreement.  All Exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  If an Exhibit is a form of agreement, such agreement, when executed and delivered by the parties thereto, shall constitute a document independent of this Agreement.

**Section 1.4**   Knowledge.   When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of the Company**" or words of similar import, it shall mean the current, actual knowledge of Transwestern Commercial Services, LLC and/or the Chief Restructuring Officer, without inquiry or investigation.  Where any representation, warranty or other provision in this Agreement refers to notice or written notice having been delivered or received by the Company, or any of its Affiliates, such representation, warranty or other provision shall be interpreted to include only any notice to the individuals listed in the immediately preceding sentence or any notice of which one

of such individuals has actual knowledge, without any implication that any such Person has made any inquiry or investigation as to the sending or receipt of such notice.

## ARTICLE II

## THE CLOSING

**Section 2.1**    Sale of Membership Interests.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, Seller shall cause West Madison Holding to sell, assign, transfer and deliver to Purchaser at the Closing on the Closing Date, and Purchaser shall purchase from West Madison Holding at the Closing on the Closing Date, the Membership Interests free and clear of all Liens other than Liens created or imposed by Purchaser, or under applicable securities Laws or any Reinstated Indebtedness pursuant to the Plan.

**Section 2.2**    Delivery of Funds.  At the Closing, Purchaser shall pay to Seller or Seller's designee, as paying agent, the Purchase Price, less the Deposit (as defined below), by wire transfer of immediately available funds to the account(s) of Seller specified in writing to Purchaser at least two (2) Business Days prior to the Closing Date; provided, that any delay in the delivery of such wire instructions shall be without prejudice to Seller's rights to receive such amounts, as applicable, which shall promptly be paid upon the later of the Closing Date and the receipt of such account notification.

**Section 2.3**    Closing; Closing Deliverables.  (a) Unless this Agreement shall have been terminated and the transactions contemplated hereby shall have been abandoned pursuant to Article VIII, and subject to the satisfaction or waiver (to the extent such waiver is permitted by applicable Law) of all of the conditions set forth in Article VII, the closing of the sale of Membership Interests (the "**Closing**") shall take place at 10:00 A.M. at the offices of White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020-1095 or by electronic transmittal of executed documents, as soon as practicable, but in any event, within three (3) Business Days after the last of the conditions set forth in Article VII is satisfied or waived (to the extent such waiver is permitted by applicable Law), other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions, or at such other date, time or place as the Contracting Parties shall agree in writing; provided, however, that the Closing shall take place on or before August 31, 2023, unless such date is extended by the written consent of the Seller and Purchaser.  Such date is herein referred to as the "**Closing Date**".

(b)    At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following:

(i)    an instrument of assignment, in form reasonably satisfactory to Purchaser and Seller, duly executed by an authorized officer of West Madison Holding, assigning and transferring the Membership Interests to Purchaser;

(ii)    a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the effect that the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied;

30646430

-12-

(iii)    customary forms of lien affidavits and transfer forms and such other documents or affidavits as may be reasonably required by the Title Company to issue the Title Policy with extended coverage, deletion of the exception for mechanic's and materialmen's liens, and deletion of any general exceptions; provided, however, that, except with respect to a customary gap indemnity for a duration of not greater than thirty (30) days, in no event shall the Seller be required to provide any indemnities to Purchaser or the Title Company hereby;

(iv)    a properly executed IRS Form W-9 from the Seller (or, if the Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner for such purposes); and

(v)    the mortgage loan modification agreement modifying the Reinstated Indebtedness in form and substance acceptable to West Madison Mortgage Lender and Purchaser (the "**Loan Modification Agreement**").

(c)    At the Closing, Purchaser shall deliver to Seller a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the effect that the conditions set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u> have been satisfied.

**Section 2.4**    <u>Deposit Escrow</u>.

(a)    Concurrently with the execution of this Agreement, Purchaser has deposited into a deposit escrow account with the Escrow Agent an amount equal to $2,000,000 (such amount, the "**<u>Deposit</u>**") by wire transfer of immediately available funds.

(b)    Seller shall give written instruction to the Escrow Agent to release the Deposit to Seller upon the earliest to occur of (i) the Closing, or (ii) two (2) Business Days following the termination of this Agreement by (A) Seller or the Company pursuant to <u>Section 8.3(a)</u> or <u>Section 8.3(e)</u> or (B) the Purchaser, the Company or Seller for any reason at a time when Seller or the Company could have terminated this Agreement pursuant to <u>Section 8.3(a)</u> or <u>Section 8.3(e)</u> (any such termination described in the foregoing <u>clause (ii)(A)</u> or <u>(ii)(B)</u>, a "**<u>Purchaser Default Termination</u>**").

(c)    If this Agreement or the Transactions are terminated other than for a termination which constitutes a Purchaser Default Termination, Seller shall provide written instructions to the Escrow Agent to, within two (2) Business Days after such instruction, return to the Purchaser the Deposit by wire transfer of immediately available funds.

(d)    Each of the parties hereto acknowledges that the Deposit is not intended to be a penalty but rather constitutes liquidated damages in a reasonable amount that will compensate the Company in the circumstances in which such Deposit is paid for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

30646430

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the disclosure schedule delivered by the Seller to Purchaser (the "**Disclosure Schedules**") concurrently with the execution of this Agreement, the Company hereby represents and warrants to Purchaser as follows:

**Section 3.1** <u>Due Organization, Good Standing and Power</u>. The Company is a limited liability company duly organized and validly existing under the Laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted. The Company is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so qualified or licensed and in good standing (or the equivalent thereof) would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. The Company has delivered prior to the date of this Agreement to the Purchaser copies of Organizational Documents, in each case, as amended and in full force and effect as of the date of this Agreement. The Company is not in material violation of any of the provisions of its Organizational Documents.

**Section 3.2** <u>Authorization; Enforceability</u>. Subject to the applicable provisions of the Bankruptcy Code and the entry and effectiveness of the Sale Order, the Company has the requisite power and authority and has taken all action necessary to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. Subject to the applicable provisions of the Bankruptcy Code and the entry and effectiveness of the Confirmation Order and the Sale Order, the execution, delivery and performance of this Agreement by the Company, the consummation by the Company of the transactions contemplated hereby, and the performance by the Company of its obligations hereunder, have been duly authorized. No other proceedings on the part of the Company are necessary to authorize the execution, delivery or performance of this Agreement by the Company or to consummate the transactions contemplated hereby, subject to the entry and effectiveness of the Sale Order. Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly executed and delivered by the Company and, assuming due execution and delivery by other Contracting Parties, this Agreement constitutes a valid and binding obligation of the Company, enforceable by and against the Company in accordance with its terms, except to the extent that its enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (regardless of whether considered in a proceeding in equity or at law). For the purposes of this <u>Section 3.2</u>, references to the "Agreement" shall mean the Agreement and any ancillary agreements hereto.

**Section 3.3** <u>Capitalization</u>. (a) All issued and outstanding Membership Interests, have been duly authorized and validly issued and are fully paid, and, except pursuant to the Organizational Documents of the Company, are not subject to any preemptive rights, subscription rights, rights of first refusal, options, or any Liens (other than under securities Laws) or any Reinstated Indebtedness pursuant to the Plan, and have been issued in compliance with

30646430

-14-

applicable securities Laws or exemptions therefrom.  Except as set forth in this Agreement, as of the date of this Agreement, no equity interests or other equity securities or phantom equity securities of the Company are issued, reserved for issuance or outstanding.  Except as described in this <u>Section 3.3</u>, the Company is not a party to any outstanding option, warrant, call, convertible or exchangeable securities, "phantom stock" rights, stock appreciation rights, stock-based performance units, other equity-based compensation awards, subscription or other right (including any preemptive right), agreement or commitment which obligates the Company to issue, sell or transfer, or repurchase, redeem or otherwise acquire, any of the equity interests in the Company. Except pursuant to the Organizational Documents of the Company, there are no voting trusts or other binding agreements or binding understandings with respect to the voting of the equity securities of the Company and the Company is not party to or bound by any stockholders agreement, registration rights agreement or other similar agreement or understanding.

(b)    The Company has no Subsidiaries nor  does it own, directly or indirectly, beneficially or of record, any equity interest, or any instrument which is exercisable for, convertible into or exchangeable for an equity interest, in any Person.

**Section 3.4**    <u>No Conflict; Required Filings and Consents</u>.

(a)    Assuming the truth and accuracy of the representations and warranties of Purchaser set forth in <u>Section 5.3</u> and except as set forth in <u>Section 3.4(a)</u> of the Disclosure Schedules or to the extent excused by or unenforceable as a result of the filing of the Bankruptcy Cases, subject to the entry and effectiveness of the Sale Order by the Bankruptcy Court, the execution, delivery and performance by the Company of this Agreement and all other instruments and agreements to be delivered by the Company as contemplated hereby to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not:

(i)    conflict with any provision of the Organizational Documents of the Company, as amended to the date of this Agreement;

(ii)    conflict with or violate any Law or Order currently in effect applicable to the Company or any of its assets or properties; or

(iii)    conflict with or result in a breach of, or default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give rise to any rights of termination, payment, amendment, modification, or result in the creation of any Lien on any of the assets or properties of the Company pursuant to, any Material Contract;

except, in the case of <u>clauses (ii)</u> or <u>(iii)</u>, for any such conflict, violation, breach or default that would not reasonably be expected to be, individually or in the aggregate, material to the Company.

(b)    Assuming the truth and accuracy of the representations and warranties of Purchaser set forth in <u>Section 5.3</u>, the Company is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of, or with any Governmental Entity in connection with, the execution and delivery of this Agreement and all other instruments and agreements to be delivered by the Company or the consummation by the Company of the transactions contemplated hereby and thereby or in order to prevent the termination of any right,

30646430

privilege, license or qualification of the Company, except (i) for such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (ii) the entry and effectiveness of the Sale Order by the Bankruptcy Court or (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would reasonably be expected to be, individually or in the aggregate, material to the Company.

Section 3.5    Absence of Certain Changes.  Except as set forth on Section 3.5 of the Disclosure Schedules or which would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, during the period from the Petition Date to the date of this Agreement, there has not occurred a Material Adverse Effect.

Section 3.6    Compliance with Laws.  For the past twelve (12) months, (i) the business and operations of the Company have not been and are not currently being conducted in violation of any Law or Order applicable to the Company and (ii) the Company is not in receipt of any written notice with respect to any failure to comply with any provision of applicable Law, in each case, except as set forth on Section 3.6 of the Disclosure Schedules or for violations or failure that have not been and would not be reasonably likely to be, individually or in the aggregate, a Material Adverse Effect.

Section 3.7    Permits.  To the Knowledge of  the Company, the Company holds all federal, state, local and foreign permits, approvals, licenses, authorizations, registrations, accreditations, certificates, rights, exemptions and Orders from Governmental Entities (collectively, the "**Permits**") that are necessary for the operation of the business of the Company as presently conducted, or that are necessary for the lawful ownership of their respective properties and assets except to the extent that any such failure to hold Permits or any such default would not reasonably be expected to be material to the Company.  The Company is in compliance, in all material respects, with the terms and conditions of such Permits, all of which are in full force and effect in all material respects.  There is not any material Action pending or, to the Knowledge of the Company, threatened against the Company seeking to revoke, suspend, or otherwise limit any such Permit.

Section 3.8    Litigation.  Except (i) as set forth on Section 3.8 of the Disclosure Schedules or (ii) in connection with the Bankruptcy Cases, as of the date hereof there is no, and for the past two (2) years, there has not been any material Action by or before any Governmental Entity, pending, or, to the Knowledge of the Company, threatened in writing, against the Company or any of its assets.  Neither the Company nor any of its assets or properties is subject to any material Order other than any Order entered in connection with the Bankruptcy Cases.

Section 3.9    Employee Benefit Plans.  The Company does not currently have, and since the Petition Date has not had, any employees.

Section 3.10    Sole Owner.  The Company is the sole owner of the Owned Real Property.

Section 3.11    Tax Matters.

(a)    Tax Returns.  The Company has filed or caused to be filed all material Returns that are required to be filed by, or with respect to, the Company (taking into account any

30646430

applicable extension of time within which to file), and all such Returns are true, correct and complete in all material respects.

(b)   <u>Payment of Taxes</u>.  All material Taxes and Tax Liabilities of the Company that are due and payable have been paid.

(c)   <u>Tax Returns; Payment of Taxes of West Madison Holding</u>.  West Madison Holding is the owner of the Company for U.S. federal and applicable state and  local income tax purposes, and West Madison Holding has paid all material Taxes required to be paid by it (to the extent such Tax Liabilities have not been, and will not be, discharged in bankruptcy), filed all material Returns required to be filed by it and those Returns are true, correct and complete in all material respects.

(d)   <u>Other Tax Matters</u>. Except as would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect:

(i)   The Company is not currently the subject of an audit or other examination relating to the payment of Taxes of the Company by the tax authorities of any nation, state or locality nor has the Company received any written notices from any taxing authority that such an audit or examination is contemplated or pending.

(ii)   The Company (A) has not entered into a written agreement or waiver extending any statute of limitations relating to the payment or collection of Taxes of the Company that has not expired and (B) is not presently contesting any Tax Liability of the Company before any court, tribunal or agency.

(iii)   All Taxes that the Company is (or was) required by Law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, member or other third party have been duly withheld or collected, and have been paid over to the proper authorities in compliance with all Tax withholding and remitting provisions of applicable Laws to the extent due and payable.

(iv)   No tax authority in a jurisdiction where the Company does not file Returns or pays Taxes has asserted in writing that the Company is or may be required to pay Taxes to or file Returns with that tax authority.

(v)   The Company is not subject to any contract or agreement relating to the sharing, allocation or payment of, or indemnity for, any Taxes.

(vi)   The Company has been from formation an entity that is disregarded as separate from its owner for U.S. federal, state and local tax purposes.

(e)   Notwithstanding any provision in this Agreement to the contrary, (i) the representations and warranties set forth above in this <u>Section 3.11</u> shall constitute the sole and exclusive representations and warranties made by the Company with respect to Taxes, and no other representation or warranty contained in any other section of this Agreement shall be deemed to be made with respect to Taxes, and (ii) the Company makes no representation or warranty with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating

loss, net operating loss carryforward, capital loss carryforward, basis amount or other Tax attributes of the Company.

**Section 3.12**   Transactions with Affiliates.  Except as set forth on Section 3.12 of the Disclosure Schedules, to the Knowledge of the Company, none of the shareholders, members, managers, directors, or officers of any member of the Company (a) is party to any Material Contract with the Company (other than (i) employment arrangements entered into in the ordinary course of business and (ii) any agreement or transaction which is on terms no less favorable to the Company as would reasonably be expected to be obtained by the Company at the time in a comparable arm's length transaction with a Person not affiliated with the Company), or (b) owns any property or right, tangible or intangible, that is material and used by the Company.

**Section 3.13**   Broker's or Finder's Fee.  No agent, broker, Person or firm acting on behalf of the Company is, or shall be, entitled to any broker's fees, finder's fees or commissions from the Company or any of the other Contracting Parties in connection with this Agreement or any of the transactions contemplated hereby.  There are no leasing commissions which are or may become due or owing with respect to the Real Property Leases (as hereinafter defined) or otherwise which will not have been paid prior to Closing.

**Section 3.14**   Material Contracts.  Section 3.14 of the Disclosure Schedules contains a list, as of the date of this Agreement, of the following Contracts (each Contract of the following types, a "**Material Contract**") to which the Company is party: (a) all Contracts or binding options to sell or lease (as lessor) any property or asset of the Company for an amount in excess of $500,000 over any one-year period (other than the Real Property Leases), (b) all Contracts (other than purchase orders entered into in the ordinary course of business) pursuant to which the Company has agreed to acquire or lease any property or asset for an amount in excess of $500,000 over any one-year period, and (c) all material partnership or joint venture or profit sharing agreements to which the Company is a party.  Neither the Company nor, to the Knowledge of the Company, any other party to such Material Contract, is in default, in any material respect, under any Material Contract.  Except as contemplated by the Plan, to the Knowledge of the Company, no party to any Material Contract has exercised any termination rights with respect thereto.

**Section 3.15**   Environmental Matters.  Except as would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company is and has been for the past three (3) years in compliance with all applicable Environmental Laws, and have obtained, and are in compliance with, all Permits required under applicable Environmental Laws in connection with the operation of the Company's properties, assets and business, and (ii) there are no written Actions pending or, to the Knowledge of the Company, threatened in writing against the Company relating to Environmental Law (including in connection with the present operation of its business, properties or assets), nor has the Company  received any other unresolved written notice of any violation of, or Liability under any Environmental Law.

**Section 3.16**   Real Property.

(a)   Section 3.16(a) of the Disclosure Schedules sets forth a list of the addresses of all real property owned or used by the Company (the "**Owned Real Property**").  Section 3.16(a)

30646430

of the Disclosure Schedules contains a list as of the date of this Agreement of all material leases of real property to which the Company is a party (as lessee, sublessee, or lessor) (collectively, the "**Real Property Leases**").  There have been no amendments, modifications or supplements to the Real Property Leases, except as set forth on Section 3.16(a) of the Disclosure Schedules.  Except as would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, the Company is not in default under any such Real Property Lease.  To the Knowledge of the Company, except as disclosed by the Rent Roll or in Section 3.16(a) of the Disclosure Schedules, no tenant under any Real Property Lease is in default under any such Real Property Lease that would be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

(b)    The rent roll set forth on Section 3.16(b) of the Disclosure Schedules (the "**Rent Roll**") is a true, correct and complete copy of the rent roll utilized by the Company in the ordinary course of business as of the date hereof.

(c)    Except as set forth in the Rent Roll, none of the Owned Real Property is subject to any option, lease, license, sublease or other occupancy agreement granting to any third party and right to use, occupy or enjoy any portion of the Owned Real Property or to obtain title to any portion of the Owned Real Property.

(d)    Since the Petition Date, no condemnation, requisition or taking by any public authority is pending nor has been threatened in writing, and, since the Petition Date, the Company has not received any written notice of any such condemnation, requisition or taking by a Governmental Entity, with respect to any part of the Owned Real Property.  Except as set forth in Section 3.16(d) of the Disclosure Schedules, there are no tax reduction proceedings in progress with respect to the Owned Real Property.

(e)    The Rent Roll describes all security deposits (including letters of credit) made by tenants under Real Property Leases.

(f)    Except as may be otherwise disclosed on the Rent Roll: (i) each tenant is now in possession of the premises under its Real Property Lease; and (ii) there are no arrearages of rent or any additional rent payable by any tenant in excess of one (1) month, except as set forth on the Rent Roll.

Section 3.17    Exclusivity of Representations.  Notwithstanding anything to the contrary herein to the contrary, it is the explicit intent of the Contracting Parties, and the Contracting Parties hereby agree, that the representations and warranties made by the Company in this Article III (as qualified by the Disclosure Schedules hereto) and in any certificate delivered at Closing are the exclusive representations and warranties made by the Company or any other Person (other than the representations and warranties of the Seller in accordance with Article IV, or as may be set forth in any ancillary agreement hereto) with respect to the Company, including the businesses and assets of each of them, or the subject matter of this Agreement.  The Company hereby disclaims any other express or implied representations or warranties made by any Person with respect to itself, the businesses and assets of the Company, the Membership Interests and the transactions contemplated by this Agreement and any certificate, instrument or document delivered pursuant hereto.  Except as expressly set forth herein or in any certificate delivered at

Closing, the condition of the assets of the Company shall be "as is", "where is" and "with all faults" and the Company makes no warranty of merchantability, suitability, adequacy, fitness for a particular purpose or quality with respect to the businesses and any of the assets of the Company or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  Except for the representations and warranties contained in this Article III or in any certificate delivered at Closing, the Company is not, directly or indirectly, and no other Person on behalf of the Company is, making any representations or warranties regarding any *pro-forma* financial information, financial projections or other forward-looking prospects, risks or statements (financial or otherwise) of the Company made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or their respective Representatives (including any opinion, information, projection or advice in any management presentation or the confidential information memorandum provided to Purchaser and its Affiliates and their respective Representatives), and the Company hereby disclaims all Liability and responsibility for any such information and statements.  It is understood that any Due Diligence Materials made available to Purchaser or its Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of the Company or its Affiliates or their respective Representatives.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth on the Disclosure Schedules delivered in connection with this Agreement, Seller hereby represents and warrants to Purchaser as follows:

**Section 4.1**    Due Organization, Good Standing and Power.  Seller is a limited liability company duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of the State of Delaware and has all requisite power and authority to indirectly own the Membership Interests. Seller is not in violation of any of the provisions of its Organizational Documents except as would not be reasonably likely to have, individually or in the aggregate, a material adverse effect on the ability of Seller to consummate the transactions contemplated hereby.

**Section 4.2**    Authorization; Enforceability.  Seller has, subject to the entry of and the Sale Order, the requisite power and authority and has taken all action necessary to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.  Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement by Seller, the consummation by Seller of the transactions contemplated hereby and the performance by Seller of its obligations hereunder, have been duly authorized.  No other partnership proceedings on the part of Seller are necessary to authorize the execution, delivery or performance of this Agreement by Seller or to consummate the transactions contemplated hereby.  Subject to the entry of the Sale Order, this Agreement has been duly executed and delivered by Seller and, assuming due execution and delivery by the other Contracting Parties, this Agreement constitutes a valid and binding obligation of Seller, enforceable by and against Seller in accordance with its respective terms, except to the extent that its enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general

equitable principles (regardless of whether considered in a proceeding in equity or at law).  For the purposes of this <u>Section 4.2</u>, references to the "Agreement" shall mean the Agreement and any ancillary agreements hereto.

Section 4.3    <u>No Conflict; Required Filings and Consents</u>.  Assuming the truth and accuracy of the representations and warranties of Purchaser set forth in <u>Section 5.3</u>, subject to the entry and effectiveness of the Sale Order by the Bankruptcy Court and except as set forth in <u>Section 4.3(a)</u> of the Disclosure Schedules, the execution, delivery and performance by Seller of this Agreement and all other instruments and agreements to be delivered by Seller as contemplated hereby and the consummation of the transactions contemplated hereby and thereby do not and will not:

(i)    conflict with any provision of the Organizational Documents of Seller, as amended to the date of this Agreement;

(ii)    conflict with or violate any Law currently in effect applicable to Seller; or

(iii)    conflict with or result in a breach of, or default under, any material Contract of Seller;

except, in the case of <u>clauses (ii)</u> or <u>(iii)</u>, for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Seller's ability to consummate the transactions contemplated hereby.

Section 4.4    <u>Ownership of Membership Interests</u>.    Seller indirectly owns beneficially and of record all of the membership interests of West Madison Holding. West Madison Holding owns beneficially and of record all of the Membership Interests, free and clear of all Liens, other than restrictions on transfer under applicable securities Laws.

Section 4.5    <u>Broker's or Finder's Fee</u>.  No agent, broker, Person or firm acting on behalf of Seller is, or shall be, entitled to any broker's fees, finder's fees or commissions from Seller or any of the other Contracting Parties in connection with this Agreement or any of the transactions contemplated hereby.

Section 4.6    <u>Exclusivity of Representations</u>.  Notwithstanding anything to the contrary herein to the contrary, it is the explicit intent of the Contracting Parties, and the Contracting Parties hereby agree, that the representations and warranties made by Seller in this <u>Article IV</u> (as qualified by the Disclosure Schedules hereto) are the exclusive representations and warranties made by Seller or any other Person (other than the Company in accordance with <u>Article III</u>) with respect to Seller or any of its Affiliates or their respective Representatives, including the businesses and assets of each of them, or the subject matter of this Agreement.  Seller hereby disclaims any other express or implied representations or warranties made by any Person with respect to itself or any of its Affiliates or their respective Representatives.  Except as expressly set forth in <u>Article III</u>, the condition of the assets of the Company shall be "as is", "where is" and "with all faults" and Seller and its Affiliates make no warranty of merchantability, suitability, adequacy, fitness for a particular purpose or quality with respect to the businesses and any of the assets of the Company or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  Seller and its Affiliates are not, directly or indirectly, making

any representations or warranties regarding any *pro-forma* financial information, financial projections or other forward-looking prospects, risks or statements (financial or otherwise) of the Company made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or their respective Representatives (including any opinion, information, projection or advice in any management presentation or the confidential information memorandum provided Purchaser, its Affiliates and their respective Representatives), and Seller and its Affiliates hereby disclaims all Liability and responsibility for any such information and statements.  It is understood that any Due Diligence Materials made available to Purchaser or its Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of Seller or its Affiliates or their respective Representatives.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

**Section 5.1**    Due Organization, Good Standing and Power.  Purchaser is a limited company duly organized and validly existing under the Laws of the jurisdiction in which it is organized and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  Purchaser is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed and in good standing would not be reasonably likely to have, individually or in the aggregate, a material adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby.  Purchaser is not in violation of any of the provisions of its Organizational Documents except as would not would not be reasonably likely to have, individually or in the aggregate, a material and adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby.

**Section 5.2**    Authorization; Enforceability.  Purchaser has the requisite power and authority and has taken all action necessary to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby and the performance by Purchaser of its obligations hereunder have been duly authorized.  No other proceedings on the part of Purchaser are necessary to authorize the execution, delivery or performance of this Agreement by Purchaser or to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Purchaser and, assuming due execution and delivery by each of the other Contracting Parties, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except to the extent that its enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (regardless of whether considered in a proceeding in equity or at law).  For the purposes of this Section 5.2, references to the "Agreement" shall mean the Agreement and any ancillary agreements hereto.

30646430

**Section 5.3**    Consents and Approvals.  Assuming the truth and accuracy of the representations and warranties of the Company set forth in Section 3.4 and Seller set forth in Section 4.3, the entry and effectiveness of the Sale Order by the Bankruptcy Court, the execution, delivery and performance by Purchaser of this Agreement and all other instruments and agreements to be delivered by Purchaser as contemplated hereby and the consummation of the transactions contemplated hereby and thereby do not and will not:

> (i)    conflict with the Organizational Documents of Purchaser, in each case, as amended to the date of this Agreement;

> (ii)    conflict with or violate any Law currently in effect applicable to Purchaser; or

> (iii)    conflict with, result in a breach of, or default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give rise to any rights of termination, payment, amendment, modification, or result in the creation of any Lien on any property or asset of the Purchaser pursuant to,  any Contract to which the Purchaser is a party or otherwise bound;

except, in the case of clauses (ii) or (iii), for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a material and adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

**Section 5.4**    Broker's or Finder's Fee.  No agent, broker, Person or firm acting on behalf of Purchaser is, or shall be, entitled to any fee, commission or broker's or finder's fees in connection with this Agreement or any of the transactions contemplated hereby from any of the other Contracting Parties or from any Affiliate of the other Contracting Parties.

**Section 5.5**    Financing.  Purchaser has, and will have on the Closing Date, sufficient funds available to consummate the transactions contemplated hereby, including to pay the Purchase Price and amounts payable with respect to the Reinstated Indebtedness pursuant to Section 2.2.  Purchaser does not know of any circumstance or condition that could reasonably be expected to prevent or materially delay the availability of such funds at Closing.  In no event shall the receipt or availability of any funds or financing by Purchaser or any of its Affiliates or any other financing or other transactions be a condition to any of Purchaser's obligations under this Agreement.

**Section 5.6**    Solvency.  Purchaser is not entering the transactions contemplated hereby with actual intent to hinder, delay or defraud either present or future creditors.  Immediately after giving effect to the transactions contemplated hereby, the Company will be Solvent.  Assuming the truth and accuracy of the representations and warranties set forth in Article III and Article IV, immediately after giving effect to the transactions contemplated by this Agreement, the Company will have adequate capital to carry on its business.

**Section 5.7**    Litigation.  There is no Action pending or threatened in writing against or affecting Purchaser, or any of its properties or rights with respect to the transactions contemplated hereby.

30646430

-23-

**Section 5.8**    <u>Investment Intent</u>.  (a) Purchaser is acquiring the Membership Interests for its own account, for investment purposes only and not with a view toward, or for sale in connection with, any distribution thereof, nor with any present intention of distributions or selling the Membership Interests in violation of the federal securities Laws or any applicable foreign or state securities Law.

(b)    Purchaser qualifies as an "accredited investor", as such term is defined in Rule 501(a) promulgated pursuant to the Securities Act.

(c)    Purchaser understands that the acquisition of the Membership Interests to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Purchaser and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement, and Purchaser can bear the economic risk of its investment (which may be for an indefinite period) and has such knowledge and experience in financial or business matters that Purchaser is capable of evaluating the merits and risks of its investment in the Membership Interests to be acquired by it pursuant to the transactions contemplated hereby.

(d)    Purchaser understands that the Membership Interests to be acquired by it pursuant to this Agreement have not been registered under the Securities Act.  Purchaser acknowledges that such securities may not be transferred, sold, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any other provision of applicable state securities Laws or pursuant to an applicable exemption therefrom.  Purchaser acknowledges that there is no public market for the Membership Interests and that there can be no assurance that a public market will develop.

**Section 5.9**    <u>Investigation by Purchaser; Company's Liability</u>.  Purchaser has conducted its own independent investigation, verification, review and analysis of the business, operations, assets, Liabilities, results of operations, financial condition, technology and prospects of the Company, which investigation, verification, review and analysis was conducted by Purchaser and its Affiliates and, to the extent Purchaser deemed appropriate, by Purchaser's Representatives.  Purchaser acknowledges that it and its Representatives have been provided adequate access to the personnel, properties, premises and records of the Company and the audit work papers of the Company's auditors for such purpose.  In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned investigation, verification, review and analysis and not on any factual representation, warranty, inducement, promise, understanding, condition or opinion of the Company or any of its Affiliates or their respective Representatives (except the specific representations and warranties of the Company and Seller set forth in <u>Article III</u> and <u>Article IV</u>, respectively), and Purchaser acknowledges and agrees, to the fullest extent permitted by Law, that:

(a)    none of the Company or any of its directors, officers, equityholders, members, employees, Affiliates, controlling Persons, agents, advisors or Representatives or any other Person makes or has made any oral or written representation or warranty, either express or implied, as to the accuracy or completeness of (i) any of the information set forth in management presentations relating to the Company made available to Purchaser, its Affiliates or its Representatives, in materials made available in any "data room" (virtual or otherwise), including

any cost estimates delivered or made available, financial projections or other projections, in presentations by the management of the Company, in "break-out" discussions, in responses to questions submitted by or on behalf of Purchaser, its Affiliates or its Representatives, whether orally or in writing, in materials prepared by or on behalf of the Company, or in any other form (such information, collectively, "**Due Diligence Materials**"), or (ii) any information delivered or made available pursuant to <u>Section 6.1(a)</u>, or (iii) the *pro-forma* financial information, projections or other forward-looking statements of the Company, in each case in expectation or furtherance of the transactions contemplated by this Agreement;

(b)    none of the Company or any of its directors, officers, employees, equityholders, members, Affiliates, controlling Persons, agents, advisors, Representatives or any other Person shall have any Liability or responsibility whatsoever to Purchaser or its directors, officers, employees, Affiliates, controlling Persons, agents or Representatives on any basis (including in contract, tort or equity, under federal or state securities Laws or otherwise) based upon any information provided or made available, or statements made (including set forth in management summaries relating to the Company provided to Purchaser, in materials furnished in the Company's data site (virtual or otherwise), in presentations by the Company's management or otherwise), to Purchaser or its directors, officers, employees, Affiliates, controlling Persons, advisors, agents or Representatives (or any omissions therefrom);

(c)    without limiting the generality of the foregoing, the Company makes no representation or warranty regarding any third-party beneficiary rights or other rights which Purchaser might claim under any studies, reports, tests or analyses prepared by any third parties for the Company or any of its Affiliates, even if the same were made available for review by Purchaser or its Representatives; and

(d)    without limiting the generality of the forgoing, Purchaser expressly acknowledges and agrees that none of the documents, information or other materials provided to them at any time or in any format by the Company or any of its Affiliates or Representatives constitute legal advice, and Purchaser (i) waives all rights to assert that it received any legal advice from the Company, any of its Affiliates, or any of their respective Representatives or counsel, or that it had any sort of attorney-client relationship with any of such Persons, and (ii) agrees to indemnify and hold harmless the Company, its Affiliates (including Seller), and each of their respective Representatives and counsel against any such assertion made by or on behalf of any of Purchaser's Affiliates.

**Section 5.10**  <u>OFAC</u>.    Neither Purchaser nor any of its Affiliates, nor to Purchaser's knowledge, any of their respective agents acting in any capacity in connection with the transactions contemplated by this Agreement, is or will be (a) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (b) engaging in certain dealings with countries and organizations designated under section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (c) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (d) a foreign shell bank or any person that a financial institution

would be prohibited from transacting with under the USA PATRIOT Act; or (e) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (i) any U.S. anti-money laundering law, (ii) the Foreign Corrupt Practices Act, (iii) the U.S. mail and wire fraud statutes, (iv) the Travel Act, (v) any similar or successor statutes, or (vi) any regulations promulgated under the foregoing statutes.

Section 5.11    Exclusivity of Representations.  The representations and warranties made by Purchaser in this Article V are the exclusive representations and warranties made by Purchaser.  Seller acknowledges that Purchaser hereby disclaims any other express or implied representations or warranties with respect to itself.

## ARTICLE VI

## COVENANTS

Section 6.1    Access to Information Concerning Properties and Records.  (a) During the period commencing on the date of this Agreement and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is terminated pursuant to Section 8.1, Section 8.2 or Section 8.3, the Company shall, upon reasonable prior notice and advanced written consent of Seller (such consent not to be unreasonably withheld, conditioned or delayed), afford Purchaser and its Representatives, reasonable access during normal business hours to the officers, directors, employees, accountants, properties, books and records of the Company; provided, that (x) such access shall not unreasonably disrupt the operations of the Company (including with respect to the Bankruptcy Case) and (y) no such access shall be permitted other than in the presence of Seller or one of its Representatives.  Notwithstanding anything to the contrary contained in this Agreement, the Company may restrict the foregoing access and shall not be required to (A) provide any information or access that the Company reasonably believes could violate applicable Law, including data protection Laws, rules or regulations or the terms of any applicable agreement (including confidentiality obligations) or cause forfeiture of attorney/client privilege or an attorney work-product privilege (the "**Disclosure Limitations**"), (B) provide any information relating to the sale process, bids received from other Persons in connection with the transactions contemplated by this Agreement and information and analysis (including financial analysis) relating to such bids or (C) conduct, or permit Purchaser or any of its Representatives to conduct, any Phase I or II environmental site assessment or investigation, or other environmental sampling relating to any real property owned by or leased to the Company.  Purchaser acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, all documents, materials, communications, analyses and other information relating to the sale process, bids received from Purchaser and other Persons in connection with the transactions contemplated by this Agreement that are in the possession of Seller or the Company as of the date of this Agreement and through the Closing will be transferred to Seller prior to, or as of, the Closing and Seller shall not be required to grant access to such documents, materials and other information to Purchaser or any of its Affiliates at any time.

(b)    Purchaser acknowledges and agrees that: (i) nothing contained in this Agreement shall be construed to give to Purchaser, directly or indirectly, rights to control or direct the Company's operations prior to the Closing, (ii) prior to the Closing, the Company shall

30646430

exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of its operations and (iii) notwithstanding anything to the contrary set forth herein, no consent of Purchaser (or request thereof) shall be required with respect to any matter set forth in Section 6.3 or elsewhere in this Agreement to the extent the requirement of such consent would, upon the reasonable advice of the Company's counsel, violate any Law or the requirements of any Governmental Entity, or violate any Contract to which the Company is a party.

(c)      Purchaser hereby agrees that it is not authorized to and shall not (and shall not permit any of its employees, counsel, accountants, consultants, financing sources and other authorized Representatives to) contact any competitor, supplier, distributor, customer, tenant, agent or Representative of the Company prior to the Closing with respect to the Company, it business, operations, assets, employees or the transactions contemplated by this Agreement or any ancillary agreements hereto, without the prior written consent of the Company (such consent not to be unreasonably withheld, conditioned or delayed).

(d)      From and after the Closing, for a period of seven (7) years following the Closing Date, Purchaser will upon reasonable prior notice and advanced written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), afford the Seller (or its successor) and its Representatives, reasonable access (at the Seller's sole expense) during normal business hours to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Company with respect to periods or occurrences prior to the Closing Date, for the sole purposes of (i) complying with the requirements of any Governmental Entity, including the Bankruptcy Court, (ii) the closing of the Bankruptcy Cases and the wind down of the Seller's estate (including reconciliation of Claims), (iii) making insurance Claims, (iv) complying with applicable Laws and (v) defending or prosecuting any Action to which the Seller is a party. Notwithstanding the foregoing, Purchaser shall not be obligated to provide any such access that would conflict with the Disclosure Limitations; provided, further, that Purchaser and the Seller (or its successor) shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Purchaser after consultation with outside counsel) reasonably be likely to cause such violation to occur or such privilege to be undermined with respect to such information.

(e)      Unless otherwise consented to in writing by the Seller (or its successor), Purchaser will use commercially reasonable efforts to not, for a period of seven (7) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records contemplated by Section 6.1(d) without first offering to surrender to the Seller such books and records or any portion thereof that Purchaser may intend to destroy, dispose of or alter. From and after the Closing, Purchaser will, at the Seller's sole expense, provide the Seller (or its successor) with reasonable assistance, support and cooperation with the wind-down of the operations and related activities (e.g., helping to locate documents or information related to prosecution or processing of insurance/benefit Claims) of the Seller.

(e)      From and after the Closing, for a period of seven (7) years following the Closing Date, the Seller will upon reasonable prior notice and advanced written consent of the Seller (such consent not to be unreasonably withheld, conditioned or delayed), afford Purchaser and its Representatives, reasonable access (at Purchaser's sole expense) during normal business

30646430

hours to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining) and the Seller's accountants, counsel, financial advisors and other authorized outside Representatives, officers and senior management possessing information, in each case relating to the Company with respect to periods or occurrences prior to the Closing Date. Notwithstanding the foregoing, Seller shall not be obligated to provide any such access that would conflict with the Disclosure Limitations.

Section 6.2    Confidentiality.    Information obtained by Purchaser and its Representatives in connection with the transactions contemplated by this Agreement shall be subject to the provisions of the Confidentiality Agreement by and between the Company and Purchaser or its Affiliate, dated July 10, 2023 (the "**Confidentiality Agreement**").  The terms of the Confidentiality Agreement shall survive the termination of this Agreement and continue in full force and effect thereafter and the Confidentiality Agreement shall not be modified, waived or amended without the written consent of the Company.  After the Closing Date, the Confidentiality Agreement shall be deemed to have been terminated by the parties thereto as it relates to the confidential information regarding the Company and shall no longer be binding.   For the elimination of any doubt, it is understood and agreed that the Seller, as a debtor and debtor in possession under the Bankruptcy Code, is required to disclose the terms of this Agreement to the Bankruptcy Court.

Section 6.3    Conduct of the Business of the Company Pending the Closing.  The Company agrees that, except as (A) set forth on Section 6.3 of the Disclosure Schedules, (B) may be required or expressly permitted by this Agreement or any other Transaction Agreement, (C) as required by any Order of the Bankruptcy Court (or as reasonably necessary in connection with the Bankruptcy Cases), (D) in connection with the taking of any Emergency Response or (E) required by Law, by a Governmental Entity, or by any Contract to which the Company is a party, during the period commencing on the date of this Agreement and ending at the earlier of (x) the Closing and (y) the valid termination of this Agreement pursuant to Section 8.1, Section 8.2 or Section 8.3:

(a)    the Company shall conduct its operations in all material respects in the ordinary course of business (taking into account in each case the fact that (A) the Bankruptcy Cases commenced on the Petition Date, (B) the business of the Company has been and continues to be operated while in bankruptcy, and (C) the continuing operation of the business of the Company, including payments to vendors and suppliers, has been and will continue to be subject to the approval of the Bankruptcy Court); and

(b)    the Company shall not effect any of the following without the prior written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed; provided, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within five (5) Business Days from the date on which request for such consent is provided by the Company to Purchaser):

(i)    make any change in or amendment to its Organizational Documents;

(ii)    issue, pledge or sell, or authorize to issue, pledge or sell, any equity interests, shares of its capital stock, or any other ownership interests, as applicable, or issue, pledge or sell, or authorize to issue, pledge or sell, any securities convertible into or

30646430

exchangeable for, or options, warrants or rights to purchase or subscribe for, or enter into any Contract with respect to the issuance or sale of, any shares of its equity interests, capital stock, or any other ownership interests, as applicable, including any "phantom" stock rights, stock appreciation rights, stock-based performance units or other equity-based compensation awards;

(iii)    adjust, split, subdivide, combine, redeem or reclassify, or purchase or otherwise acquire, any shares of its capital stock, equity interests or its other securities, as applicable;

(iv)    other than in the ordinary course of business or consistent with past practice, sell, license, lease, transfer, assign, abandon, or otherwise dispose of any of its properties or assets that are material to its business or mortgage, pledge or impose any Lien upon any of its properties or assets that are material to its business;

(v)    make, change or revoke any Tax election, file any Return, change any Tax accounting method, surrender any Tax refund, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating the Company, or settle or compromise any Tax Liability; or

(vi)    commit or agree to take any of, the foregoing actions in respect of which it is restricted by the provisions of this Section 6.3.

Section 6.4    Reasonable Best Efforts.    Subject to the terms and conditions set forth herein, and to applicable legal requirements, each of the Company, Purchaser and Seller shall cooperate and use their respective reasonable best efforts to take, or cause to be taken, all necessary action, and do, or cause to be done, and assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Closing and the other transactions contemplated hereby, including the satisfaction of the respective conditions set forth in Article VII.    Notwithstanding the foregoing, the obligations of the Purchaser and Company under this Section 6.4 shall not require the Company or any of its Affiliates to expend any money, to commence any litigation or arbitration proceeding or to offer or grant any accommodation (financial or otherwise) to any third party.

Section 6.5    Indemnity; Directors' and Officers' Insurance; Fiduciary and Employee Benefit Insurance.    (a) The Company from and after the Closing agrees to ensure, that all rights to indemnification and exculpation now existing in favor of any individual who, at or prior to the Closing, was a director, officer, employee or agent (including the Independent Agents) of the Company or who, at the request of the Company, served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise (collectively, with such individual's heirs, executors or administrators, the "**Indemnified Persons**") as provided in the Organizational Documents of the Company, shall survive the Closing and shall continue in full force and effect for a period of not less than five (5) years from the Closing and such provisions with respect to indemnification and limitations on liability set forth in such Organizational Documents of the Company shall not be amended, repealed or otherwise modified; provided, that in the event any claim or claims are asserted or made within such five (5) year period, all rights to indemnification in respect of any such claim or claims shall continue until final disposition of any and all such claims; provided,

30646430

further that the Company shall not be an indemnitor of first resort and each Indemnified Party shall be required to seek and exhaust all other sources of indemnification prior to seeking to make a claim for indemnification against the Company.

(b)     The provisions with respect to limitation of liabilities of Indemnified Persons and advancement of expenses and indemnification of the Indemnified Persons that are set forth as of the date of this Agreement in the Organizational Documents of the Company are incorporated herein by reference and shall continue to apply after the date of this Agreement to the Indemnified Persons in their former capacities with the Company, and in each case this Section 6.5 shall not be amended, repealed or otherwise modified in a manner that would adversely affect the rights hereunder of the Indemnified Persons.

(c)     Notwithstanding any other provisions hereof, the obligations of the Company contained in this Section 6.5 shall be binding upon the successors and assigns of the Company.  In the event the Company, or any of its successors or assigns, (i) consolidates with or merges into any other Person or (ii) transfers all or substantially all of its properties or assets to any Person, then, and in each case, proper provision shall be made so that the successors and assigns of the Company, as the case may be, honor the indemnification and other obligations set forth in this Section 6.5.

(d)     The obligations of the Company under this Section 6.5 shall survive the Closing and shall not be terminated or modified in such a manner as to affect adversely any Indemnified Person to whom this Section 6.5 applies without the consent of such affected Indemnified Person (it being expressly agreed that the Indemnified Persons to whom this Section 6.5 applies shall be third-party beneficiaries of this Section 6.5, each of whom may enforce the provisions of this Section 6.5).

(e)     Nothing in this Agreement is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to the Company or any of its directors or officers, it being understood and agreed that the indemnification provided for in this Section 6.5 is not prior to or in substitution for any such claims under such policies.

Section 6.6    Public Announcements.  Purchaser, Seller and the Company each agree to (a) reasonably consult with each other before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement, (b) provide to the other Contracting Parties for review a copy of any such press release or public statement and (c) not issue any such press release or make any such public statement prior to such consultation and review and the receipt of the prior consent of the other parties to this Agreement, unless required by applicable Law, in which case such party shall advise the other parties of such obligation and the Contracting Parties shall attempt to cause a mutually agreeable release or announcement to be issued; provided, however, that nothing in this Agreement shall restrict or prohibit Seller, the Company from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Bankruptcy Cases or making any other disclosures in respect of this Agreement required by any applicable Law or Orders.

**Section 6.7**   Transfer Taxes.

(a)     The parties hereto agree that stamp, transfer, documentary, sales, excise and use, value added, registration and other similar Taxes and fees (including any penalties and interest) (collectively, the "**Transfer Taxes**") are not payable under applicable Tax Law in connection with this Agreement or any other Transaction. No party hereto shall take any contrary position on any Return or before any taxing authority unless otherwise required pursuant to a "determination" as such term is defined in Section 1313 of the Code. Consistent with the foregoing, Purchaser shall, at its own expense, prepare all necessary Returns or other documents with respect to Transfer Taxes and deliver a draft of such Returns to Seller at least ten (10) days prior to their due dates.  Purchaser shall consider in good faith any reasonable comments from the Seller and shall file such Returns to the extent permitted under applicable Tax Law. If any of these Returns are required under applicable Law to be filed by the Seller, Purchaser shall deliver such Returns to the Seller so that they are received no later than two (2) days prior to their due date so that the Seller can timely file such Returns.

(b)     Each of the Seller and Purchaser agrees to furnish or cause to be furnished to the other party, upon reasonable request and at the cost and expense of the requesting party, as promptly as practicable, such information and assistance relating to the Company (including access to books and records) as is reasonably necessary for the preparation and filing of any Returns (including any claim for a Tax refund) by the Seller or Purchaser, the making of any election relating to Taxes by the Seller or Purchaser, the determination of liability for Taxes, the preparation for any audit by any Governmental Entity, and the prosecution or defense of any claim, suit or other Action relating to any Tax.  The Seller shall give Purchaser thirty (30) days' written notice prior to transferring, destroying or discarding any such Tax records and, if Purchaser so requests, shall allow Purchaser to take possession of such Tax records.

**Section 6.8**   Submission for Bankruptcy Court Approval .

(a)     Seller and Purchaser each acknowledges that this Agreement and the sale of the Membership Interests to Purchaser are subject to Bankruptcy Court approval.  Purchaser acknowledges that to obtain such approval, (i) Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Membership Interests (as further set out in Section 6.10) and (ii) the Purchaser must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to all obligations of the Company.  Provided that Purchaser is selected as the winning bidder in respect of the Membership Interests at the Auction, if any, or if no Competing Bid is submitted with respect to the Membership Interests, each of Seller and Purchaser shall use their respective commercially reasonable efforts to have (y) the Sale Hearing, if necessary, prior to the applicable closing date set forth in the Bidding Procedures, and (z) the Sale Order entered no later than the applicable closing date set forth in the Bidding Procedures.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of such Orders and a finding of adequate assurance of future performance by the Purchaser of all obligations of the Company, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement. Seller shall give notice of the Transaction, including such additional notice as the Bankruptcy Court shall direct or as Purchaser may reasonably request, and provide appropriate

opportunity for hearing, relating to this Agreement or the Transactions.  Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to Purchaser prior to their filing with the Bankruptcy Court for Purchaser's prior review.

(b)    Each of Seller and Purchaser shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.  The Seller shall promptly provide Purchaser and its counsel with copies of all notices, filings and Orders of the Bankruptcy Court that Seller receives pertaining to the Sale Order or any other Order related to any of the Transactions, but only to the extent such papers are not publicly available on the Bankruptcy Court's docket or otherwise made available to Purchaser and its counsel.

(c)    If the Sale Order, or any other Orders of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

**Section 6.9**    Use of Proceeds.  Seller will apply the proceeds from the sale of the Membership Interests for the purposes identified in the Plan.

**Section 6.10**    Competing Bids.

(a)    Purchaser acknowledges that the Company and its Affiliates may take reasonable steps to obtain the highest or otherwise best price for the Membership Interest including giving notice thereof to the creditors of the West Madison Debtors and other interested parties, providing information about the Company's business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, if additional prospective bidders desire to place one or more Qualified Bids for the Membership Interest in accordance with the Bidding Procedures, conducting an auction in accordance with the Bidding Procedures Order (the "**Auction**").

(b)    The Bidding Procedures to be employed with respect to this Agreement and the Auction shall be those reflected in the Bidding Procedures Order.  Each of Purchaser and the Company agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as approved by the Bankruptcy Court.  Each of Purchaser and the Company agrees that this Agreement and the Transactions are subject to the right of the Company, the other West Madison Debtors and their Affiliates and Representatives to seek, solicit, invite, encourage, consider, discuss and negotiate higher or better Competing Bids in accordance with the Bidding Procedures Order and the Bidding Procedures. From the date hereof (and any prior time) and until the completion of the Auction, the Company, the other West Madison Debtors and their Affiliates are permitted to, and are permitted to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with a Competing Bid

30646430

or Alternative Transaction, including to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase any or all of the Membership Interest (including supplying information relating to the business of the Company and the assets of the Company to prospective purchasers), and solely to the extent a Competing Bid or Alternative Transaction would reasonably be likely to result in a transaction that constitutes a Superior Transaction.

(c)     If an Auction is conducted, and Purchaser is not the prevailing bidder at the Auction but is the next highest bidder at the Auction, Purchaser shall serve as a back-up bidder (the "**Back-up Bidder**") and keep Purchaser's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon at the election of the Purchaser in its sole discretion in the Auction) open and irrevocable, and Purchaser shall not terminate this Agreement in accordance with <u>Section 8.2(a)</u> (as a result of any breach of <u>Section 6.4</u> or <u>Section 6.8</u>) or <u>Section 8.2(c)</u>, notwithstanding any right of Purchaser to otherwise terminate this Agreement pursuant to <u>Article VIII</u> hereof, until the earlier of (i) the End Date and (ii) the date of the consummation of an Alternative Transaction.  Following the completion of the Auction and prior to the End Date, if the prevailing bidder in the Auction fails to consummate an Alternative Transaction, Purchaser (as the Back-up Bidder) will be deemed to have the new prevailing bid, and the Company will be authorized to, without further Order of the Bankruptcy Court, and Purchaser shall, consummate the Transactions on the terms and subject to the conditions set forth in this Agreement (as the same may be improved upon in the Auction by the Purchaser in its sole discretion).

(d)     Subject to the other provisions of this Section 6.10(d), from the completion of the Auction until the earlier of the termination of this Agreement in accordance with its terms and the entry of the Sale Order, (i) Seller and the Company shall, shall cause each of their Affiliates to, and shall instruct and direct their respective Representatives to, immediately cease and terminate any ongoing solicitations with respect to any Alternative Transaction, and (ii) each of Seller and the Company shall not, shall cause each of their Affiliates not to, and shall instruct and direct their respective Representatives not to, other than to inform any Person of the provisions of this Section 6.10(d), directly or indirectly, initiate or solicit any discussions, inquiries or negotiations in connection with any proposal, expression of interest or offer relating to an Alternative Transaction, or knowingly encourage any effort by any Person that is seeking to make, or has made, an Alternative Transaction Proposal.

(e)     Notwithstanding the foregoing clause (a), if, following the completion of the Auction until the earlier of the termination of this Agreement in accordance with its terms and the entry of the Sale Order, Seller, the Company or any of their Affiliates receive an unsolicited proposal, expression of interest or offer (whether written or unwritten) for an Alternative Transaction (an "**Alternative Transaction Proposal**") from any Person not solicited by Seller, the Company or any of their Affiliates in violation of Section 6.10(d), then Seller, the Company or any of their Affiliates (or any Representative thereof) may, directly or indirectly, (i) contact any Person that has made an unsolicited Alternative Transaction Proposal (and its advisors) for the purpose of clarifying, discussing or negotiating the proposal and any terms thereof and the likelihood of consummation, so as to determine whether such proposal constitutes, or could reasonably be expected to lead to, a Superior Proposal or (ii) if the Independent Agents shall have determined in good faith and after considering the advice of their outside counsel, that such Alternative Transaction Proposal, constitutes, or could reasonably be expected to result in, a

Superior Transaction and that failure of Seller, the Company or any of its Affiliates to pursue such Alternative Transaction Proposal could reasonably be expected to result in a breach of the Independent Agents' fiduciary duties under applicable Laws (a "**Superior Proposal**"), Seller, the Company or any of its Affiliates may, in response to such Superior Proposal, directly or indirectly: (x) furnish non-public information in response to a request therefor by such Person if such Person has executed and delivered to the Company a confidentiality agreement and if the Company also promptly makes such information available to the Purchaser, to the extent not previously provided to the Purchaser; and (y) engage or participate in discussions and negotiations with such Person regarding such Superior Proposal.  Subject to applicable confidentiality restrictions, the Company shall provide (i) notice of all Alternative Transaction Proposals (whether oral or written) that constitute, or could reasonably be expected to result in, a Superior Proposal to the Purchaser within two (2) Business Days after the time such determination is made and (ii) a copy of each such Alternative Transaction Proposal.

(f)    Following the entry of the Sale Order and until the Closing or the earlier valid termination of this Agreement in accordance with its terms, Seller, the Company and their Affiliates are neither permitted to, nor permitted to cause their Representatives and Affiliates to initiate contact with, solicit or knowingly encourage, induce or facilitate any Competing Bid or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid.

(g)    The Seller and the Purchaser agree that the provisions of this Agreement, including this Section 6.10, are reasonable, were a material inducement to the Purchaser to enter into this Agreement and are designed to achieve the highest and best price for the Membership Interests.

**Section 6.11**    Contract Rejections.  At least twenty nine (29) days prior to the earlier of the Voting Deadline (as defined in the Plan) and the deadline for objecting to the Plan, Purchaser shall propose to Seller the list of Contracts to be assumed and rejected pursuant to the Plan Supplement, and Purchaser and Seller shall cooperate in good faith to finalize the Plan Supplement by no later than seven (7) days prior to the earlier of the Voting Deadline (as defined in the Plan) and the deadline for objecting to the Plan; provided that, at the Closing Date, Purchaser shall pay to Seller the aggregate amount of rejection damages payable in respect of the Contracts being rejected pursuant to the Plan; provided further, that Real Property Leases may not be rejected.

**Section 6.12**    Support for the Transactions.  The Purchaser agrees and shall cause its Affiliates to agree, during the period beginning on the date of this Agreement through the earlier of (x) the Closing Date and (y) the date this Agreement is validly terminated pursuant to its terms, to:cooperate and coordinate activities with the West Madison Debtors and their Affiliates and use its reasonable best efforts to pursue, support, obtain additional support for, implement, and consummate the transactions contemplated by this Agreement, and to execute and take all actions contemplated hereby and thereby and as necessary, or as may be required by order of the Bankruptcy Court, to support and achieve consummation of the transactions contemplated hereby;

(b)    execute and deliver such other instruments and perform such acts, in addition to the matters specified herein, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effect the transactions

contemplated hereby, as applicable; *provided*, for the avoidance of doubt, that nothing herein requires Purchaser to comply with any order of the Bankruptcy Court that is inconsistent with this Agreement or the Plan and entered by the Bankruptcy Court without the prior written consent of Purchaser; and

(c)    promptly inform the West Madison Debtors' counsel identified in <u>Section 9.3</u> of this Agreement of any communication from Situs Holdings, LLC or any third-party with respect to any Alternative Transaction Proposal.

**Section 6.13**    <u>Negative Covenants</u>.  The Purchaser agrees and shall cause its Affiliates to agree, during the period beginning on the date of this Agreement through the earlier of (x) the Closing Date and (y) the date this Agreement is validly terminated pursuant to its terms, to not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions; <u>provided</u> that any action taken by Purchaser to enforce this Agreement shall not constitute a violation of this <u>Section 6.13(a)</u>;

(b)    object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Plan (including the payment in full or reinstatement of all administrative, priority, other secured, and general unsecured claims);

(c)    exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or interests in any of the West Madison Debtors;

(d)    solicit, propose, file, or support any Alternative Transaction Proposal or any chapter 11 plan other than the Plan;

(e)    take any other actions in contravention of this Agreement, the Plan or to the material detriment of the Transactions;

(f)    file any motion, application, pleading, other document, or proceeding with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(g)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement or the transactions contemplated herein against the West Madison Debtors or the other Contracting Parties other than to enforce this Agreement or the Plan or as otherwise permitted under this Agreement; or

(h)    file or support any motion, application, pleading, other document, or proceeding seeking, or file any joinder or other document supporting, the appointment of an examiner, the appointment of a trustee, to convert any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, to seek discovery pursuant to rule 2004 or any other rule promulgated under the Federal Rules of Bankruptcy Procedure.

30646430

**Section 6.14**   Title Insurance; Survey.   The Company has obtained from Old Republic National Title Insurance Company a commitment for title insurance (the "**Title Commitment**") bearing File Number NCT22011755 and an ALTA Survey (the "**Survey**") dated March 11, 2022, issued by Sarko Surveying, Inc. (the "**Surveyor**").   Purchaser shall be entitled to obtain, at its sole cost and expense and in its sole discretion, from the Title Company an update to the Title Commitment and an owner's and/or lender's policy of title insurance (each, a "**Title Policy**") insuring title to the Owned Real Property in favor of the Purchaser or any lender for the Owned Real Property, in each instance in an amount determined by Purchaser in its sole discretion, as well as an update to the Survey from the Surveyor.   The Title Policy may contain any endorsements that may be available and that Purchaser may desire and be subject only to Permitted Liens and such exceptions as Purchaser may approve.   The Company shall reasonably cooperate with Purchaser, the Title Company and the Surveyor in connection with Purchaser's efforts to obtain a Title Policy or an update to the Title Commitment (or any other title commitment from the Title Company) and the Survey, and the issuance of any Title Policy, including by providing any affidavits and other documents as may be reasonably required by the Title Company, the Surveyor and/or service provider (which shall include an "owner's affidavit" as provided in Section 2.3(b)(ii)).   Receipt by Purchaser of the Title Commitment, any update thereto, the Survey, any update thereto, and/or any Title Policy, in any form or forms whatsoever, shall be entirely elective on the part of the Purchaser and shall not constitute a condition to Closing or the performance by Purchaser of its obligations to proceed with Closing under this Agreement; provided, that if Purchaser does obtain a Title Policy or an update to the Title Commitment (or any other title commitment from the Title Company) and the Survey, Purchaser shall provide copies of the same to the Company.

**Section 6.15**   Tenant Estoppels.   The Company will request from all Tenants, and use commercially reasonable efforts to obtain and provide to Purchaser at least five (5) Business Days prior to the Closing Date, an estoppel certificate substantially in the form of Exhibit B attached hereto or in such other form expressly required under its Real Property Lease (collectively, the "**Estoppel Certificates**").   Purchaser shall have the right to review each Estoppel Certificate which the Company intends to deliver to each Tenant before the Company delivers the same to each such Tenant.   The Contracting Parties agree that the receipt of the Estoppel Certificates contemplated by this Section 6.15 shall not be a condition to Closing.

**Section 6.16**   Deliverables.   At the Closing Date, upon the request of Purchaser, to the extent not in the possession or control of Purchaser as of the Closing Date, the Seller will use its reasonable best efforts to (and will direct the property manager for the Owned Real Property to) provide to Purchaser (or use its commercially reasonable efforts to cause the same to be located at the Owned Real Property as of the Closing Date) (i) all keys, lock or safe combinations or codes relating to the operation of the Owned Real Property; and (ii) all original tenant files, unexpired warranties and guaranties affecting the Owned Real Property, Permits for the Owned Real Property, real estate tax bills, water, sewer and utility bills for the Owned Real Property, Contracts, copies of financial records for the Owned Real Property and all other books and records of the Company, including those held by the property manager for the Owned Real Property, the Real Property Leases, all engineering, structural, geologic, environmental and similar reports applicable to the Owned Real Property, a complete set of the plans and specifications with respect to the Owned Real Property, and any other material instruments and documents affecting the Owned Real Property, whether in the possession or control of the Company or its agents (including the

30646430

property manager for the Owned Real Property); provided that for the foregoing clause (ii) shall include only the records, documents or files of the Company (the deliverables described in the foregoing clauses (i) and (ii), the "**Real Estate Deliverables**").  Delivery of the Real Estate Deliverables to Purchaser shall be effective and be deemed to have been satisfied if the Real Estate Deliverables have been left in the on-site office of the property manager for the Owned Real Property.  The provisions of this Section 6.16 shall survive the Closing.  Receipt by Purchaser of the Real Estate Deliverables contemplated by this Section 6.16 shall not constitute a condition to Closing or the performance by Purchaser of its obligations to proceed with Closing under this Agreement.

Section 6.17    Further Assurances.

(a)    Following the date of this Agreement and until the earlier of the Closing and the date on which this Agreement is terminated in accordance with Article VIII, the Seller, on the one hand, and Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the Transactions, including promptly furnishing the other with copies of notices or other communications received by the Seller, the Company or Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Entity with respect to the Transactions.

(b)    From time to time, on or after the Closing Date until the earlier of the six (6) months anniversary of the date hereof and the dissolution and liquidation of the Seller, the Seller shall execute and deliver such other instruments of transfer to Purchaser as are reasonably necessary and as Purchaser may reasonably request in order to more effectively vest in Purchaser all of the Seller's right, title and interest to the Membership Interests, free and clear of all Liens (other than Permitted Liens).

(a)    Nothing in this Section 6.17 shall (i) require the Seller or the Company to make any expenditure or incur any obligation on their own or on behalf of Purchaser, (ii) prohibit the Seller from ceasing operations or winding up its affairs following the Closing, or (iii) prohibit the Seller from taking such actions as are necessary to conduct the Auction, as are required by the Bankruptcy Court or as would otherwise be permitted under Section 6.3.

# ARTICLE VII

## CONDITIONS PRECEDENT

Section 7.1    Conditions to the Obligations of Each Party.  The respective obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction or (to the extent permitted by applicable Law) waiver by Purchaser, on the one hand, or Seller, on the other hand, at or before the Closing, of each of the following conditions:

(a)    Injunctions; Illegality.  No Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) shall be in effect that restrains, enjoins or otherwise prohibits the transactions contemplated hereby.

(b)    Sale Order. The Bankruptcy Court shall have entered the Sale Order.

(c)     Plan.  All conditions to the occurrence of the West Madison Sale Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Plan shall have been satisfied or waived (other than such conditions that, by their terms, are to be satisfied as of the occurrence of the West Madison Sale Effective Date of the Plan) in accordance with the terms of the Plan.

(d)     West Madison Sale Effective Date.  The West Madison Sale Effective Date shall have occurred, or shall be deemed to have occurred, concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan.

**Section 7.2**     Conditions to the Obligations of Purchaser.  The obligations of Purchaser to consummate the Closing are subject to the satisfaction or (to the extent permitted by applicable Law) waiver by Purchaser on or prior to the Closing Date of the following further conditions:

(a)     Performance.  All of the material covenants of the Company and Seller to be performed prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects.

(b)     Representations and Warranties.     Each of (i) the Fundamental Representations shall be true and correct other than *de minimis* inaccuracies, as of the Closing Date as if made at and as of such time (other than those made as of a specified date, which shall be true and correct as of such specified date (other than *de minimis* inaccuracies) and (ii) the other representations and warranties of the Company contained in Article III and the representations and warranties of Seller in Article IV (without giving effect to any materiality or Material Adverse Effect qualifications set forth therein) shall be true and correct as of the Closing Date as if made at and as of such time (other than those made as of a specified date, which shall be true and correct as of such specified date), except for such failures to be true and correct that do not have, individually or in the aggregate, a Material Adverse Effect.

(c)     Closing Deliveries. Purchaser shall have received the items to be delivered to it pursuant to Section 2.3(b).

**Section 7.3**     Conditions to the Obligations of Seller.  The obligations of Seller to consummate the Closing are subject to the satisfaction or (to the extent permitted by applicable Law) waiver by Seller on or prior to the Closing Date of the following further conditions:

(a)     Performance.  All of the material agreements and covenants of Purchaser to be performed prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects.

(b)     Representations and Warranties.  The representations and warranties of Purchaser contained in Article V (without giving effect to any materiality or Material Adverse Effect qualifications set forth therein) shall be true and correct in all respects at and as of the Closing Date as if made at and as of such time (other than those made at and as of a specified date, which shall be true and correct in all respects at and as of such specified date), except where the failure of such representations and warranties to be true and correct would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the ability of

Purchaser to perform its obligations under this Agreement or consummate the transactions contemplated hereby.

(c)     <u>Closing Deliveries</u>. The Seller shall have received the items to be delivered to it pursuant to <u>Section 2.3(c)</u>.

**Section 7.4**     <u>Frustration of Closing Conditions</u>.  Neither Purchaser nor Seller may rely on the failure of any condition set forth in this <u>Article VII</u> to be satisfied if such failure was caused by such party's failure to act in good faith or such party's breach of any provision of this Agreement (including, without limitation, such party's failure to use its reasonable best efforts to cause the Closing to occur, as required by <u>Section 6.4</u>).

## ARTICLE VIII

<u>TERMINATION</u>

**Section 8.1**     <u>Consensual Termination; Illegality; End Date</u>.  This Agreement may be terminated and the Transactions may be abandoned, at any time prior to the Closing:

(a)     by mutual written consent of the Company and Purchaser; and

(b)     by either Purchaser, on the one hand, or Seller, on the other hand, upon written notice to the other party, if

(i)     following the date of this Agreement, any Governmental Entity shall have issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated hereby; <u>provided</u>, that no party may terminate this Agreement pursuant to this <u>Section 8.1(b)(i)</u> if such party is in material breach of this Agreement;

(ii)     the Closing shall not have occurred on or prior to August 31, 2023, which may be extended by the prior written consent of the Seller and the Purchaser (the "**<u>End Date</u>**"); <u>provided</u>, that (A) no party may terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u> if such party is in material breach of this Agreement and (B) Purchaser shall not have the right to terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u> in the event that the Company has initiated proceedings prior to the End Date to specifically enforce this Agreement while such proceedings are still pending.

**Section 8.2**     <u>Termination by Purchaser.</u>

This Agreement may be terminated by Purchaser upon written notice to Seller, upon the occurrence of any of the Events set forth in this <u>Section 8.2</u>, in each case prior to Closing; <u>provided</u>, <u>however</u>, that Purchaser may not seek to terminate this Agreement based upon a breach of this Agreement by Seller if such breach arises primarily out of Purchaser's own actions:

(a)     (i) any of the representations and warranties of the Company contained in <u>Article III</u> or any of the representations and warranties of the Seller contained in <u>Article IV</u> shall fail to be true and correct, or (ii) there shall be a breach by the Company or the Seller of any

covenant or agreement of the Company in this Agreement that, in either case, (A) would result in the failure of a condition set forth in Section 7.2(a) or Section 7.2(b) and (B) which is not curable or, if curable, is not cured upon the occurrence of the earlier of (x) the thirtieth (30th) day after written notice thereof is given by Purchaser to the Company, and (y) the day that is five (5) Business Days prior to the End Date; provided, that Purchaser may not terminate this Agreement pursuant to this Section 8.2(a) if Purchaser is in material breach of this Agreement;

(b)      the (i) conversion of one or more of the Bankruptcy Cases of the West Madison Debtors to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Bankruptcy Cases of the West Madison Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of Purchaser;

(c)      subject to the limitations set forth in Section 6.10, (i) the Bankruptcy Court approves or authorizes an Alternative Transaction; or (ii) any of the West Madison Debtors enters into any Contract providing for the consummation of any Alternative Transaction or files any motion or application seeking authority to propose, join in or participate in the formation of, any actual or proposed Alternative Transaction;

(d)      following entry by the Bankruptcy Court of the Sale Order, such order is (i) amended, modified or supplemented in any way without Purchaser's prior written consent or (ii) voided, reversed or vacated or is subject to a stay;

(e)      the Confirmation Order is terminated, reversed, dismissed or vacated, by the Bankruptcy Court, or any such Order is modified or amended by the Bankruptcy Court after entry without the prior written consent of Purchaser in a manner that prevents or prohibits the consummation of the Transactions contemplated by this Agreement or the other Transaction Agreements in a way that cannot be remedied by the West Madison Debtors in a manner reasonably acceptable to Purchaser (and such action has not been reversed or vacated within ten (10) calendar days after its issuance); or

(f)      within five (5) Business Days following the cure period set forth in Section 8.2(a) upon receipt by Purchaser of a Supplement pursuant to Section 9.15, if the Supplement gives rise to a breach that would entitle Purchaser to terminate this Agreement pursuant to Section 8.2(a) and such breach is not cured within the cure period set forth in such Section 8.2(a).

**Section 8.3**      Termination by the Company or Seller.

This Agreement may be terminated by the Company or Seller upon written notice to Purchaser upon the occurrence of any of the following Events, subject to the rights of the Company to fully and unconditionally waive, in writing, on a prospective or retroactive basis the occurrence of such Event; provided, however, that neither the Company nor Seller may seek to terminate this Agreement based upon a breach of this Agreement by Purchaser which arises primarily out of the Company's or Seller's own actions in material breach of this Agreement.

(a)      if: (i) any of the representations and warranties of Purchaser contained in Article V shall fail to be true and correct, or (ii) there shall be a breach by Purchaser of any covenant or agreement of Purchaser in this Agreement that, in either case, (A) would result in the failure of a condition set forth in Section 7.3(a) or Section 7.3(b) and (B) which is not curable or,

if curable, is not cured upon the occurrence of the earlier of (x) the thirtieth (30th) day after written notice thereof is given by the Company or Seller to Purchaser and (y) the day that is five (5) Business Days prior to the End Date; provided, that neither the Company nor Seller may terminate this Agreement pursuant to this Section 8.3(a) if the Company is in material breach of this Agreement;

(b)     the Independent Agents determine in good faith, based upon advice of outside counsel, (a) that proceeding with the Transactions contemplated herein and in the Plan, and consummation of the Plan, would be inconsistent with the exercise of their fiduciary duties under applicable Law or (b) in the exercise of their fiduciary duties under applicable Law, to pursue an Alternative Transaction;

(c)     the Bankruptcy Court (or other court of competent jurisdiction) enters an Order (i) directing the appointment of an examiner (other than an independent fee examiner) with expanded powers or a trustee in any of the Bankruptcy Cases, (ii) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Bankruptcy Cases, or (iv) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement; or

(d)     the Confirmation Order is terminated, reversed, dismissed or vacated, by the Bankruptcy Court, or any such Order is modified or amended by the Bankruptcy Court after entry without the prior written consent of the Company in a manner that prevents or prohibits the consummation of the Transactions in a way that cannot be remedied in a manner reasonably acceptable to Seller (and such action has not been reversed or vacated within ten (10) calendar days after its issuance); or

(e)     if: (i) all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied, or waived by Purchaser (other than (A) those conditions that by their terms cannot be satisfied until the Closing, but which conditions are, at the time the notice of termination is delivered by the Company to Purchaser, capable of being satisfied if the Closing were to occur at the time the Closing was required to occur pursuant to Section 2.3(a) and (B) those conditions that have not been satisfied, in whole or in part, as a result of a breach of this Agreement by Purchaser), (ii) the Company has confirmed in writing to Purchaser that it is ready, willing and able to effect the Closing and (iii) Purchaser does not consummate the Closing by the date the Closing is required to occur pursuant to Section 2.3(a).

**Section 8.4      Effect of Termination.**   In the event of the termination of this Agreement pursuant to Section 8.1, Section 8.2 or Section 8.3 by Purchaser, on the one hand, or the Company or Seller, on the other hand, written notice thereof shall forthwith be given to the other parties hereto specifying the provision hereof pursuant to which such termination is made, and this Agreement shall be terminated and become void and have no effect, and there shall be no Liability hereunder on the part of Purchaser, Seller or the Company, except that Section 2.4, Section 6.2, this Section 8.4 and Article IX shall survive any termination of this Agreement. Nothing in this Section 8.4 shall (i) relieve or release any party to this Agreement of any Liability or damages (which, solely in the case of the Company and Seller, the parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and may include to the extent proven the benefit of the bargain lost by the West Madison Debtors' stakeholders

(taking into consideration relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party) arising out of such party's willful and material breach of any provision of this Agreement or the conscious participation in Fraud prior to such valid termination or (ii) subject to <u>Section 9.12</u>, impair the right of any party hereto to compel specific performance by the other party or parties, as the case may be, of such party's obligations under this Agreement.

## ARTICLE IX

### <u>MISCELLANEOUS</u>

**Section 9.1**    <u>Fees and Expenses</u>.  Except as expressly set forth herein, including in <u>Section 6.5</u> and <u>Section 6.7</u> all costs and expenses incurred in connection with this Agreement and the consummation of the Transactions shall be paid by the party incurring such costs and expenses.

**Section 9.2**    <u>Extension; Waiver</u>.  Subject to the express limitations herein, at any time prior to the Closing, the Contracting Parties may (a) extend the time for the performance of any of the obligations or other acts of the other Contracting Parties, (b) waive any inaccuracies in the representations and warranties contained herein by any other applicable party or in any document, certificate or writing delivered pursuant hereto by any other applicable party or (c) waive compliance with any of the agreements or conditions contained herein.  Any agreement on the part of any party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.  No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed as a waiver of, or acquiescence in, any breach of any representation, warranty, covenant or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

**Section 9.3**    <u>Notices</u>.  Except as otherwise provided herein, all notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email transmission (with copies by overnight courier service or registered mail) to the respective parties as follows (or, in each case, as otherwise notified by any of the Contracting Parties) and shall be effective and deemed to have been given (a) immediately when sent by email between 9:00 A.M. and 6:00 P.M. (Eastern Time) on any Business Day (and when sent outside of such hours, at 9:00 A.M. (Eastern Time) on the next Business Day), and (b) when received if delivered by hand or overnight courier service or certified or registered mail on any Business Day:

(a)    If to Seller, and prior to the Closing, to the Company, at:

PWM Property Management LLC
c/o M3 Advisory Partners LP
1700 Broadway, 19th Floor
New York, New York 10018;

with a copy (which shall not constitute notice) to:

White & Case LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attention: Fan B. He
Email: fhe@whitecase.com

and

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attention: Bojan Guzina
          Gregory F. Pesce
Email:    bojan.guzina@whitecase.com
          gregory.pesce@whitecase.com

and

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention: Adam Cieply
Email:    adam.cieply@whitecase.com

(b)    if to Purchaser or, after the Closing, the Company, at:

SinOceanic I Limited.
Clarendon House, 2 Church Street,
Hamiltion, HM11, Bermuda
Attention: Mr. Liu Liang
Email: ll@sinoceanic.no;

with a copy (which shall not constitute notice) to:

Vedder Price P.C.
1633 Broadway, 31st Floor
New York, NY 10019
Attention: Michael Schein
          Alexander Berger
Email:    mschein@vedderprice.com
          aberger@vedderprice.com

or to such other Person or address as any party shall specify by notice in writing in accordance with this Section 9.3 to each of the other parties.  Notices sent by multiple means, each of which is in compliance with the provisions of this Agreement will be deemed to have been received at the earliest time provided for by this Agreement.

30646430

-43-

**Section 9.4**    Entire Agreement.  This Agreement, together with the Exhibits hereto, the Disclosure Schedules and the other Transaction Documents, contains the entire understanding of the Contracting Parties with respect to the subject matter contained herein and supersedes all prior agreements and understandings, oral and written, with respect thereto, other than the Confidentiality Agreement.  This Section 9.4 shall not be deemed to be an admission or acknowledgement by any of the Contracting Parties that any prior agreements or understandings, oral or written, with respect to the subject matter hereof exist, other than the Confidentiality Agreement.

**Section 9.5**    Non-Recourse.  Except to the extent otherwise set forth in the Confidentiality Agreement, all claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and such representations and warranties are those solely of) the Persons that are expressly identified as parties in the preamble to this Agreement (the "**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any Contracting Party, or any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any of the foregoing (collectively, the "**Nonparty Affiliates**"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as set forth in the Confidentiality Agreement) and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, except to the extent otherwise set forth in the Confidentiality Agreement, each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

**Section 9.6**    Binding Effect; Benefit; Assignment.  This Agreement shall inure to the benefit of and be binding upon the Contracting Parties.  Except with respect to Sections 6.5, 9.10 and 9.12 and this 9.6 of this Agreement, which shall inure to the benefit of the Persons benefiting from the provisions thereof, all of whom are intended to be third-party beneficiaries thereof, no other Person not party to this Agreement shall be entitled to enforce this Agreement.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Contracting Parties without the prior written consent of each of the other Contracting Parties; provided, however, that Seller may assign its rights and obligations under this Agreement to any of its Affiliates without prior written consent.  Any attempted assignment in violation of this Section 9.6 will be void.

**Section 9.7**    Survival. None of the representations, warranties, agreements or covenants set forth in this Agreement or in any certificate or document delivered at, or prior to,

the Closing in connection with this Agreement shall survive the Closing Date, and thereafter none of the Company, Purchaser or Seller shall be under any Liability whatsoever with respect to any such representation, warranty, agreement or covenant.  Purchaser, Seller, and the Company shall have no post-Closing remedy for breaches of any representation, warranty, agreement or covenant set forth in this Agreement or in any certificate delivered at the Closing; provided, that notwithstanding the foregoing, the agreements and covenants set forth in Article I and this Article IX and Sections 2.2, 2.3, 2.4, 6.2, 6.6(a) and 8.4 shall survive such termination in accordance with their terms.  Without limiting the generality of the foregoing:

(a)     after the Closing, neither Purchaser nor any of its Affiliates or their respective former, current or future general or limited partners, equityholders, managers, members, directors, officers, employees, agents and representatives may seek the rescission of the transactions contemplated by this Agreement;

(b)     the provisions of, and the limitation of remedies provided in, this Section 9.7 were specifically bargained for between the parties hereto and were taken into account by the parties hereto in arriving at the Purchase Price, as may be adjusted pursuant to the terms of this Agreement;

(c)     the Contracting Parties hereto have voluntarily agreed to define their rights, liabilities and obligations respecting the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of this Agreement; and

(d)     the Contracting Parties hereto each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations and the parties hereto specifically acknowledge that no party hereto has any special relationship with another party hereto that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction; provided, however, that notwithstanding anything to the contrary set forth in this Agreement, no Party shall be precluded from bringing a claim for Fraud against any Party.

**Section 9.8**     Amendment and Modification.  This Agreement may not be amended or modified except by a written instrument executed by all parties to this Agreement.

**Section 9.9**     Counterparts.  This Agreement may be executed and delivered (including via scanned pdf image or electronic signature software such as DocuSign) in several counterparts, each of which shall be deemed to be an original instrument, and all of which together shall be deemed to be one and the same agreement.

**Section 9.10**     Applicable Law.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER, ARISING OUT OF, OR IN CONNECTION

30646430

WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION TO HEAR SUCH ACTION, SUIT OR PROCEEDING, ANY STATE OR FEDERAL COURT LOCATED IN DELAWARE COUNTY, DELAWARE, AND BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.   THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED IN SECTION 9.3, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

**Section 9.11**  Severability.   If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein; provided, that notwithstanding anything in this Agreement to the contrary, the Contracting Parties intend that the remedies and limitations thereon (including Section 9.5, Section 9.6, Section 9.7, Section 9.12 and Section 9.13) to each be construed as an integral provision of this Agreement and that such remedies and limitations shall not be severable in any manner that increases the liability or obligations of any member of the Pre-Closing Equityholder Group and no Contracting Party shall be required to take any action that would increase any such obligations or liabilities of any member of the Pre-Closing Equityholder Group.  Upon such a determination, the Contracting Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Contracting Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

**Section 9.12**  Specific Enforcement.

(a)      The Contracting Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached and that an award of money damages would be inadequate in such event.  Accordingly, it is acknowledged that the Contracting Parties and the third-party beneficiaries of this Agreement shall be entitled to equitable relief, without proof of actual damages, including an injunction or injunctions or Orders for specific performance to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including any Order sought by one party to cause the other party to perform its agreements and covenants contained in this Agreement), in addition to any other remedy to which they are entitled at law or in equity as a remedy for any such breach or threatened breach. Each Contracting Party further agrees that no Contracting Party or any other Person shall

be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 9.12, and each Contracting Party (i) irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument and (ii) agrees, subject only to the immediately succeeding sentence, to cooperate fully in any attempt by the Contracting Parties in obtaining such equitable relief. Each Contracting Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.

(c)     The parties hereto agree that (i) by seeking the remedies provided for in this Section 9.12 (including the commencement of legal proceedings), a party shall not in any respect waive its right to terminate this Agreement in accordance with the terms of Article VIII or waive its right to seek at any time any other form of relief that may be available to a party under this Agreement and (ii) nothing set forth in this Section 9.12 shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 9.12 prior to or as a condition to exercising any termination right under Article VIII (and pursuing monetary damages following such termination).

Section 9.13    Waiver of Jury Trial.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES, AND AGREES TO CAUSE ITS SUBSIDIARIES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.14    Rules of Construction.    The Contracting Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and have participated jointly in the drafting of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

Section 9.15    Interpretation.    The Disclosure Schedules relate to and qualify certain of the representations, warranties, covenants and obligations of the parties hereto in this Agreement and the Disclosure Schedules are not intended to broaden or constitute, and shall not be construed or otherwise be deemed to broaden or constitute, any representation, warranty, covenant or obligation of any party hereto or any other Person except to the extent expressly provided in this Agreement.  Matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules.  To the extent any such additional matters are included, they are included for informational purposes and do not necessarily include other matters of a similar nature.  In no event shall any disclosure of additional matters be deemed or interpreted to broaden or otherwise amend any of the covenants or representations or warranties in this Agreement.  To the extent that the Disclosure Schedules include brief descriptions or summaries of certain agreements and instruments, such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents and instruments described.  Headings and subheadings have been inserted in the Disclosure Schedules for convenience of reference only and shall to no extent have the effect of amending or changing the express description thereof as set forth in this Agreement.  Disclosure of any fact or item in this Agreement or any Disclosure Schedule referenced by a particular Section

in this Agreement shall be deemed to have been disclosed with respect to every other Section in this Agreement to the extent that it is reasonably apparent from the face of such disclosure that such disclosure would apply to such other Sections.  Any matter, condition or set of facts which is more specifically (rather than generally or by implication) covered in any of the representations and warranties of <u>Article III</u>, <u>Article IV</u> or <u>Article V</u> shall be solely governed by such more specific representation and warranty without reference to or inclusion within a more generalized representation and warranty that but for this sentence could be applicable to such matter, condition or set of facts.  No reference to or disclosure of any item or other matter in this Agreement or the Disclosure Schedules or any Annexes or Exhibits attached hereto or thereto shall be construed as an admission, representation or indication that such item or other matter is "material" or would have a Material Adverse Effect or that such item or other matter is required to be so referred to or so disclosed.  Each party hereto may, at its option, include in its Disclosure Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement or otherwise.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement or the Disclosure Schedules or any Annexes or Exhibits attached hereto or thereto is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the ordinary course of business or are material to the Company, and no Contracting Party shall use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement or the Disclosure Schedules or any Annexes or Exhibits hereto or thereto in any dispute or controversy between the Contracting Parties as to whether any obligation, item or matter not described or included in this Agreement or in any section of the Disclosure Schedules or any Annexes or Exhibits hereto or thereto is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or is within or outside of the ordinary course of business or material for purposes of this Agreement.  The information contained in this Agreement and in the Disclosure Schedules or any Annexes and Exhibits hereto or thereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Contracting Party to any third party of any matter whatsoever (including any violation of any Law or Order or breach of contract).  The Contracting Parties do not assume any responsibility to any Person that is not a party to this Agreement for the accuracy of any information set forth in the Disclosure Schedules.  The information set forth in the Disclosure Schedules was not prepared or disclosed with a view to its potential disclosure to others.  Subject to applicable Law, such information is disclosed in confidence for the purposes contemplated in this Agreement and is subject to the confidentiality provisions of any other agreements, including the Confidentiality Agreement, entered into by the Contracting Parties or their Affiliates.  Moreover, in disclosing the information in the Disclosure Schedules, each Contracting Party expressly does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed therein.  From time to time after the date hereof and prior to the Closing, the Company shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules by providing written notice to Purchaser in accordance with <u>Section 9.3</u>, which notice must state in bold font "Failure to Act within Five Business Days Will Waive Purchaser's Termination Right Under <u>Section 8.2(f)</u>" (each

30646430

such supplement or amendment, a "**<u>Supplement</u>**"), and each such Supplement shall be deemed to be incorporated into and to supplement and amend the Disclosure Schedules for all purposes pursuant to this Agreement.  If Purchaser does not provide a written termination notice pursuant to <u>Section 8.2(f)</u> within five (5) Business Days after receipt of such Supplement, Purchaser shall be deemed to have waived its rights to terminate this Agreement pursuant to <u>Section 8.2(f)</u>, solely with respect to the subject matter of such Supplement.

**Section 9.16**   <u>Time of the Essence</u>.  Time is of the essence in this Agreement.  If the date specified for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next date which is a Business Day.

**Section 9.17**   <u>Control of Attorney-Client and All Other Privileges</u>.

(a)    The Purchaser agrees, on behalf of itself and its Affiliates, that all Deal Communications (including any Deal Communications between the Seller or any of its Affiliates and White & Case LLP and any other lawyer representing the Seller or any of its Affiliates) shall not be acquired by Purchaser and shall remain privileged and fully owned by the Seller and its Affiliates from and after the Closing except as otherwise expressly provided in this Agreement. For the period immediately prior to the Closing, the attorney-client and all other privileges available to the Seller and its Affiliates with respect to Deal Communications shall remain privileged and the expectation of client confidence belongs to, and shall remain controlled by, the Seller and will not pass to or be claimed by Purchaser or its Affiliates.  Any disclosure of Deal Communications shall be agreed as between Purchaser and the Seller to be inadvertent and in good faith mistake.

(b)    The Seller agrees that the Seller shall protect and shall not waive any attorney-client and other legal privileges available to the Seller and its Affiliates, and the Seller agrees that the Seller will make efforts that are satisfactory to Purchaser in its reasonable discretion to ensure that any such attorney-client and other legal privileges are protected and not waived notwithstanding the dissolution of the Seller after Closing.  This <u>Section 9.17(b)</u> is subject to compliance with the covenant set forth in <u>Section 9.17(a)</u>.

(c)    Notwithstanding any other provision of this Agreement, the covenants set forth in <u>Section 9.17(b)</u> shall survive the Closing in accordance with the full performance of their terms.

*        *        *        *        *

IN WITNESS WHEREOF, each of Purchaser, Seller and the Company has caused this Agreement to be executed by their respective officers thereunto duly authorized, all as of the date first above written.

SINOCEANIC I LIMITED


By:_____
    Name:
    Title:


PWM PROPERTY MANAGEMENT LLC


By:_____
    Name:
    Title:


181 WEST MADISON PROPERTY LLC


By:_____
    Name:
    Title:

# **EXHIBIT A**

## **Form of Sale Order**

*[Intentionally Omitted]*

# **EXHIBIT B**

## **Form of Estoppel Certificate**

*[Intentionally Omitted]*

30646430

**<u>EXHIBIT B</u>**

**Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PWM Property Management LLC, *et al.*, | ) Case No. 21-11445 (MFW) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Ref. Docket No. ___** |
| | ) |

### ORDER (I) AUTHORIZING AND APPROVING THE SALE OF THE MEMBERSHIP INTERESTS IN 181 WEST MADISON FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) GRANTING RELATED RELIEF

Upon the consideration of the relief requested by PWM Property Management LLC and 181 West Madison Property LLC (together, the "**West Madison Debtors**") pursuant to sections 105(a), 365, 1123, and 1141 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and upon consideration of that certain Membership Interest Purchase Agreement, dated as of [●], 2023 (including the exhibits and schedules thereto, and as may be amended from time to time, the "**Membership Interest Purchase Agreement**"),[2] by and among SinOceanic I Limited (the "**Purchaser**") and the West Madison Debtors regarding the sale (the "**Sale**") of 100% of the

---

[1]   The remaining West Madison Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each debtor's federal tax identification number, are:  PWM Property Management LLC (2514) and 181 West Madison Property LLC (3759) (together, the "**West Madison Debtors**").  The service address of the West Madison Debtors for purposes of these Chapter 11 Cases is c/o M3 Partners, LLC, 1700 Broadway, 19th Floor, New York, NY 10019.  The Chapter 11 Cases of HNA 245 Park Ave JV LLC (5043); 245 Park JV LLC (2417); 245 Park Avenue Mezz C LLC (5276); 245 Park Avenue Mezz B LLC (4961); 245 Park Avenue Mezz A LLC (4673); and 181 West Madison Holding LLC (2346) were closed as of September 27, 2022. *See* Docket No. 1050.

[2]   A true and correct copy of the Membership Interest Purchase Agreement (without schedules or exhibits) is attached hereto as **Schedule 1**.  Capitalized terms used herein but not defined have the meaning assigned to such terms in the Plan (defined below), the West Madison Bidding Procedures Orders, the West Madison Bidding Procedures, or the Membership Interest Purchase Agreement, as applicable.

30646429.1

membership interests of 181 West Madison Property LLC (the "**Membership Interests**"), free and clear of all liens, claims, encumbrances and interests in accordance with the terms and conditions set forth in the Membership Interest Purchase Agreement; and the Court having considered the transactions contemplated by the Membership Interest Purchase Agreement (the "**Sale Transaction**"); and the Court having entered the *Order (I) Modifying Bidding and Auction Procedures Relating to the Submission of Transaction Proposals for 181 West Madison and (II) Granting Related Relief* [Docket No. 1300] (the "**Initial West Madison Bidding Procedures Order**") and the *Order (I) Authorizing Certain Clarifications and Modifications to the West Madison Bidding Procedures and (II) Granting Related Relief* [Docket No. 1362] ("**Modified West Madison Bidding Procedures Order**," collectively, the "**West Madison Bidding Procedures Orders**") approving, among other things, the dates, deadlines, and bidding procedures (the "**West Madison Bidding Procedures**") with respect to, and notice of, the proposed sale of the Membership Interests; and the Court having entered the *Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of PWM Property Management LLC and Its Debtor Affiliates* (the "**Plan**") [Docket No. 1296] (the "**Confirmation Order**"), which contemplated a potential sale of the Membership Interests in accordance with the terms of the West Madison Bidding Procedures Order; and due and sufficient notice of the Sale Transaction having been given under the circumstances; and it appearing that no other or further notice need be provided; and the Court having held a hearing on August 29, 2023 (the "**Sale Hearing**") to approve the Sale Transaction; and approval of the assumption of certain executory contracts and unexpired leases (the "**Assumed Contracts**") provided under the *Schedule of Assumed Contracts and Proposed Cure Payments* attached as Exhibit D to the *Plan Supplement* [Docket No. 889] (the "**Cure Schedule**") having been granted by the Court pursuant to the Plan and the Confirmation

Order; and the Court having considered the evidence proffered or adduced at the Sale Hearing and any other hearing related to the Sale Transaction; and it appearing that the relief requested in this order (this "**Order**") is in the best interests of the West Madison Debtors, their estates, creditors and other parties in interest; and upon the record of the Sale Hearing and the Chapter 11 Cases; and after due deliberation thereon; and good cause appearing therefore, it is hereby,

**FOUND, DETERMINED, AND CONCLUDED THAT:**[3]

A.    **Jurisdiction and Venue**. This Court has jurisdiction to consider the Order under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*, dated February 29, 2012 (Sleet, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Chapter 11 Cases and this Order is proper in this District under 28 U.S.C. §§ 1408 and 1409.

B.    **Petition Date**.  On October 31, 2021 (the "**Petition Date**"), the West Madison Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

C.    **West Madison Bidding Procedures Orders**.  On April 4, 2023 and July 5, 2023, respectively, this Court entered the Initial West Madison Bidding Procedures Order [Docket No. 1300] and the Modified West Madison Bidding Procedures Order [Docket No. 1362].

D.    **Plan and Confirmation Order**.  On April 4, 2023, this Court entered the Confirmation Order confirming the Plan of the West Madison Debtors.  The Plan provides, among other things, that in the event that the West Madison Mortgage Loan Amendment Effective Date has not occurred by May 31, 2023, the West Madison Debtors shall conduct an additional

---

[3]    The findings, determinations, and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

marketing and auction process with respect to transaction proposals for 181 West Madison pursuant to the Plan and the West Madison Bidding Procedures.

E. **Commencement of the Sale Process**. The West Madison Mortgage Loan Amendment Effective Date did not occur. On June 1, 2023, the West Madison Debtors filed the *Notice of Commencement of Sale Process for 181 West Madison* [Docket No. 1326] (the "**Sale Process Notice**") and the *Notice of Auction* [Docket No. 1327] (the "**Auction Notice**").

F. **Sale Notice**. On August 3, 2023, the Debtors filed a notice cancelling the auction. [Docket No. 1387]  On August [●], 2023, the West Madison Debtors filed a notice designating Purchaser as the Successful Bidder and attaching the Membership Interest Purchase Agreement [Docket No. [●]] (the "**Sale Notice**").

G. **Compliance with the Confirmation Order and the West Madison Bidding Procedures Orders**. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, if any, and (ii) the representations of counsel made on the record at the Sale Hearing, the West Madison Debtors have marketed 181 West Madison and conducted the sale process in compliance with the West Madison Bidding Procedures Orders. The West Madison Debtors and their professionals conducted the Sale Process in compliance with the West Madison Bidding Procedures Orders and have afforded potential purchasers a full and fair opportunity to make higher and better offers. The Purchaser has acted in good faith and in compliance with the terms of the West Madison Bidding Procedures. In accordance with the West Madison Bidding Procedures, the West Madison Debtors have determined that the bid submitted by the Purchaser and memorialized by the Membership Interest Purchase Agreement is the Successful Bid (as defined in the West Madison Bidding Procedures). The Membership Interest Purchase Agreement constitutes the highest and best offer for 181 West Madison and will provide a greater

recovery for the West Madison Debtors' estates than would be provided by any other available alternative. The West Madison Debtors' determination that the Membership Interest Purchase Agreement constitutes the highest and best offer for 181 West Madison constitutes a valid and sound exercise of the West Madison Debtors' business judgment.

H.      **Notice**. As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the West Madison Bidding Procedures, the Plan, the Confirmation Order, the Sale Process Notice, the Auction Notice, the Sale Hearing, and the Sale Transaction have been provided in accordance with sections 102(l), 365, 1123, and 1141 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local Rules 2002-1, 6004-1, and 9013-1 and in compliance with the West Madison Bidding Procedures Orders, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the West Madison Bidding Procedures, the Auction, the Sale Hearing, the Sale Transaction is or shall be required. With respect to entities whose identities are not reasonably ascertainable by the West Madison Debtors, publication of the Auction Notice in *The New York Times* and *Chicago Tribune* on July 7, 2023 was sufficient and reasonably calculated under the circumstances to reach such entities.

I.      **Assumption and Assignment.** Pursuant to the Plan, the Confirmation Order, the Cure Schedule, and the Assumption and Assignment Notice, notice of the cure payments (the "**Cure Payments**") of the Assumed Contracts had been provided to each non-Debtor party thereto and each of the non-Debtor parties to the Assumed Contracts has had a sufficient opportunity to object to the Cure Payments set forth in the Cure Schedule.

**J.**    **Corporate Authority**.  The West Madison Debtors have full corporate power and authority to execute the Membership Interest Purchase Agreement and all other documents contemplated thereby (collectively, the "**Transaction Documents**") and to consummate the transactions contemplated thereby.

**K.**    **Opportunity to Object**.  A fair and reasonable opportunity to object and to be heard with respect to the Sale Notice and the relief requested therein, has been given to all interested persons and entities in accordance with the paragraph 18 of the Confirmation Order. The Sale Notice has been served on the following parties: (i) all counterparties to the Assumed Contracts, (ii) the U.S. Trustee; (iii) the West Madison Servicer; (iv) SLG Member; (v) the West Madison Manager; (vi) holders of the twenty (20) largest unsecured claims against the West Madison Debtors; and (vii) any such other party entitled to receive notice pursuant to Bankruptcy Rule 2002.

**L.**    **Highest and Best Offer.**  No other person or entity or group of persons or entities has offered to purchase the Membership Interests for an amount that would give equal or greater economic value to the West Madison Debtors in the aggregate than the value being provided by the Purchaser pursuant to the Membership Interest Purchase Agreement.  Among other things, the Sale Transaction is the best option available to the West Madison Debtors to maximize the return to their estates.  The terms and conditions of the Membership Interest Purchase Agreement, including the consideration to be realized by the West Madison Debtors, are fair and reasonable. Approval of the Sale Transaction, the Membership Interest Purchase Agreement, and the transactions contemplated thereby, including the Sale Transaction, is in the best interests of the West Madison Debtors, their estates and creditors, and all other parties in interest.

**M.    Arms-Length Sale**.  The Transaction Documents were negotiated, proposed and entered into by the West Madison Debtors and the Purchaser without collusion, in good faith, and from arm's- length bargaining positions.  None of the West Madison Debtors, the Purchaser, any other party in interest, or any of their respective representatives has engaged in any conduct that would cause or permit the Transaction Documents, or the consummation of the Sale Transaction, to be avoidable or avoided, or for costs or damages to be imposed, or has acted in bad faith or in any improper or collusive manner with any entity in connection therewith under any applicable laws.  The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under the Bankruptcy Code, the Plan, this Order and any other applicable or similar bankruptcy and non-bankruptcy law.

**N.    Continuation of the West Madison Mortgage Loan Modification Agreement**.  The Purchaser will enter into the West Madison Mortgage Loan Modification Agreement with the West Madison Mortgage Lender, continuing the obligations under the West Madison Mortgage Loan.

**O.    Free and Clear**.  The West Madison Debtors may sell the Membership Interests free and clear of all encumbrances, claims, rights, obligations, liabilities and other interests of any kind or nature whatsoever against the West Madison Debtors or Membership Interests (other than those liabilities to be expressly assumed by the Purchaser under the Plan and the West Madison Mortgage Loan Modification Agreement), any liabilities, debts or obligations arising under or out of, in connection with, or in any way relating to, any acts or omissions, agreements, suits, demands, guaranties, contractual commitments, licenses, restrictions, options, environmental liabilities, labor and employment claims, employee pension or benefit plan claims, multiemployer benefit plan claims, workers' compensation claims, claims for taxes of or against the West Madison

Debtors or their assets, any derivative, vicarious, transfer or successor liability claims, and any other rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, matured or unmatured, liquidated or unliquidated, or contingent or non-contingent, and whether imposed by agreement, understanding, law, equity or otherwise, arising under or out of, in connection with, or in any way related to the West Madison Debtors (or their predecessors), the West Madison Debtors' interests in the Membership Interests, the operation of the West Madison Debtors' businesses before the Closing (collectively, the "**Interests**").

   **P.**  **Free and Clear; No Successor Liability.**  The Purchaser would not have entered into the Membership Interest Purchase Agreement and would not consummate the transactions contemplated thereby, including the Sale Transaction, (i) if the transfer of the Membership Interests were not free and clear of all Interests, including, without limitation, rights or claims based on any successor or transferee liability, of any kind or nature whatsoever (except as expressly set forth in the Membership Interest Purchase Agreement, the West Madison Mortgage Loan Modification Agreement, this Order, or the Plan) or (ii) if the Purchaser or any of its Affiliates, past, present and future members or shareholders, lenders, subsidiaries, parents, divisions, funds, agents, representatives, insurers, attorneys, successors and assigns, or any of their respective directors, managers, officers, employees, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, "**Purchaser Parties**") would, or in the future could, be liable for any such Interest.  The Purchaser will not consummate the transactions contemplated by the Membership Interest Purchase

Agreement, including the Sale Transaction, unless this Court expressly orders that none of the Purchaser, the other Purchaser Parties will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Interest.

Q.    **Prompt Consummation**.  The sale of the Membership Interests must be approved and consummated promptly on or prior to August 31, 2023, in accordance with the Plan. Therefore, time is of the essence in consummating the Sale Transaction, and the West Madison Debtors and the Purchaser intend to close the Sale Transaction as soon as reasonably practicable. The West Madison Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the Membership Interest Purchase Agreement, including the Sale Transaction.  The Purchaser, being a good faith purchaser, may close the Sale Transaction contemplated by the Membership Interest Purchase Agreement at any time after entry of this Order, subject to the terms and conditions of the Membership Interest Purchase Agreement. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with regards to the transactions contemplated by this Order.

R.    **No Fraudulent Transfer**.  The Transaction Documents were not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia, and none of the parties to the Transaction Documents are consummating the Sale Transaction for any other fraudulent or otherwise improper purpose.

S.    **Adequacy of Consideration.**  The consideration provided by the Purchaser for the Membership Interests pursuant to the Membership Interest Purchase Agreement (i) is fair and

reasonable, (ii) is the highest and best offer for the Membership Interests, (iii) will provide a greater recovery for the West Madison Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the Uniform Voidable Transactions Act), and any other applicable law.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.      The relief requested is **GRANTED** and **APPROVED** as set forth herein, and the Sale Transaction contemplated thereby and by the Membership Interest Purchase Agreement is approved, in each case as set forth in this Order.

2.      This Court's findings of fact and conclusions of law set forth in the West Madison Bidding Procedures Orders are incorporated herein by reference.

3.      Any objections to the relief requested therein, the Transaction Documents, the Sale, or the entry of this Order that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby **DENIED** and **OVERRULED** on the merits with prejudice.  All withdrawn objections are deemed withdrawn with prejudice.  Those parties who did not object to the entry of this Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes.

## Approval of the Sale of the Membership Interests

4.      The Membership Interest Purchase Agreement, including any amendments, supplements and modifications thereto, all other Transaction Documents, and all of the terms and conditions therein, are hereby **APPROVED** in all respects.

5.      The sale of the Membership Interests to the Purchaser free and clear of all Interests is approved in all respects pursuant to sections 1123 and 1141 of the Bankruptcy Code.

## Sale and Transfer of the Membership Interests

6.      The consideration provided by the Purchaser for the Membership Interests under the Membership Interest Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and the laws of the United States, any state, territory, possession, or the District of Columbia including without limitation the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, and any other applicable law.  The Sale Transaction may not be avoided or rejected by any person, or costs or damages imposed or awarded against the Purchaser, under any provision of the Bankruptcy Code.

7.      The Sale Transaction authorized herein shall be of full force and effect, regardless of the West Madison Debtors' lack or purported lack of good standing in any jurisdiction in which the West Madison Debtors are formed or authorized to transact business.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to implement the Sale Transaction and the other provisions of this Order; *provided*, *however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

8.      Subject to the terms, conditions, and provisions of this Order, all entities are hereby forever prohibited and barred from taking any action that would adversely affect or interfere, or

that would be inconsistent (a) with the ability of the West Madison Debtors to sell and transfer the Membership Interests to the Purchaser in accordance with the terms of the Transaction Documents and this Order and (b) with the ability of the Purchaser to acquire, take possession of, use and operate 181 West Madison in accordance with the terms of the Transaction Documents and this Order; *provided*, *however*, that the foregoing restriction shall not prevent any party in interest from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

9. Pursuant to 11 U.S.C. §§ 105, 365, 1123, 1141 and the Plan, the West Madison Debtors are hereby authorized and directed to, and shall, take any and all actions necessary or appropriate to (a) sell the Membership Interests to the Purchaser, (b) consummate the Sale Transaction in accordance with, and subject to the terms and conditions of, the Transaction Documents, and (c) transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with and subject to the terms and conditions of the Transaction Documents, in each case without further notice to or order of this Court. The West Madison Debtors are further authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Transaction Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Membership Interest Purchase Agreement, including the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Membership Interests, or as may be necessary or appropriate to the performance of the West Madison Debtors' obligations as contemplated by the Membership Interest Purchase Agreement without further notice to or order of this Court.

10.     Pursuant to 11 U.S.C. §§ 365 and 1123, all of the Membership Interests shall be transferred to the Purchaser upon consummation of the Membership Interest Purchase Agreement (such date, the "**Closing Date**") free and clear of all Interests.  The provisions of this Order authorizing and approving the transfer of Member Interests free and clear of all Interests shall be self-executing, and neither the West Madison Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

11.     Following the Closing Date, the Purchaser may, but shall not be required to, file a certified copy of this Order in any filing or recording office in any federal, state, county, or other jurisdiction in which the West Madison Debtors are incorporated or has real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Order as of the Closing Date.  On the Closing Date, this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of Member Interests to the Purchaser.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Membership Interest Purchase Agreement.

12.     Except as expressly permitted by the Membership Interest Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding Interests against or in a West Madison Debtor or 181 West Madison (whether legal or equitable, secured or unsecured, matured or

unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the West Madison Debtors, 181 West Madison or the operation of 181 West Madison before the Closing Date, or the transactions contemplated by the Membership Interest Purchase Agreement, including the Sale Transaction and the assumption and assignment of the Assumed Contracts, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such persons' or entities' Interests, whether by payment, setoff, or otherwise, directly or indirectly, against the Purchaser, Purchaser Parties, or any successors or assigns, their respective property and 181 West Madison.  Following the closing of the Sale Transaction, no party shall interfere with the Purchaser's title to or use and enjoyment of 181 West Madison based on or related to any such Interest or based on any action the West Madison Debtors may take in the Chapter 11 Cases.

13.    To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license or similar grant relating to the operation of 181 West Madison on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Membership Interest Purchase Agreement, including the Sale Transaction and the assumption and assignment of the Assumed Contracts.  Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale set forth in the Membership Interest Purchase Agreement.

14.    To the greatest extent available under applicable law and to the extent provided for under the Membership Interest Purchase Agreement, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the West Madison Debtors with respect to the Membership Interests, and, to the

greatest extent available under applicable law and to the extent provided for under the Membership Interest Purchase Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing Date.

15.     Subject to the terms and conditions of this Order, the transfer of the Membership Interests to the Purchaser pursuant to the Membership Interest Purchase Agreement constitutes a legal, valid, and effective transfer of the Membership Interests, and shall vest the Purchaser with all right, title, and interest of the West Madison Debtors in and to the Membership Interests free and clear of all Interests.

### No Successor Liability

16.     The Purchaser is not a "successor" to the West Madison Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, or be deemed to assume, or in any way be responsible for any Liability or obligation of any of the West Madison Debtors and/or their estates except as set forth in the Transaction Documents.

17.     Upon consummation of the Sale Transaction, the Purchaser shall not be deemed to (a) be the successor to the West Madison Debtors, (b) have, *de facto* or otherwise, merged with or into the West Madison Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the West Madison Debtors.

### Good Faith

18.     The transactions contemplated by the Transaction Documents are undertaken by the Purchaser without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale Transaction shall not alter, affect, limit, or otherwise impair the validity of the sale of the Membership Interests to

30646429.1

the Purchaser. The Purchaser is a good faith purchaser of the Membership Interests and is entitled to, and is hereby granted, the full rights, benefits, privileges and protections of the Bankruptcy Code and applicable law. The West Madison Debtors and the Purchaser will be acting in good faith if they proceed to consummate the Sale at any time after the entry of this Order.

19.    As a good faith purchaser of the Membership Interests, the Purchaser has not entered into an agreement with any other potential bidders, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Membership Interests, and, therefore, neither the West Madison Debtors nor any successor in interest to the West Madison Debtors' estates shall be entitled to bring an action against the Purchaser, and the Sale Transaction may not be avoided, and no party shall be entitled to any damages or other recovery in respect of the Membership Interest Purchase Agreement or the Sale Transaction.

### West Madison Mortgage Loan Modification Agreement

20.    On the Closing Date, the Purchaser shall enter into the West Madison Mortgage Loan Modification Agreement with the West Madison Mortgage Lender and continue any and all obligations under the West Madison Mortgage Loan.

21.    The West Madison Debtors are hereby authorized to make any and all payment obligations to the West Madison Mortgage Loan Lender in accordance with the terms of the West Madison Mortgage Loan Settlement and related documents.

### Additional Provisions

22.    The terms and provisions of the Transaction Documents and this Order shall be binding in all respects upon, and shall inure to the benefit of, the West Madison Debtors and their respective affiliates, successors and assigns, their estates, and their creditors, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including, but not

30646429.1

16

limited to, all persons asserting Interests in, on or against the Membership Interests to be sold to the Purchaser and all counterparties to the Assumed Contracts pursuant to the Membership Interest Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

23.     The failure specifically to include any particular provisions of the Membership Interest Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Membership Interest Purchase Agreement be authorized and approved in its entirety.

24.     The Transaction Documents or any other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court.

25.     To the extent of any such conflict or derogation, the provisions of the Membership Interest Purchase Agreement or the terms of this Order shall govern.  The provisions of this Order and the Membership Interest Purchase Agreement and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered converting these Chapter 11 Cases from chapter 11 to chapter 7 of the Bankruptcy Code, and the terms and provisions of the Membership Interest Purchase Agreement, as well as the rights and interests granted pursuant to this Order and the Membership Interest Purchase Agreement, shall continue in these Chapter 11 Cases or any superseding case and shall be specifically performable and enforceable against and binding upon the West Madison Debtors, their estates, all creditors, all holders of equity interests in the West Madison Debtors, all holders of claim(s) (whether known or unknown) against the West Madison Debtors, all holders of interests (whether known or unknown) against, in or on all or any portion

of the Membership Interests, the Purchaser and their respective successors and permitted assigns, any trustee, responsible officer or other fiduciary hereafter appointed or elected as a legal representative of the West Madison Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, including, without limitation, plan fiduciaries, plan administrators and liquidating trustees.

26.    Any and all valid and perfected liens or interests in the Membership Interests shall attach to any proceeds of the Sale Transaction immediately upon receipt of such proceeds by the West Madison Debtors in the order of priority, and with the same validity, force and effect which they now have against such Membership Interests, subject to any rights, claims, and defenses of the West Madison Debtors, the West Madison Debtors' estates (to the extent any such rights, claims, and defenses exist), including, but not limited to the right to bring a challenge (as prescribed in the *Final Order (I) Authorizing Postpetition Use of Cash Collateral with respect to 181 West Madison Property; (II) Granting Adequate Protection to Prepetition Secured Party; and (III) Granting Related Relief* [Docket No. 241], amended by [Docket Nos. 1001, 1177, 1235]), as applicable, may possess with respect thereto; *provided*, *however*, that setoff rights will be extinguished to the extent there is no longer mutuality after the consummation of the Sale Transaction in addition to any limitations on the use of such proceeds pursuant to any provision of this Order.

27.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale Transaction.

28.    In the event that the Purchaser fails to consummate the Sale Transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the West Madison Debtors will be authorized, without further order of this Court, to consummate the Sale Transaction with the Backup Bidder as the Purchaser (as such term is used throughout this Order).

29.     To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any Securities, instruments, or documents (including, without limitation, the Sale Transaction contemplated under the Membership Interest Purchase Agreement), (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) any transfers (directly or indirectly) of property or transfer of beneficial ownership of property pursuant to the Membership Interest Purchase Agreement, (d) any assumption, assignment, or sale by the Debtors of their interests in Unexpired Leases of nonresidential real property or Executory Contracts (each as defined in the Plan) pursuant to section 365(a) of the Bankruptcy Code and the Membership Interest Purchase Agreement, and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, the Confirmation Order, and the Membership Interest Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Membership Interest Purchase Agreement, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

30.     To the maximum extent permitted by law, this Court shall retain exclusive jurisdiction to enforce and implement the terms and provisions of the Membership Interest Purchase Agreement to the Purchaser, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects,

including, but not limited to, retaining jurisdiction to (a) compel delivery of the Membership Interests free and clear of Interests, or compel the performance of other obligations owed by the West Madison Debtors, (b) compel delivery of the purchase price or performance of other obligations owed to the West Madison Debtors, (c) resolve any disputes arising under or related to the Membership Interest Purchase Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Purchaser and Purchaser Parties against (i) claims made related to any of the Excluded Liabilities, (ii) any claims of successor or vicarious liability related to the Membership Interests, or (iii) any Interests asserted in, on, or against the West Madison Debtors or the Membership Interests, of any kind or nature whatsoever.

31.    The West Madison Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Plan, the West Madison Bidding Procedures Orders and the Membership Interest Purchase Agreement.

## **SCHEDULE 1**

*[Intentionally Omitted]*

**<u>EXHIBIT C</u>**

**Blackline**

Debtors' Draft: March 20, 2023
*Execution Version*

# ~~STOCK~~MEMBERSHIP INTEREST PURCHASE AGREEMENT

## BY AND AMONG

## [PURCHASER]SINOCEANIC I LIMITED,

## ~~181 WEST MADISON HOLDING~~PWM PROPERTY MANAGEMENT LLC,

## AND

## 181 WEST MADISON PROPERTY LLC

## DATED August __, 2023

~~BIDDERS ARE REQUIRED TO PROVIDE COMMENTS ON THIS DRAFT STOCK PURCHASE AGREEMENT IN THE FORM OF A CLEAN AND A BLACK-LINE TYPED MARK-UP HEREOF. THIS DRAFT STOCK PURCHASE AGREEMENT SHALL BE KEPT CONFIDENTIAL PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BY THE RECIPIENT HEREOF AND, IF APPLICABLE, ITS AFFILIATES, WITH RESPECT TO THE SUBJECT MATTER HEREOF.~~

~~*This draft Stock Purchase Agreement is intended solely to facilitate discussions among the parties identified herein. It is not intended to create, and will not be deemed to create, a legally binding or enforceable offer or agreement of any type or nature prior to the duly authorized and approved execution of this document by all such parties and the delivery of an executed copy hereof by all such parties to all other parties.*~~

TABLE OF CONTENTS

Page

**ARTICLE I** DEFINITIONS ................................................................................. 1

    **Section 1.1**    Definitions .................................................................... 1
    **Section 1.2**    Construction ................................................................. 10
    **Section 1.3**    Exhibits and Schedules ................................................. 11
    **Section 1.4**    Knowledge ................................................................... 11

**ARTICLE II** THE CLOSING ............................................................................. 12

    **Section 2.1**    Sale of Membership Interests ........................................ 12
    **Section 2.2**    Delivery of Funds ......................................................... 12
    **Section 2.3**    Closing; Closing Deliverables ....................................... 12
    **Section 2.4**    Deposit Escrow ............................................................ 13

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF THE COMPANY ............ 14

    **Section 3.1**    Due Organization, Good Standing and ~~Corporate~~ Power ...... 14
    **Section 3.2**    Authorization; Enforceability ........................................ 14
    **Section 3.3**    Capitalization .............................................................. 14
    **Section 3.4**    No Conflict; Required Filings and Consents .................... 15
    **Section 3.5**    Absence of Certain Changes .......................................... 16
    **Section 3.6**    Compliance with Laws .................................................. 16
    **Section 3.7**    Permits ....................................................................... 16
    **Section 3.8**    Litigation ................................................................... 16
    **Section 3.9**    Employee Benefit Plans ................................................ 16
    **Section 3.10**    ~~[Reserved]~~Sole Owner ............................................. ~~17~~16
    **Section 3.11**    Tax Matters ................................................................. 17
    **Section 3.12**    Transactions with Affiliates .......................................... ~~17~~18
    **Section 3.13**    Broker's or Finder's Fee ............................................... 18
    **Section 3.14**    Material Contracts ....................................................... 18
    **Section 3.15**    Environmental Matters .................................................. 18
    **Section 3.16**    Real Property .............................................................. 18
    **Section 3.17**    Exclusivity of Representations ....................................... 19

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF SELLER .................... 20

    **Section 4.1**    Due Organization, Good Standing and ~~Corporate~~ Power ...... 20
    **Section 4.2**    Authorization; Enforceability ........................................ 20
    **Section 4.3**    No Conflict; Required Filings and Consents .................... ~~20~~21
    **Section 4.4**    Ownership of Membership Interests ................................ 21
    **Section 4.5**    Broker's or Finder's Fee ............................................... 21
    **Section 4.6**    Exclusivity of Representations ....................................... 21

**ARTICLE V** REPRESENTATIONS AND WARRANTIES OF PURCHASER ............... 22

    **Section 5.1**    Due Organization, Good Standing and ~~Corporate~~ Power ...... 22
    **Section 5.2**    Authorization; Enforceability ........................................ 22
    **Section 5.3**    Consents and Approvals ................................................ 22

**Section 5.4**   Broker's or Finder's Fee ........................................................................... 23
**Section 5.5**   Financing ................................................................................................... 23
**Section 5.6**   Solvency ................................................................................................... ~~24~~23
**Section 5.7**   Litigation ................................................................................................. ~~24~~23
**Section 5.8**   Investment Intent .................................................................................... ~~24~~23
**Section 5.9**   Investigation by Purchaser; Company's Liability .................................. 24
**Section 5.10**  OFAC ........................................................................................................ ~~26~~25
**Section 5.11**  Exclusivity of Representations ............................................................... 26

**ARTICLE VI** COVENANTS .......................................................................................... 26

**Section 6.1**   Access to Information Concerning Properties and Records .................. 26
**Section 6.2**   Confidentiality ......................................................................................... 28
**Section 6.3**   Conduct of the Business of the Company Pending the Closing ........... 28
**Section 6.4**   Reasonable Best Efforts .......................................................................... 29
**Section 6.5**   Indemnity; Directors' and Officers' Insurance; Fiduciary and Employee
                  Benefit Insurance .................................................................................... ~~30~~29
**Section 6.6**   Public Announcements ............................................................................ ~~32~~30
**Section 6.7**   Transfer Taxes ........................................................................................ ~~32~~30
**Section 6.8**   Submission for Bankruptcy Court Approval .......................................... ~~33~~31
**Section 6.9**   Use of Proceeds ...................................................................................... ~~33~~32
**Section 6.10**  Competing Bids ...................................................................................... ~~34~~32
**Section 6.11**  Contract Rejections ................................................................................ ~~36~~34
**Section 6.12**  Support for the Transactions .................................................................. ~~36~~34
**Section 6.13**  Negative Covenants ................................................................................ ~~36~~35
**Section 6.14**  Title Insurance; Survey .......................................................................... ~~37~~35
**Section 6.15**  Tenant Estoppels ..................................................................................... ~~38~~36
**Section 6.16**  Deliverables ............................................................................................ ~~38~~36
**Section 6.17**  Further Assurances. ................................................................................ ~~38~~37

**ARTICLE VII** CONDITIONS PRECEDENT ................................................................... ~~39~~37

**Section 7.1**   Conditions to the Obligations of Each Party ......................................... ~~39~~37
**Section 7.2**   Conditions to the Obligations of Purchaser ........................................... ~~40~~38
**Section 7.3**   Conditions to the Obligations of Seller .................................................. ~~40~~38
**Section 7.4**   Frustration of Closing Conditions .......................................................... ~~40~~39

**ARTICLE VIII** TERMINATION ...................................................................................... ~~41~~39

**Section 8.1**   Consensual Termination .......................................................................... ~~41~~39
**Section 8.2**   Termination by Purchaser. ...................................................................... ~~41~~39
**Section 8.3**   Termination by the Company or Seller. .................................................. ~~42~~40
**Section 8.4**   Effect of Termination .............................................................................. ~~43~~41

**ARTICLE IX** MISCELLANEOUS .................................................................................. ~~44~~42

**Section 9.1**   Fees and Expenses .................................................................................. ~~44~~42
**Section 9.2**   Extension; Waiver ................................................................................... ~~44~~42
**Section 9.3**   Notices ..................................................................................................... ~~44~~42
**Section 9.4**   Entire Agreement .................................................................................... ~~45~~44
**Section 9.5**   Non-Recourse ......................................................................................... ~~45~~44

(ii)

**Section 9.6**    Binding Effect; Benefit; Assignment ................................. ~~46~~44

**Section 9.7**    Survival ................................................................... ~~46~~44

**Section 9.8**    Amendment and Modification ...................................... ~~47~~45

**Section 9.9**    Counterparts ............................................................ ~~47~~45

**Section 9.10**    Applicable Law ........................................................ ~~47~~45

**Section 9.11**    Severability ............................................................. ~~48~~46

**Section 9.12**    Specific Enforcement ................................................ ~~48~~46

**Section 9.13**    Waiver of Jury Trial ................................................. ~~49~~47

**Section 9.14**    Rules of Construction ............................................... ~~49~~47

**Section 9.15**    Interpretation .......................................................... ~~49~~47

**Section 9.16**    Time of the Essence ................................................. ~~50~~49

**Section 9.17**    Control of Attorney-Client and All Other Privileges. ........ ~~51~~49

**<u>Exhibits</u>**

**Exhibit A – Form of Sale Order**

**Exhibit B – Form of Estoppel Certificate**

# ~~STOCK~~MEMBERSHIP INTEREST PURCHASE AGREEMENT[1]

This ~~STOCK~~MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is dated [●]August ___, 2023, by and among ~~[PURCHASER], a [●]~~SinOceanic I Limited, a limited company organized under the Laws of [●]Bermuda ("**Purchaser**"), ~~181 West Madison Holding~~PWM Property Management LLC, a limited liability company organized under the Laws of Delaware ("**Seller**"), and 181 West Madison Property LLC, a limited liability company organized under the Laws of Delaware (the "**Company**").

W I T N E S S E T H:

WHEREAS, the West Madison Debtors (as defined herein) commenced voluntary cases under the Bankruptcy Code in the Bankruptcy Court on October 31, 2021 (the "**Petition Date**") and such cases are being jointly administered for procedural purposes under the lead case *In re PWM Property Management LLC, et al.*, Case No. 21-11445 (MFW) (collectively, the "**Bankruptcy Cases**");

WHEREAS, Seller indirectly owns 100% of the membership interests of 181 West Madison Holding LLC, a limited liability company organized under the Laws of Delaware ("**West Madison Holding**"), such membership interests representing all of the issued and outstanding equity interests of West Madison Holding;

WHEREAS, ~~Seller~~West Madison Holding directly owns 100% of the membership interests of the Company (the "**Membership Interests**"), such Membership Interests representing all of the issued and outstanding equity interests of the Company;

WHEREAS, Seller desires to, directly or indirectly, sell the Membership Interests, and Purchaser desires to purchase the Membership Interests, on the terms and subject to the conditions set forth herein and in the Plan (as defined herein); and

WHEREAS, it is the intention of the parties hereto that following the entry of the Sale Order finding the Purchaser as the prevailing bidder at the Auction (if any),  upon the consummation of the purchase and sale of the Membership Interests pursuant to this Agreement and the Plan, Purchaser shall own directly all of the issued and outstanding equity interests of the Company, free and clear of any Liens other than Liens created or imposed by Purchaser, or under applicable securities Laws or any Reinstated Indebtedness pursuant to the Plan.

NOW, THEREFORE, in consideration of the premises and of the representations, warranties, covenants and agreements herein contained, the parties hereto, intending to be legally bound, agree as follows:

---

[1]  ~~**Note to Draft**: Purchaser's obligations under this Agreement to be guaranteed by a creditworthy entity if Purchaser is not a creditworthy entity.~~

# ARTICLE I

## DEFINITIONS

**Section 1.1**    Definitions.  When used in this Agreement, the following terms shall have the respective meanings specified therefor below.

"**Action**" shall mean any action, hearing, claim (including any cross-claim or counterclaim), charge, demand, litigation, Order, mediation, audit, inquiry, investigation, suit, arbitration or other proceeding, whether civil or criminal, at law or in equity, by or before any Governmental Entity.

"**Affiliate**" of any Person shall mean any Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided, further, that in no event shall M3 Advisory Partners, LP or any of its personnel (including Mohsin Y. Meghji) be considered an Affiliate of the Company.

"**Agreement**" shall have the meaning given to it in the Preamble.

"**Alternative Transaction**" shall mean any transaction with respect to a plan of reorganization or liquidation, dissolution, winding up, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity interests of the Company, or any other restructuring involving the West Madison Debtors without the prior written consent of Purchaser that renders the Transactions or the Plan unable to be consummated on the terms set forth in the Plan and this Agreement.

"**Alternative Transaction Proposal**" shall have the meaning given to it in ~~Section 6.10(b)~~Section 6.10(e).

"**Auction**" shall have the meaning given to it in Section 6.10(a).

"**Back-Up Bidder**" shall have the meaning given to it in Section 6.10(c).

"**Bankruptcy Cases**" shall have the meaning given to it in the Recitals.

"**Bankruptcy Code**" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as it may be amended from time to time.

"**Bankruptcy Court**" shall have the meaning given to it in the Plan.

"**Bidding Procedures**" shall mean the bidding procedures attached to the Bidding Procedures Order as Schedule 1.

"**Bidding Procedures Order**" shall mean (a) the *Order (I) Modifying Bidding and Auction Procedures Relating to the Submission of Transaction Proposals for 181 West Madison and (II) Granting Related Relief* [Docket No. —1300] approving, among other matters the Bidding Procedures and authorizing the West Madison Debtors to take any and all actions necessary or appropriate to implement the Bidding Procedures, as further modified by the (b) the Order (I) Authorizing Certain Clarifications and Modifications to the West Madison Bidding Procedures and (II) Granting Related Relief [Docket No. 1362].

"**Business Day**" shall mean any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York.

"**Chief Restructuring Officer**" shall mean Mohsin Y. Meghji.

"**Closing**" shall have the meaning given to it in Section 2.3(a).

"**Closing Date**" shall have the meaning given to it in Section 2.3(a).

"**Code**" shall mean the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated and the rulings issued thereunder.

"**Company**" shall have the meaning given to it in the Preamble.

"**Competing Bid**" shall mean any bid, offer or proposal contemplating an Alternative Transaction.

"**Confidentiality Agreement**" shall have the meaning given to it in Section 6.2.

"**Confirmation Order**" shall mean a Final Order of the Bankruptcy Courtthat certain Order (I) Confirming *Second Amended Joint Chapter 11 Plan of Reorganization of the West Madison Debtors* and (II) Granting *Related Relief* [Docket No. 1296] (i) confirming the Plan pursuant to section 1129 of the Bankruptcy Code and (ii) authorizing the transactions contemplated under this Agreement, including the sale of the Membership Interests under sections 365, 1123 and 1141 of the Bankruptcy Code pursuant to the Plan.

"**Contract**" shall mean any legally enforceable written agreement, contract, indenture, note, bond, loan, lease, license, purchase and sale order, conditional sales contract, mortgage, instrument, or other arrangement or instrument including all amendments and modifications thereto.

"**Contracting Parties**" shall have the meaning given to it in Section 9.5.

"**COVID-19**" shall mean SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof or related or associated epidemics, pandemic or disease outbreaks.

"**Deal Communications**" means all communications (whether before, at or after the Closing and whether in writing, electronic or other form) between internal or external legal counsel and the Seller or any of its Affiliates or any of their respective Representatives that relate

in any way to the Transactions or the Bankruptcy Cases that are entitled to any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege.

"**Deposit**" shall have the meaning given to it in Section 2.4(a).

"**Disclosure Schedules**" shall have the meaning given to it in Article III.

"**Due Diligence Materials**" shall have the meaning given to it in ~~Section 5.9(a)(i)~~Section 5.9.

"**Emergency Event**" means any Order, event, circumstance, development, state of facts, occurrence, change, effect, incident or accident of the type referred to in any of clauses (f), (g), (h), (i) or (j) of the definition of "Material Adverse Effect".

"**Emergency Response**" means any emergency or immediate remedial or protective action taken or determined or committed to be taken by Seller, the Company, ~~any other~~ West Madison ~~Debtor~~Holding or any of their Affiliates, in their good faith reasonable determination in the best interests of the Company in response to any Emergency Event.

"**End Date**" shall have the meaning given to it in Section 8.1(b)(ii).

"**Environmental Law**" shall mean any Law, Order or other requirement of Law, relating to pollution, public or worker health or safety to the extent public or worker health or safety relates to exposure to hazardous materials, or the protection of the environment.

"**ERISA**" shall have the meaning given to it in Section 3.9.

"**Escrow Agent**" means Citibank, N.A.

"~~**Escrow Agreement**" means that certain Escrow Agreement, dated as of [●], by and between Seller and the Escrow Agent.~~

"**Estoppel Certificates**" shall have the meaning given to it in Section 6.15.

"**Event**" shall mean any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exhibits**" shall have the meaning given to it in Section 1.3.

"**Final Order**" shall have the meaning given to it in the Plan.

"**Fraud**" shall mean, with respect to any party, an actual and intentional fraud with respect to any material statement in any representation or warranty set forth in Article III, Article IV or Article V (as applicable); provided, however, that such actual and intentional fraud of such party shall only be deemed to exist if, with respect to the Company or the Seller, the individuals listed on Section 1.04 of the Disclosure Schedules, had (a) actual knowledge (as opposed to imputed or constructive knowledge) on the date hereof that such representations and warranties (as qualified by the Disclosure Schedules) were actually and materially breached on

-4-

the date hereof, (b) the express intention that the other party would rely on such breached representations and warranties to its detriment and (c) the actual intent to deceive a party to this Agreement and to receive a material benefit from such deception.  Under no circumstances shall "Fraud" include any equitable fraud, negligent misrepresentation, promissory fraud, unfair dealings, extra-contractual fraud or any other fraud or torts based on recklessness or negligence.

"**Fundamental Representations**" means the representations and warranties set forth in Section 3.1 (Due Organization, Good Standing and Corporate Power) (other than the last two sentences thereof), Section 3.2 (Authorization; Enforceability), Section 3.3 (Capitalization), Section 3.4(a)(i) (No Conflicts), Section 4.1 (Due Organization, Good Standing and Corporate Power), Section 4.2 (Authorization; Enforceability) and Section 4.4 (Ownership of Membership Interests).

"**GAAP**" shall mean generally accepted accounting principles of the United States of America consistently applied, as in effect from time to time on or prior to the Closing Date.

"**Governmental Entity**" shall mean any domestic or foreign court, arbitral tribunal, administrative agency or commission or other governmental or regulatory agency or authority or any securities exchange, as well as any arbitral body.

["**Guarantee**" shall have the meaning set forth in Section 5.5.][2]

"**Indemnified Person Claim**" shall have the meaning given to it in Section 6.5(b).

"**Indemnified Persons**" shall have the meaning given to it in Section 6.5.

"**Independent Agent**" shall mean Alan J. Carr and Vikram Jindal, in their capacities as independent agents of Seller or PWM Property Management LLCWest Madison Holding.

"**Knowledge of the Company**" shall have the meaning given to it in Section 1.4.

"**Law**" shall mean any statute, law, code, Order, common law, ordinance, rule or regulation of any Governmental Entity.

"**Liabilities**" shall mean any and all debts, liabilities and obligations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured or determined or determinable.

"**Liens**" shall have the meaning given to it in the Plan.

"**Material Adverse Effect**" shall mean any change, development, effect, event or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of the

---

[2]   **Note to Draft**: To be included if Purchaser is not a creditworthy entity.

Company; provided, however, that none of the following events, changes, conditions, circumstances, developments or effects (or the results thereof) shall be deemed to constitute a "Material Adverse Effect" and shall not be taken into account, individually or in the aggregate, in determining whether a Material Adverse Effect has occurred or would be reasonably likely to occur:  (a) the execution, announcement or pendency of this Agreement (including any action or inaction by the customers, suppliers, landlords, and employees, ~~consultants or competitors~~ of the Company and ~~their respective~~its Affiliates as a result thereof) and compliance with the express provisions of this Agreement or the consummation of the Transactions ~~(including the impact thereof on the relationships, contractual or otherwise, of the business of the Company with labor unions, financing sources, customers, employees, suppliers, regulators or partners or other business relationships)~~, including the initiation of litigation or other administrative proceedings by any Person with respect to this Agreement or any of the Transactions, (b) actions or omissions taken or not taken by or on behalf of the Company or any of its Affiliates at the request of, or with the prior written consent of, Purchaser or its Affiliates, (c) actions taken by Purchaser or its Affiliates, (d) failure of the Company or its Affiliates to meet any internal or published projections, forecasts, estimates or predictions (provided, that this clause (d) shall not prevent a determination that any change, event, circumstance or effect underlying such failure has resulted in a Material Adverse Effect, unless such change, event, circumstance or effect is otherwise excepted by this definition), (e) ~~changes or prospective changes in Law or GAAP or other applicable accounting principles or standards in the United States or elsewhere, or changes or prospective changes in the~~any promulgation or enactment of, change in, implementation of, enforcement or change in interpretation, implementation or enforcement of ~~any of the foregoing, or any changes or prospective changes in general legal, regulatory or political conditions;~~GAAP or Law, (f) volcanoes, tsunamis, effects of climate change, earthquakes, floods, storms, hurricanes, tornados, fires, epidemics, pandemics, disease, outbreak, public health crises or acts of god or natural disasters or man-made disasters, ~~in each case, including and any direct or indirect consequence or condition thereof, including outbreaks or additional waves of outbreaks of any contagious diseases (including influenza, COVID-19 or any variation thereof),~~ (g) any action required to be taken under any Law or Order or any existing Contract relating to the business of the Company by which the Company (or any of its properties) is bound, (h) disruptions to the energy market or changes in general economic conditions, currency exchange rates or United States or international securities, currency, debt or equity markets, (i) general trends, events or conditions generally affecting the industry, markets or geographic areas in which the Company operates, including changes in customer, supplier or regulator behavior, (j) local, regional, national or international political or social conditions or any national or international hostilities, acts of terror, cyberterrorism, police action, civil unrest, sabotage, war (whether or not declared) or any escalation or worsening of any such conditions, hostilities or acts, (k) the existence of the Bankruptcy Cases; provided, however, that, in the case of clauses (e), (f), (h), (i), and (j), such events, changes, conditions, circumstances, developments or effects shall be taken into effect in determining whether any such material adverse effect has occurred to the extent that any such events, changes, conditions, circumstances, developments or effects have a material and disproportionate adverse effect on the business of the Company relative to similar businesses, operating in the industry or markets in which the Company operates.  For the avoidance of doubt, a "Material Adverse Effect" shall be measured only against past performance of the Company, and not against any forward-looking statement, projections or forecasts of the Company or any other Person.

"**Material Contract**" shall have the meaning given to it in Section 3.14.

"**Membership Interests**" shall have the meaning given to it in the Recitals.

"**Nonparty Affiliates**" shall have the meaning given to it in Section 9.5.

"**Order**" shall mean any judgment, order, injunction, decree, writ, permit or license of any Governmental Entity or any arbitrator.

"**Organizational Documents**" shall mean, with respect to any entity, (a) the certificate or articles of incorporation and the by-laws, the certificate of formation and partnership agreement or operating agreement (as applicable), and (b) any organizational or governing documents comparable to those described in clause (a) as may be applicable to such entity pursuant to any applicable Law.

"**Owned Real Property**" shall have the meaning given to it in Section 3.16.

"**Permits**" shall have the meaning given to it in Section 3.7.

"**Permitted Lien**" shall mean (a) statutory Liens or other Liens arising by operation of law securing payments not yet due or which are being contested in good faith, including Liens of warehousemen, mechanics, suppliers, materialmen and repairmen and for which adequate reserves have been established in accordance with GAAP, (b) Liens for Taxes not yet due and payable or which are being contested in good faith and for which adequate reserves have been established in accordance with GAAP or the nonpayment of which is permitted or required by the Bankruptcy Code where such Lien will be released from the assets of the Company pursuant to the Bankruptcy Code at Closing or otherwise upon the transfer of the Membership Interests pursuant to this Agreement, (c) Liens affecting the real property set forth in Section 3.16(a) or Section 3.16(b), including (i) easements, rights of way, servitudes, permits, licenses, surface leases, ground leases to utilities, municipal agreements, railway siding agreements and other real property rights, (ii) conditions, covenants or other similar restrictions, (iii) easements for streets, alleys, highways, telephone lines, gas pipelines, power lines, railways and other easements and rights of way of public record on, over or in respect of any such real property, (iv) encroachments and other matters that would be shown in an accurate survey or physical inspection of such real property, (v) all matters which would be reflected on current title reports/commitments and (vi) any other such Liens, including irregularities of title that are non-monetary in nature provided that none of the matters set forth in the foregoing clauses (i) through (v) would reasonably be expected to materially impair the current use of the affected real property, (d) Liens in favor of the lessors under the Real Property Leases or encumbering the interests of the lessors in such real property, (e) zoning, entitlement, building and other land use regulations imposed by Governmental Entities having jurisdiction over any Owned Real Property or any real property leased by the Company, (f) Liens incurred or deposits made in connection with workers' compensation, unemployment insurance or other types of social security, (g) any other Liens not described in clauses (a) through (f) above created by this Agreement or connected with the transactions contemplated hereby or by the actions of Purchaser or any of its Affiliates, (i) Liens that do not materially and adversely interfere with the current operation of the business of the Company, (j) Liens in respect of the Reinstated Indebtedness, (k) Liens

established or reinstated pursuant to the Plan, and (l) Liens set forth in <u>Section 1.1(b)</u> of the Disclosure Schedules.

"**Person**" shall mean and include an individual, a partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, a trust, an association, an unincorporated organization, a group and a Governmental Entity or other entity.

"**Plan**" shall mean the *Second Amended Joint Chapter 11 Plan of Reorganization of PWM Property Management LLC and Its Debtor Affiliates* (including the Plan Supplement and all exhibits hereto and thereto) [Docket No. <u>—1296-1</u>], as the same may be amended, modified, supplemented or amended and restated from time to time.

"**Plan Supplement**" shall mean the compilation of documents and forms of documents, schedules, and exhibits to the Plan, filed with the Bankruptcy Court <u>[Docket No. 889]</u>, each of which shall be in form and substance materially consistent with the Plan, this Agreement, and otherwise reasonably acceptable to the Company and Purchaser, as may be amended, modified, or supplemented from time to time.

"**Pre-Closing Equityholder Group**" shall mean Seller, each direct and indirect beneficial owner of Seller, and their respective Affiliates or Representatives.

"**Prohibited Person**" shall mean, at any time, (a) any Person that is the subject of any Sanctions administered or enforced by OFAC, the U.S. Department of State, the U.S. Department of Justice, the U.S. Department of Commerce, the United Nations Security Council, or any other relevant Sanctions Authority; (b) any Person operating, organized or resident in a Sanctioned Jurisdiction; (c) any Person owned, directly or indirectly, or controlled by any such Person or Persons described in the foregoing <u>clauses (a)</u> or <u>(b)</u>; or (d) any person that is otherwise the subject of Sanctions ("subject of Sanctions" signifying a Person with whom a U.S. Person or person subject to the jurisdiction of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business, or other activities).

"**Purchase Price**" shall mean an amount equal to $[●]³less<u>2,000,000 taken together with</u> the aggregate amount of Reinstated Indebtedness.

"**Purchaser**" shall have the meaning given to it in the <u>Preamble</u>.

"**Purchaser Default Termination**" shall have the meaning given to it in <u>Section 2.4(b)</u>.

"**Qualified Bid**" shall have the meaning given to it in the Bidding Procedures.

---

³ **Note to Draft**: Bidders are required to fill in this amount. The Purchase Price must satisfy the Treatment of the West Madison Mortgage Claims requirement in the Bidding Procedures. This draft Agreement contemplates that the Reinstated Indebtedness will be continued, with the parties to discuss any requirement to deliver evidence of such continuation. However, the Purchaser has the option to instead pay off the amount of the Reinstated Indebtedness, in which case, this Agreement will be modified accordingly.

"**Real Property Leases**" shall have the meaning given to it in Section 3.16.

"**Reinstated Indebtedness**" shall mean the West Madison Mortgage Loan (as defined in the Plan) as it may be modified with the consent of the West Madison Mortgage Lender (as defined in the Plan).

"**Rent Roll**" shall have the meaning given to it in Section 3.16(b).

"**Representatives**" of any Person shall mean such Person's directors, managers, officers, employees, agents (including, in the case of the West Madison Debtors, the Independent Agents), attorneys, consultants, advisors or other representatives.

"**Return**" shall mean any returns, statements, forms, reports, declarations, estimates, information statements or disclosures supplied or required to be supplied to a Governmental Entity with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Sale Hearing**" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"**Sale Order**" shall mean the Final Order entered by the Bankruptcy Court authorizing the transactions contemplated under this Agreement, including the sale of the Membership Interests pursuant to the Plan, in each case, in accordance with the terms of this Agreement, substantially in the form of Exhibit CA (as modified or amended (i) by the Seller for de minimis or non-substantive changes, (ii) with the written consent of the Seller and Purchaser or (iii) as otherwise agreed to by the Seller and Purchaser on the record at any hearing, including the Sale Hearing, before the Bankruptcy Court).

"**Sanctioned Jurisdiction**" shall mean, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the Crimea region of Ukraine, the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine, Cuba, Iran, North Korea, and Syria).

"**Sanctions**" shall mean (a) economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, the U.S. Department of Justice, the U.S. Department of Commerce or any other U.S. government authority or department; and (b) any other applicable sanctions laws and regulations.

"**Sanctions Authority**" shall mean OFAC, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"), the U.S. Department of Justice, the U.S. Department of State, or any other Governmental Entity or agency administering laws, regulations, or restrictive measures relating to Sanctions.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Seller**" shall have the meaning given to it in the <u>Preamble</u>.

"**Solvent**" shall mean, with respect to any Person, that (a) the property of such Person, at a present fair saleable valuation, exceeds the sum of its debts (including contingent and unliquidated debts); (b) the present fair saleable value of the property of such Person exceeds the amount that will be required to pay such Person's probable Liability on its existing debts as they become absolute and matured; (c) such Person has adequate capital to carry on its business; and (d) such Person does not intend or believe it will incur debts beyond its ability to pay as such debts mature.  In computing the amount of contingent or unliquidated Liabilities at any time, such Liabilities will be computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become actual or matured Liabilities.

"**Subsidiary**", with respect to any Person, shall mean (a) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more subsidiaries of such Person and (b) any limited liability company, partnership, association, joint venture or other entity in which such Person directly or indirectly through one or more subsidiaries of such Person has more than a fifty percent (50%) equity interest.

"**Superior Proposal**" shall have the meaning given to it in ~~Section 6.10(b)~~<u>Section 6.10(e)</u>.

"**Superior Transaction**" shall mean a transaction that the Independent Agents determine in good faith, based on the advice of the Seller's financial and legal advisors: (x) would be in the best interests of the Company and its creditors and equity holders as a whole, and (y) would reasonably be expected to be superior to the Company and its creditors and equity holders in comparison to the transactions contemplated under this Agreement and the Plan.

"**Tax**" or "**Taxes**" shall mean <u>(a)</u> all United States federal, state, local, foreign and other taxes, assessments, charges, duties, fees, levies or other governmental charges including all income, franchise, profits, gross receipts, capital gains, capital stock, transfer, sales, use, value added, ad valorem, occupation, property, excise, severance, windfall profits, stamp, license, goods and services, payroll, withholding, social security, and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding)<u>, and</u> all estimated taxes, deficiency assessments, additions to tax, penalties and interest with respect thereto <u>and (b) any Taxes of another Person pursuant to Treasury Regulations Section 1.1502-6 (or any analogous or similar state, local, or foreign law), as a transferee or successor, by contract or otherwise</u>.

"**Title Company**" shall mean Old Republic National Title Insurance Company or Royal Abstract.

"**Title Policy**" shall have the meaning given to it in Section 6.14.

"**Transaction Documents**" shall mean this Agreement and any other Contract to be entered into by Purchaser and any other West Madison Debtor, in connection with the Transactions or the Plan.

"**Transactions**" shall mean the transactions contemplated by this Agreement, the Plan and the other Transaction Documents, including the purchase and sale of the Membership Interests.

"**Transfer Taxes**" shall have the meaning given to it in <u>Section 6.7</u>.

"**West Madison Debtors**" shall mean ~~PWM Property Management LLC, a Delaware limited liability company, and 181 West Madison Property LLC, a Delaware limited liability company~~<u>the Seller and the Company</u>.

"**West Madison Sale Effective Date**" shall have the meaning given to it in the Plan.

"<u>West Madison Holding</u>" <u>shall have the meaning given to it in the Recitals.</u>

**Section 1.2**    <u>Construction</u>.  In this Agreement, unless the context otherwise requires:

(a)    references in this Agreement to "writing" or comparable expressions include a reference to electronic transmission or comparable means of communication (including electronic mail); <u>provided</u>, that the sender complies with <u>Section 9.3</u>;

(b)    the phrases "delivered" or "made available", when used in this Agreement, shall mean that the information referred to has been physically or electronically delivered to the relevant parties (including, in the case of "made available" to Purchaser, material that has been posted, retained and thereby made available to Purchaser through the on-line "virtual data room" established by the Company and / or its Representatives);

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)    references to Articles, Sections, Exhibits, Schedules, the Preamble and Recitals are references to articles, sections, exhibits, schedules, the preamble and recitals of this Agreement;

(e)    the descriptive headings of the several Articles, Sections and Schedules of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(f)    references to "day" or "days" are to calendar days and whenever any action must be taken under this Agreement on or by a day that is not a Business Day, then that action may be validly taken on or by the next day that is a Business Day;

-11-

(g)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any provision of this Agreement;

(h)    this "Agreement" or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented;

(i)    "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import;

(j)    references to any Governmental Entity or Law shall mean and include any successor or replacement Governmental Entity or Law to the referenced one;

(k)    the words "ordinary course of business" means acting or refraining from acting in a manner materially consistent with how a similarly situated company in the same industry acting reasonably could reasonably be expected to act or refrain from acting under similar circumstances and reasonably informed by the past practice of the Company (including recent past practice in light of the current pandemic, epidemic or disease outbreak (taking into account any event, change or circumstance, in each case, to the extent related to COVID-19 that occurs following the date of this Agreement), and any action taken or omitted to be taken, that relates to or arises out of such pandemic, epidemic or disease outbreak shall be deemed to be in the "ordinary course of business"); and

(l)    references to "Dollars", "dollars" or "$" without more are to the lawful currency of the United States of America and all payments hereunder shall be made in United States dollars.

**Section 1.3**    Exhibits and Schedules.  The exhibits (the "**Exhibits**") and the schedules to this Agreement are incorporated into and form an integral part of this Agreement. All Exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  If an Exhibit is a form of agreement, such agreement, when executed and delivered by the parties thereto, shall constitute a document independent of this Agreement.

**Section 1.4**    Knowledge.  When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of the Company**" or words of similar import, it shall mean the current, actual knowledge of Transwestern Commercial Services, LLC and/or the Chief Restructuring Officer, without inquiry or investigation.  Where any representation, warranty or other provision in this Agreement refers to notice or written notice having been delivered or received by the Company, or any of its Affiliates, such representation, warranty or other provision shall be interpreted to include only any notice to the individuals listed in the immediately preceding sentence or any notice of which one of such individuals has actual knowledge, without any implication that any such Person has made any inquiry or investigation as to the sending or receipt of such notice.

## ARTICLE II

## THE CLOSING

**Section 2.1**    Sale of Membership Interests.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, Seller shall cause West Madison Holding to sell, assign, transfer and deliver to Purchaser at the Closing on the Closing Date, and Purchaser shall purchase from ~~Seller~~West Madison Holding at the Closing on the Closing Date, the Membership Interests free and clear of all Liens other than Liens created or imposed by Purchaser, or under applicable securities Laws or any Reinstated Indebtedness pursuant to the Plan.

**Section 2.2**    Delivery of Funds.  At the Closing, Purchaser shall pay to Seller or Seller's designee, as paying agent, the Purchase Price, less the Deposit (as defined below), by wire transfer of immediately available funds to the account(s) of Seller specified in writing to Purchaser at least two (2) Business Days prior to the Closing Date; provided, that any delay in the delivery of such wire instructions shall be without prejudice to Seller's rights to receive such amounts, as applicable, which shall promptly be paid upon the later of the Closing Date and the receipt of such account notification.

**Section 2.3**    Closing; Closing Deliverables.  (a) Unless this Agreement shall have been terminated and the transactions contemplated hereby shall have been abandoned pursuant to Article VIII, and subject to the satisfaction or waiver (to the extent such waiver is permitted by applicable Law) of all of the conditions set forth in Article VII, the closing of the sale of Membership Interests (the "**Closing**") shall take place at 10:00 A.M. at the offices of White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020-1095 or by electronic transmittal of executed documents, as soon as practicable, but in any event, within three (3) Business Days after the last of the conditions set forth in Article VII is satisfied or waived (to the extent such waiver is permitted by applicable Law), other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions, or at such other date, time or place as the Contracting Parties shall agree in writing; provided, however, that the Closing shall take place on or before ~~[●][1]~~August 31, 2023, unless such date is extended by the written consent of the Seller and Purchaser.  Such date is herein referred to as the "**Closing Date**".

(b)    At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following:

(i)    an instrument of assignment, in form reasonably satisfactory to Purchaser and Seller, duly executed by an authorized officer of West Madison Holding, assigning and transferring the Membership Interests to Purchaser;

---

[1]    ~~**Note to Draft**: To be updated with appropriate closing date deadline once the Plan has been confirmed.~~

(ii)    ~~(i)~~ a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the effect that the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied;

(iii)    ~~(ii)~~ customary forms of lien affidavits and transfer forms and such other documents or affidavits as may be reasonably required by the Title Company to issue the Title Policy with extended coverage, deletion of the exception for mechanic's and materialmen's liens, and deletion of any general exceptions; provided, however, that, except with respect to a customary gap indemnity for a duration of not greater than thirty (30) days, in no event shall the Seller be required to provide any indemnities to Purchaser or the Title Company hereby; ~~and~~

(iv)    ~~(iii)~~ a properly executed IRS Form W-9 from the Seller (or, if the Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner for such purposes)~~.~~; and

(v)    the mortgage loan modification agreement modifying the Reinstated Indebtedness in form and substance acceptable to West Madison Mortgage Lender and Purchaser (the "**Loan Modification Agreement**").

(c)    At the Closing, Purchaser shall deliver to Seller a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the effect that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied.[5]

**Section 2.4**    Deposit Escrow.

(a)    Concurrently with the execution of this Agreement, Purchaser has deposited into a deposit escrow account with the Escrow Agent an amount equal to $~~[●]~~[6]2,000,000 (such amount, the "**Deposit**") by wire transfer of immediately available funds.

(b)    Seller shall give written ~~notice~~instruction to the Escrow Agent to release the Deposit to Seller upon the earliest to occur of (i) the Closing, or (ii) two (2) Business Days following the termination of this Agreement by (A) Seller or the Company pursuant to Section 8.3(a) or Section ~~8.3(f)~~8.3(e) or (B) the Purchaser, the Company or Seller for any reason at a time when Seller or the Company could have terminated this Agreement pursuant to Section 8.3(a) or Section ~~8.3(f)~~8.3(e) (any such termination described in the foregoing clause (ii)(A) or (ii)(B), a "**Purchaser Default Termination**").

(c)    If this Agreement or the Transactions are terminated other than for a termination which constitutes a Purchaser Default Termination, Seller shall provide written

---

[5]    ~~**Note to Draft**: Requirement to deliver evidence of the continuation of the Reinstated Indebtedness to be discussed.~~

[6]    ~~**Note to Draft**: To equal 10% of the Purchase Price.~~

instructions to the Escrow Agent to, within two (2) Business Days after such instruction, return to the Purchaser the Deposit by wire transfer of immediately available funds.

(d)    Each of the parties hereto acknowledges that the Deposit is not intended to be a penalty but rather constitutes liquidated damages in a reasonable amount that will compensate the Company in the circumstances in which such Deposit is paid for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the disclosure schedule delivered by the Seller to Purchaser (the "**Disclosure Schedules**") concurrently with the execution of this Agreement, the Company hereby represents and warrants to Purchaser as follows:

**Section 3.1**    Due Organization, Good Standing and ~~Corporate~~ Power.    The Company is a ~~corporation~~limited liability company duly organized and validly existing under the Laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  The Company is duly qualified or licensed to do business and is in good standing (or the equivalent thereof) in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so qualified or licensed and in good standing (or the equivalent thereof) would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. The Company has delivered prior to the date of this Agreement to the Purchaser copies of Organizational Documents, in each case, as amended and in full force and effect as of the date of this Agreement. The Company is not in material violation of any of the provisions of its Organizational Documents.

**Section 3.2**    Authorization; Enforceability.  Subject to the applicable provisions of the Bankruptcy Code and the entry and effectiveness of the Sale Order, the Company has the requisite ~~corporate~~ power and authority and has taken all ~~corporate~~ action necessary to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.  Subject to the applicable provisions of the Bankruptcy Code and the entry and effectiveness of the Confirmation Order and the Sale Order, the execution, delivery and performance of this Agreement by the Company, the consummation by the Company of the transactions contemplated hereby, and the performance by the Company of its obligations hereunder, have been duly authorized.  No other ~~corporate~~ proceedings on the part of the Company are necessary to authorize the execution, delivery or performance of this Agreement by the Company or to consummate the transactions contemplated hereby, subject to the entry and effectiveness of the Sale Order.  Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly executed and delivered by the Company and, assuming due execution and delivery by other Contracting Parties, this Agreement constitutes a valid and binding obligation of the Company, enforceable by and against the Company in accordance with

its terms, except to the extent that its enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (regardless of whether considered in a proceeding in equity or at law). For the purposes of this <u>Section 3.2</u>, references to the "Agreement" shall mean the Agreement and any ancillary agreements hereto.

**Section 3.3** <u>Capitalization</u>. (a) All issued and outstanding Membership Interests, have been duly authorized and validly issued and are fully paid, and, except pursuant to the Organizational Documents of the Company, are not subject to any preemptive rights, subscription rights, rights of first refusal, options, or any Liens (other than under securities Laws) or any Reinstated Indebtedness pursuant to the Plan, and have been issued in compliance with applicable securities Laws or exemptions therefrom. Except as set forth in this Agreement, as of the date of this Agreement, no equity interests or other equity securities or phantom equity securities of the Company are issued, reserved for issuance or outstanding. Except as described in this <u>Section 3.3</u>, the Company is not a party to any outstanding option, warrant, call, convertible or exchangeable securities, "phantom stock" rights, stock appreciation rights, stock-based performance units, other equity-based compensation awards, subscription or other right (including any preemptive right), agreement or commitment which obligates the Company to issue, sell or transfer, or repurchase, redeem or otherwise acquire, any of the equity interests in the Company. Except pursuant to the Organizational Documents of the Company, there are no voting trusts or other binding agreements or binding understandings with respect to the voting of the equity securities of the Company and the Company is not party to or bound by any stockholders agreement, registration rights agreement or other similar agreement or understanding.

(b) The Company <u>has no Subsidiaries nor</u> does ~~not~~it own, directly or indirectly, beneficially or of record, any equity interest<u>, or any instrument which is exercisable for, convertible into or exchangeable for an equity interest,</u> in any Person.

**Section 3.4** <u>No Conflict; Required Filings and Consents</u>.

(a) Assuming the truth and accuracy of the representations and warranties of Purchaser set forth in <u>Section 5.3</u> and except as set forth in <u>Section 3.4(a)</u> of the Disclosure Schedules or to the extent excused by or unenforceable as a result of the filing of the Bankruptcy Cases, subject to the entry and effectiveness of the Sale Order by the Bankruptcy Court, the execution, delivery and performance by the Company of this Agreement and all other instruments and agreements to be delivered by the Company as contemplated hereby to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not:

(i) conflict with any provision of the ~~certificate of incorporation or bylaws or equivalent~~ Organizational Documents of the Company, as amended to the date of this Agreement;

(ii) conflict with or violate any Law or Order currently in effect applicable to the Company or any of its assets or properties; or

-16-

(iii)     conflict with or result in a breach of, or default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give rise to any rights of termination, payment, amendment, modification, or result in the creation of any Lien on any of the assets or properties of the Company pursuant to, any Material Contract;

except, in the case of clauses (ii) or (iii), for any such conflict, violation, breach or default that would not reasonably be expected to ~~have~~be, individually or in the aggregate, ~~a Material Adverse Effect~~material to the Company.

(b)     Assuming the truth and accuracy of the representations and warranties of Purchaser set forth in Section 5.3, the Company is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of, or with any Governmental Entity in connection with, the execution and delivery of this Agreement and all other instruments and agreements to be delivered by the Company or the consummation by the Company of the transactions contemplated hereby and thereby or in order to prevent the termination of any right, privilege, license or qualification of the Company, except (i) for such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (ii) the entry and effectiveness of the Sale Order by the Bankruptcy Court or (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would reasonably be expected to ~~have~~be, individually or in the aggregate, ~~a Material Adverse Effect~~material to the Company.

Section 3.5     Absence of Certain Changes.  Except as set forth on Section 3.5 of the Disclosure Schedules or which would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, during the period from the Petition Date to the date of this Agreement, there has not occurred a Material Adverse Effect.

Section 3.6     Compliance with Laws.  For the past twelve (12) months, (i) the business and operations of the Company have not been and are not currently being conducted in violation of any Law or Order applicable to the Company and (ii) the Company is not in receipt of any written notice with respect to any failure to comply with any provision of applicable Law, in each case, except as set forth on Section 3.6 of the Disclosure Schedules or for violations or ~~failures~~failure that have not been and would not be reasonably likely to be, individually or in the aggregate, a Material Adverse Effect.

Section 3.7     Permits.  To the Knowledge of  the Company, the Company holds all federal, state, local and foreign permits, approvals, licenses, authorizations, registrations, accreditations, certificates, rights, exemptions and Orders from Governmental Entities (collectively, the "**Permits**") that are necessary for the operation of the business of the Company as presently conducted, or that are necessary for the lawful ownership of their respective properties and assets except to the extent that any such failure to hold Permits or any such default would not reasonably be expected to be material to the Company.  The Company is in compliance, in all material respects, with the terms and conditions of such Permits, all of which are in full force and effect~~, except for any such non-compliance or failure that~~ ~~would not be~~ ~~reasonably likely to have, individually or in the aggregate, a Material Adverse Effect~~ in all material respects.  There is not any material Action pending or, to the Knowledge of the Company, threatened against the Company seeking to revoke, suspend, or otherwise limit any

-17-

such Permit which would be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.8    Litigation.  Except (i) as set forth on Section 3.8 of the Disclosure Schedules or (ii) in connection with the Bankruptcy Cases, as of the date hereof there is no, and for the past twelvetwo (122) monthsyears, there has not been any action, suit, proceeding at law or in equity, or any arbitration or any administrative or similar proceedingmaterial Action by or before any Governmental Entity, pending, or, to the Knowledge of the Company, threatened in writing, against the Company or any of its assets or properties which would be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor any of its assets or properties is subject to any material Order other than any Order entered in connection with the Bankruptcy Cases.

Section 3.9    Employee Benefit Plans.  The Company does not havecurrently have, and since the Petition Date has not had, any employees.

Section 3.10    [Reserved]Sole Owner.

.  The Company is the sole owner of the Owned Real Property.

Section 3.11    Tax Matters.

(a)    Tax Returns.  The Company has filed or caused to be filed all material Returns that are required to be filed by, or with respect to, the Company (taking into account any applicable extension of time within which to file), and all such Returns are true, correct and complete in all material respects.

(b)    Payment of Taxes.  All material Taxes and Tax Liabilities of the Company that are due and payable have been paid or accrued on the books and records of the Company in accordance with GAAP, applied on a basis consistent with the preparation of the most recent audited financial statements.

(c)    Tax Returns; Payment of Taxes of West Madison Holding.  West Madison Holding is the owner of the Company for U.S. federal and applicable state and local income tax purposes, and West Madison Holding has paid all material Taxes required to be paid by it (to the extent such Tax Liabilities have not been, and will not be, discharged in bankruptcy), filed all material Returns required to be filed by it and those Returns are true, correct and complete in all material respects.

(d)    (e) Other Tax Matters. Except whichas would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect:

(i)    As of the date of this Agreement, theThe Company is not currently the subject of an audit or other examination relating to the payment of Taxes of the Company by the tax authorities of any nation, state or locality nor has the Company received any written notices from any taxing authority that such an audit or examination is contemplated or pending.

-18-

(ii)    The Company (A) has not entered into a written agreement or waiver extending any statute of limitations relating to the payment or collection of Taxes of the Company that has not expired and (B) is not presently contesting any Tax Liability of the Company before any court, tribunal or agency.

(iii)    All Taxes that the Company is (or was) required by Law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, member or other third party have been duly withheld or collected, and have been paid over to the proper authorities in compliance with all Tax withholding and remitting provisions of applicable Laws to the extent due and payable.

(iv)    No tax authority in a jurisdiction where the Company does not file Returns or pays Taxes has asserted in writing that the Company is or may be required to pay Taxes to or file Returns with that tax authority.

(v)    The Company is not subject to any contract or agreement relating to the sharing, allocation or payment of, or indemnity for, any Taxes.

(vi)    The Company has been from formation an entity that is disregarded as separate from its owner for U.S. federal, state and local tax purposes.

(e)    (d) Notwithstanding any provision in this Agreement to the contrary, (i) the representations and warranties set forth above in this Section 3.11 shall constitute the sole and exclusive representations and warranties made by the Company with respect to Taxes, and no other representation or warranty contained in any other section of this Agreement shall be deemed to be made with respect to Taxes, and (ii) the Company makes no representation or warranty with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating loss, net operating loss carryforward, capital loss carryforward, basis amount or other Tax attributes of the Company.

Section 3.12    Transactions with Affiliates.  Except as set forth on Section 3.12 of the Disclosure Schedules, to the Knowledge of the Company, none of the shareholders, members, managers, directors, or officers of any member of the Company (a) is party to any Material Contract with the Company (other than (i) employment arrangements entered into in the ordinary course of business and (ii) any agreement or transaction which is on terms no less favorable to the Company as would reasonably be expected to be obtained by the Company at the time in a comparable arm's length transaction with a Person not affiliated with the Company), or (b) owns any property or right, tangible or intangible, that is material and used by the Company.

Section 3.13    Broker's or Finder's Fee.  No agent, broker, Person or firm acting on behalf of the Company is, or shall be, entitled to any broker's fees, finder's fees or commissions from the Company or any of the other Contracting Parties in connection with this Agreement or any of the transactions contemplated hereby.  There are no leasing commissions which are or may become due or owing with respect to the Real Property Leases (as hereinafter defined) or otherwise which will not have been paid prior to Closing.

Section 3.14    Material Contracts.  Section 3.14 of the Disclosure Schedules contains a list, as of the date of this Agreement, of the following Contracts (each Contract of the following types, a "**Material Contract**") to which the Company is party: (a) all Contracts or

-19-

binding options to sell or lease (as lessor) any property or asset of the Company for an amount in excess of $500,000 over any one-year period (other than the Real Property Leases), (b) all Contracts (other than purchase orders entered into in the ordinary course of business) pursuant to which the Company has agreed to acquire or lease any property or asset for an amount in excess of $500,000 over any one-year period, and (c) all material partnership or joint venture or profit sharing agreements to which the Company is a party.  ~~Except as would not be reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect, neither~~Neither the Company nor, to the Knowledge of the Company, any other party to such Material Contract, is in default, in any material respect, under any Material Contract.  Except as contemplated by the Plan, to the Knowledge of the Company, no party to any Material Contract has exercised any termination rights with respect thereto.

**Section 3.15**    <u>Environmental Matters</u>.  Except as would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company is and has been for the past three (3) years in compliance with all applicable Environmental Laws, and have obtained, and are in compliance with, all Permits required under applicable Environmental Laws in connection with the operation of the Company's properties, assets and business, and (ii) there are no written Actions pending or, to the Knowledge of the Company, threatened in writing against the Company relating to Environmental Law (including in connection with the present operation of its business, properties or assets), nor has the Company  received any other unresolved written notice of any violation of, or Liability under any Environmental Law.

**Section 3.16**    <u>Real Property</u>.

(a)    <u>Section 3.16(a)</u> of the Disclosure Schedules sets forth a list of the addresses of all real property <u>owned or</u> used by the Company (the "**Owned Real Property**"). <u>Section 3.16(a)</u> of the Disclosure Schedules contains a list as of the date of this Agreement of all material leases of real property to which the Company is a party (as lessee, sublessee, or lessor) (collectively, the "**Real Property Leases**").  There have been no amendments, modifications or supplements to the Real Property Leases, except as set forth on <u>Section 3.16(a)</u> of the Disclosure Schedules.  Except as would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, the Company is not in default under any such Real Property Lease.  To the Knowledge of the Company, except as disclosed by the Rent Roll or in <u>Section 3.16(a)</u> of the Disclosure Schedules, no tenant under any Real Property Lease is in default under any such Real Property Lease that would be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

(b)    The rent roll set forth on <u>Section 3.16(b)</u> of the Disclosure Schedules (the "**Rent Roll**") is a true, correct and complete copy of the rent roll utilized by the Company in the ordinary course of business as of the date hereof.

(c)    Except as set forth in the Rent Roll, none of the Owned Real Property is subject to any option, lease, license, sublease or other occupancy agreement granting to any third party and right to use, occupy or enjoy any portion of the Owned Real Property or to obtain title to any portion of the Owned Real Property.

(d)    Since the Petition Date, no condemnation, requisition or taking by any public authority is pending nor has been threatened in writing, and, since the Petition Date, the Company has not received any written notice of any such condemnation, requisition or taking by a Governmental Entity, with respect to any part of the Owned Real Property.  Except as set forth in Section 3.16(d) of the Disclosure Schedules, there are no tax reduction proceedings in progress with respect to the Owned Real Property.

(e)    The Rent Roll describes all security deposits (including letters of credit) made by tenants under Real Property Leases.

(f)    Except as may be otherwise disclosed on the Rent Roll: (i) each tenant is now in possession of the premises under its Real Property Lease; and (ii) there are no arrearages of rent or any additional rent payable by any tenant in excess of one (1) month, except as set forth on the Rent Roll.

**Section 3.17**    Exclusivity of Representations.  Notwithstanding anything to the contrary herein to the contrary, it is the explicit intent of the Contracting Parties, and the Contracting Parties hereby agree, that the representations and warranties made by the Company in this Article III (as qualified by the Disclosure Schedules hereto) and in any certificate delivered at Closing are the exclusive representations and warranties made by the Company or any other Person (other than the representations and warranties of the Seller in accordance with Article IV, or as may be set forth in any ancillary agreement hereto) with respect to the Company, including the businesses and assets of each of them, or the subject matter of this Agreement.  The Company hereby disclaims any other express or implied representations or warranties made by any Person with respect to itself, the businesses and assets of the Company, the Membership Interests and the transactions contemplated by this Agreement and any certificate, instrument or document delivered pursuant hereto.  Except as expressly set forth herein or in any certificate delivered at Closing, the condition of the assets of the Company shall be "as is", "where is" and "with all faults" and the Company makes no warranty of merchantability, suitability, adequacy, fitness for a particular purpose or quality with respect to the businesses and any of the assets of the Company or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  Except for the representations and warranties contained in this Article III or in any certificate delivered at Closing, the Company is not, directly or indirectly, and no other Person on behalf of the Company is, making any representations or warranties regarding any *pro-forma* financial information, financial projections or other forward-looking prospects, risks or statements (financial or otherwise) of the Company made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or their respective Representatives (including any opinion, information, projection or advice in any management presentation or the confidential information memorandum provided to Purchaser and its Affiliates and their respective Representatives), and the Company hereby disclaims all Liability and responsibility for any such information and statements.  It is understood that any Due Diligence Materials made available to Purchaser or its Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of the Company or its Affiliates or their respective Representatives.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth on the Disclosure Schedules delivered in connection with this Agreement, Seller hereby represents and warrants to Purchaser as follows:

**Section 4.1** Due Organization, Good Standing and ~~Corporate~~ Power. Seller is a limited liability company duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of the State of Delaware and has all requisite power and authority to indirectly own the Membership Interests~~, except where the failure to have such power and authority would not prevent or materially delay the consummation of the Transaction~~. Seller is not in violation of any of the provisions of its Organizational Documents except as would not be reasonably likely to have, individually or in the aggregate, a material adverse effect on the ability of Seller to consummate the transactions contemplated hereby.

**Section 4.2** Authorization; Enforceability. Seller has, subject to the entry of and the Sale Order, the requisite power and authority and has taken all action necessary to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement by Seller, the consummation by Seller of the transactions contemplated hereby and the performance by Seller of its obligations hereunder, have been duly authorized. No other partnership proceedings on the part of Seller are necessary to authorize the execution, delivery or performance of this Agreement by Seller or to consummate the transactions contemplated hereby. Subject to the entry of the Sale Order, this Agreement has been duly executed and delivered by Seller and, assuming due execution and delivery by the other Contracting Parties, this Agreement constitutes a valid and binding obligation of Seller, enforceable by and against Seller in accordance with its respective terms, except to the extent that its enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (regardless of whether considered in a proceeding in equity or at law). For the purposes of this Section 4.2, references to the "Agreement" shall mean the Agreement and any ancillary agreements hereto.

**Section 4.3** No Conflict; Required Filings and Consents. Assuming the truth and accuracy of the representations and warranties of Purchaser set forth in Section 5.3, subject to the entry and effectiveness of the Sale Order by the Bankruptcy Court and except as set forth in Section 4.3(a) of the Disclosure Schedules, the execution, delivery and performance by Seller of this Agreement and all other instruments and agreements to be delivered by Seller as contemplated hereby and the consummation of the transactions contemplated hereby and thereby do not and will not:

(i)       conflict with any provision of the ~~limited partnership agreement~~Organizational Documents of Seller, as amended to the date of this Agreement;

(ii)      conflict with or violate any Law currently in effect applicable to Seller; or

-22-

(iii)    conflict with or result in a breach of, or default under, any material Contract of Seller;

except, in the case of <u>clauses (ii)</u> or <u>(iii)</u>, for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Seller's ability to consummate the transactions contemplated hereby.

**Section 4.4**    <u>Ownership of Membership Interests</u>.    Seller <u>indirectly owns beneficially and of record all of the membership interests of West Madison Holding. West Madison Holding</u> owns beneficially and of record all of the Membership Interests, free and clear of all Liens, other than restrictions on transfer under applicable securities Laws.

**Section 4.5**    <u>Broker's or Finder's Fee</u>.  No agent, broker, Person or firm acting on behalf of Seller is, or shall be, entitled to any broker's fees, finder's fees or commissions from Seller or any of the other Contracting Parties in connection with this Agreement or any of the transactions contemplated hereby.

**Section 4.6**    <u>Exclusivity of Representations</u>.  Notwithstanding anything to the contrary herein to the contrary, it is the explicit intent of the Contracting Parties, and the Contracting Parties hereby agree, that the representations and warranties made by Seller in this <u>Article IV</u> (as qualified by the Disclosure Schedules hereto) are the exclusive representations and warranties made by Seller or any other Person (other than the Company in accordance with <u>Article III</u>) with respect to Seller or any of its Affiliates or their respective Representatives, including the businesses and assets of each of them, or the subject matter of this Agreement. Seller hereby disclaims any other express or implied representations or warranties made by any Person with respect to itself or any of its Affiliates or their respective Representatives.  Except as expressly set forth in <u>Article III</u>, the condition of the assets of the Company shall be "as is", "where is" and "with all faults" and Seller and its Affiliates make no warranty of merchantability, suitability, adequacy, fitness for a particular purpose or quality with respect to the businesses and any of the assets of the Company or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  Seller and its Affiliates are not, directly or indirectly, making any representations or warranties regarding any *pro-forma* financial information, financial projections or other forward-looking prospects, risks or statements (financial or otherwise) of the Company made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or their respective Representatives (including any opinion, information, projection or advice in any management presentation or the confidential information memorandum provided Purchaser, its Affiliates and their respective Representatives), and Seller and its Affiliates hereby disclaims all Liability and responsibility for any such information and statements.  It is understood that any Due Diligence Materials made available to Purchaser or its Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of Seller or its Affiliates or their respective Representatives.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

**Section 5.1**    Due Organization, Good Standing and ~~Corporate~~ Power. Purchaser is a ~~corporation or~~ limited ~~liability~~ company~~, as the case may be duly incorporated (or, if not a corporation,~~ duly organized~~)~~ and validly existing under the Laws of the jurisdiction in which it is ~~incorporated (or, if not a corporation, organized)~~ and has the requisite power ~~(corporate or otherwise)~~ and authority to own, lease and operate its properties and to carry on its business as now being conducted.  Purchaser is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed and in good standing would not be reasonably likely to have, individually or in the aggregate, a material adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby. Purchaser ~~has delivered prior to the date of this Agreement to the Company copies of its certificate of incorporation (or the equivalent thereof), and by-laws (or the equivalent thereof), in each case, as amended and in full force and effect as of the date of this Agreement.  Purchaser~~ is not in violation of any of the provisions of its ~~certificate of incorporation (or the equivalent thereof) or [by-laws][operating agreement] (or the equivalent thereof).~~ Organizational Documents except as would not would not be reasonably likely to have, individually or in the aggregate, a material and adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby.

**Section 5.2**    Authorization; Enforceability.    Purchaser has the requisite ~~[corporate]~~ power and authority and has taken all ~~[corporate]~~ action necessary to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby and the performance by Purchaser of its obligations hereunder have been duly authorized.  No other ~~[corporate]~~ proceedings on the part of Purchaser are necessary to authorize the execution, delivery or performance of this Agreement by Purchaser or to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Purchaser and, assuming due execution and delivery by each of the other Contracting Parties, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except to the extent that its enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (regardless of whether considered in a proceeding in equity or at law).  For the purposes of this Section 5.2, references to the "Agreement" shall mean the Agreement and any ancillary agreements hereto.

**Section 5.3**    Consents and Approvals.  Assuming the truth and accuracy of the representations and warranties of the Company set forth in Section 3.4 and Seller set forth in Section 4.3, the entry and effectiveness of the Sale Order by the Bankruptcy Court, the execution, delivery and performance by Purchaser of this Agreement and all other instruments

and agreements to be delivered by Purchaser as contemplated hereby and the consummation of the transactions contemplated hereby and thereby do not and will not:

(i)    conflict with the ~~certificate of incorporation or bylaws or equivalent~~ Organizational Documents of Purchaser, in each case, as amended to the date of this Agreement;

(ii)    conflict with or violate any Law currently in effect applicable to Purchaser; or

(iii)    conflict with, result in a breach of, or default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give rise to any rights of termination, payment, amendment, modification, or result in the creation of any Lien on any property or asset of the Purchaser pursuant to,  any Contract to which the Purchaser is a party or otherwise bound;

except, in the case of clauses (ii) or (iii), for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a material and adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

Section 5.4    Broker's or Finder's Fee.  No agent, broker, Person or firm acting on behalf of Purchaser is, or shall be, entitled to any fee, commission or broker's or finder's fees in connection with this Agreement or any of the transactions contemplated hereby from any of the other Contracting Parties or from any Affiliate of the other Contracting Parties.

Section 5.5    Financing.~~  [(a) Concurrently with the execution of this Agreement, Purchaser has delivered to the Seller a duly executed guarantee of [●] ("Guarantor") guaranteeing all of the pre-Closing obligations of Purchaser under this Agreement and all of Purchaser's obligations in the event this Agreement is terminated (the "Guarantee").  The execution, delivery and performance by the Guarantor of the Guarantee has been duly and validly authorized by all necessary corporate or other similar action.  The Guarantee is a legal, valid and binding obligation of Guarantor, enforceable against the Guarantor in accordance with its terms.  The obligations and commitments contained in the Guarantee have not been withdrawn or rescinded in any respect, and no event has occurred, which, with or without notice, lapse of time or both, would constitute a breach or violation of, or default under the Guarantee.][7]~~

~~(b)  .~~  Purchaser ~~(i)~~ has, and will have on the Closing Date, ~~(x)~~ sufficient ~~unrestricted funds (without giving effect to any unfunded financing regardless of whether any such financing is committed)~~funds available to consummate the transactions contemplated hereby, including to pay the Purchase Price~~,~~ and amounts payable with respect to the Reinstated Indebtedness pursuant to Section 2.2 ~~and the fees and expenses of Purchaser related to the transactions contemplated hereby and (y) the resources and capabilities (financial and otherwise) to perform its obligations hereunder, including in respect of equity compensation obligations, repayment or refinancing obligations to be made in connection with the transactions contemplated by this~~

---

~~[7]  Note to Draft: To be included in the event Purchaser is not a creditworthy entity.~~

~~Agreement, and (ii) has not incurred, and as of the Closing will not have incurred, any obligation, condition, commitment, restriction or liability of any kind that would impair or adversely affect such resources and capabilities.   Without limiting the generality of the foregoing, at all times between the date of this Agreement and the Closing Date, Purchaser will have available at least $[●] in the form of (x) unrestricted consolidated cash and (y) undrawn lines of credit that are available to be drawn to fund the transactions contemplated by this Agreement.~~.  Purchaser does not know of any circumstance or condition that could reasonably be expected to prevent or <u>materially</u> delay the availability of such funds at Closing.  In no event shall the receipt or availability of any funds or financing by Purchaser or any of its Affiliates or any other financing or other transactions be a condition to any of Purchaser's obligations under this Agreement.

**Section 5.6**    <u>Solvency</u>.  Purchaser is not entering the transactions contemplated hereby with actual intent to hinder, delay or defraud either present or future creditors.  Immediately after giving effect to the transactions contemplated hereby, the Company will be Solvent.  Assuming the truth and accuracy of the representations and warranties set forth in <u>Article III</u> and <u>Article IV</u>, immediately after giving effect to the transactions contemplated by this Agreement, the Company will have adequate capital to carry on its business.

**Section 5.7**    <u>Litigation</u>.  There is no Action pending or threatened in writing against or affecting Purchaser, or any of its properties or rights with respect to the transactions contemplated hereby.

**Section 5.8**    <u>Investment Intent</u>.  (a) Purchaser is acquiring the Membership Interests for its own account, for investment purposes only and not with a view toward, or for sale in connection with, any distribution thereof, nor with any present intention of distributions or selling the Membership Interests in violation of the federal securities Laws or any applicable foreign or state securities Law.

(b)    Purchaser qualifies as an "accredited investor", as such term is defined in Rule 501(a) promulgated pursuant to the Securities Act.

(c)    Purchaser understands that the acquisition of the Membership Interests to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Purchaser and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement, and Purchaser can bear the economic risk of its investment (which may be for an indefinite period) and has such knowledge and experience in financial or business matters that Purchaser is capable of evaluating the merits and risks of its investment in the Membership Interests to be acquired by it pursuant to the transactions contemplated hereby.

(d)    Purchaser understands that the Membership Interests to be acquired by it pursuant to this Agreement have not been registered under the Securities Act.  Purchaser acknowledges that such securities may not be transferred, sold, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any other provision of applicable state securities Laws or pursuant to an applicable exemption

therefrom.  Purchaser acknowledges that there is no public market for the Membership Interests and that there can be no assurance that a public market will develop.

Section 5.9    Investigation by Purchaser; Company's Liability.  Purchaser has conducted its own independent investigation, verification, review and analysis of the business, operations, assets, Liabilities, results of operations, financial condition, technology and prospects of the Company, which investigation, verification, review and analysis was conducted by Purchaser and its Affiliates and, to the extent Purchaser deemed appropriate, by Purchaser's Representatives.  Purchaser acknowledges that it and its Representatives have been provided adequate access to the personnel, properties, premises and records of the Company and the audit work papers of the Company's auditors for such purpose.  In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned investigation, verification, review and analysis and not on any factual representation, warranty, inducement, promise, understanding, condition or opinion of the Company or any of its Affiliates or their respective Representatives (except the specific representations and warranties of the Company and Seller set forth in Article III and Article IV, respectively), and Purchaser acknowledges and agrees, to the fullest extent permitted by Law, that:

(a) (a)    none of the Company or any of its directors, officers, equityholders, members, employees, Affiliates, controlling Persons, agents, advisors or Representatives or any other Person makes or has made any oral or written representation or warranty, either express or implied, as to the accuracy or completeness of (i) any of the information set forth in management presentations relating to the Company made available to Purchaser, its Affiliates or its Representatives, in materials made available in any "data room" (virtual or otherwise), including any cost estimates delivered or made available, financial projections or other projections, in presentations by the management of the Company, in "break-out" discussions, in responses to questions submitted by or on behalf of Purchaser, its Affiliates or its Representatives, whether orally or in writing, in materials prepared by or on behalf of the Company, or in any other form (such information, collectively, "**Due Diligence Materials**"), or (ii) any information delivered or made available pursuant to Section 6.1(a)Section 6.1(a), or (iii) the *pro-forma* financial information, projections or other forward-looking statements of the Company, in each case in expectation or furtherance of the transactions contemplated by this Agreement;

(b) (b)    none of the Company or any of its directors, officers, employees, equityholders, members, Affiliates, controlling Persons, agents, advisors, Representatives or any other Person shall have any Liability or responsibility whatsoever to Purchaser or its directors, officers, employees, Affiliates, controlling Persons, agents or Representatives on any basis (including in contract, tort or equity, under federal or state securities Laws or otherwise) based upon any information provided or made available, or statements made (including set forth in management summaries relating to the Company provided to Purchaser, in materials furnished in the Company's data site (virtual or otherwise), in presentations by the Company's management or otherwise), to Purchaser or its directors, officers, employees, Affiliates, controlling Persons, advisors, agents or Representatives (or any omissions therefrom);

(c) (c)    without limiting the generality of the foregoing, the Company makes no representation or warranty regarding any third-party beneficiary rights or other rights which

Purchaser might claim under any studies, reports, tests or analyses prepared by any third parties for the Company or any of its Affiliates, even if the same were made available for review by Purchaser or its Representatives; and

(d) (d)   without limiting the generality of the forgoing, Purchaser expressly acknowledges and agrees that none of the documents, information or other materials provided to them at any time or in any format by the Company or any of its Affiliates or Representatives constitute legal advice, and Purchaser (i) waives all rights to assert that it received any legal advice from the Company, any of its Affiliates, or any of their respective Representatives or counsel, or that it had any sort of attorney-client relationship with any of such Persons, and (ii) agrees to indemnify and hold harmless the Company, its Affiliates (including Seller), and each of their respective Representatives and counsel against any such assertion made by or on behalf of any of Purchaser's Affiliates.

**Section 5.10** OFAC.  Neither Purchaser nor any of its Affiliates, nor to Purchaser's knowledge, any of their respective agents acting in any capacity in connection with the transactions contemplated by this Agreement, is or will be (a) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (b) engaging in certain dealings with countries and organizations designated under section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (c) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (d) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (e) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (i) any U.S. anti-money laundering law, (ii) the Foreign Corrupt Practices Act, (iii) the U.S. mail and wire fraud statutes, (iv) the Travel Act, (v) any similar or successor statutes, or (vi) any regulations promulgated under the foregoing statutes.

**Section 5.11** Exclusivity of Representations.  The representations and warranties made by Purchaser in this Article V are the exclusive representations and warranties made by Purchaser.  Seller acknowledges that Purchaser hereby disclaims any other express or implied representations or warranties with respect to itself.

**ARTICLE VI**

COVENANTS

**Section 6.1** Access to Information Concerning Properties and Records.  (a) During the period commencing on the date of this Agreement and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is terminated pursuant to Section 8.1, Section 8.2 or Section 8.3, the Company shall, upon reasonable prior notice and advanced written consent of Seller (such consent not to be unreasonably withheld, conditioned or delayed), afford Purchaser and its Representatives, reasonable access during normal business hours to the

officers, directors, employees, accountants, properties, books and records of the Company; provided, that (x) such access shall not unreasonably disrupt the operations of the Company (including with respect to the Bankruptcy Case) and (y) no such access shall be permitted other than in the presence of Seller or one of its Representatives.  Notwithstanding anything to the contrary contained in this Agreement, the Company may restrict the foregoing access and shall not be required to (A) provide any information or access that the Company reasonably believes could violate applicable Law, including data protection Laws, rules or regulations or the terms of any applicable agreement (including confidentiality obligations) or cause forfeiture of attorney/client privilege or an attorney work-product privilege (the "**Disclosure Limitations**"), (B) provide any information relating to the sale process, bids received from other Persons in connection with the transactions contemplated by this Agreement and information and analysis (including financial analysis) relating to such bids or (C) conduct, or permit Purchaser or any of its Representatives to conduct, any Phase I or II environmental site assessment or investigation, or other environmental sampling relating to any real property owned by or leased to the Company.  Purchaser acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, all documents, materials, communications, analyses and other information relating to the sale process, bids received from Purchaser and other Persons in connection with the transactions contemplated by this Agreement that are in the possession of Seller or the Company as of the date of this Agreement and through the Closing will be transferred to Seller prior to, or as of, the Closing and Seller shall not be required to grant access to such documents, materials and other information to Purchaser or any of its Affiliates at any time.

(b)    Purchaser acknowledges and agrees that: (i) nothing contained in this Agreement shall be construed to give to Purchaser, directly or indirectly, rights to control or direct the Company's operations prior to the Closing, (ii) prior to the Closing, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of its operations and (iii) notwithstanding anything to the contrary set forth herein, no consent of Purchaser (or request thereof) shall be required with respect to any matter set forth in Section 6.3 or elsewhere in this Agreement to the extent the requirement of such consent would, upon the reasonable advice of the Company's counsel, violate any Law or the requirements of any Governmental Entity, or violate any Contract to which the Company is a party.

(c)    Purchaser hereby agrees that it is not authorized to and shall not (and shall not permit any of its employees, counsel, accountants, consultants, financing sources and other authorized Representatives to) contact any competitor, supplier, distributor, customer, tenant, agent or Representative of the Company prior to the Closing with respect to the Company, it business, operations, assets, employees or the transactions contemplated by this Agreement or any ancillary agreements hereto, without the prior written consent of the Company (such consent not to be unreasonably withheld, conditioned or delayed).

(d)    From and after the Closing, for a period of seven (7) years following the Closing Date, Purchaser will upon reasonable prior notice and advanced written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), afford the Seller (or its successor) and its Representatives, reasonable access (at the Seller's sole expense) during normal business hours to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the

Company with respect to periods or occurrences prior to the Closing Date, for the <u>sole</u> purposes of (i) complying with the requirements of any Governmental Entity, including the Bankruptcy Court, (ii) the closing of the Bankruptcy Cases and the wind down of the Seller's estate (including reconciliation of Claims), (iii) making insurance Claims, (iv) complying with applicable Laws and (v) defending or prosecuting any Action to which the Seller is a party. Notwithstanding the foregoing, Purchaser shall not be obligated to provide any such access that would conflict with the Disclosure Limitations; <u>provided</u>, <u>further</u>, that Purchaser and the Seller (or its successor) shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Purchaser after consultation with outside counsel) reasonably be likely to cause such violation to occur or such privilege to be undermined with respect to such information.

(e)    Unless otherwise consented to in writing by the Seller (or its successor), Purchaser will <u>use commercially reasonable efforts to</u> not, for a period of seven (7) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records contemplated by <u>Section 6.1(d)</u> without first offering to surrender to the Seller such books and records or any portion thereof that Purchaser may intend to destroy, dispose of or alter.  From and after the Closing, Purchaser will, at the Seller's sole expense, provide the Seller (or its successor) with reasonable assistance, support and cooperation with the wind-down of the operations and related activities (*e.g.*, helping to locate documents or information related to prosecution or processing of insurance/benefit Claims) of the Seller.

(e)    From and after the Closing, for a period of seven (7) years following the Closing Date, the Seller will upon reasonable prior notice and advanced written consent of the Seller (such consent not to be unreasonably withheld, conditioned or delayed), afford Purchaser and its Representatives, reasonable access (at Purchaser's sole expense) during normal business hours to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining) and the Seller's accountants, counsel, financial advisors and other authorized outside Representatives, officers and senior management possessing information, in each case relating to the Company with respect to periods or occurrences prior to the Closing Date. Notwithstanding the foregoing, ~~Purchaser~~<u>Seller</u> shall not be obligated to provide any such access that would conflict with the Disclosure Limitations~~; provided, further, that Purchaser and the Seller shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Seller after consultation with outside counsel) reasonably be likely to cause such violation to occur or such privilege to be undermined with respect to such information.~~<u>.</u>

**Section 6.2**    <u>Confidentiality</u>.    Information obtained by Purchaser and its Representatives in connection with the transactions contemplated by this Agreement shall be subject to the provisions of the Confidentiality Agreement by and between the Company and Purchaser or its Affiliate, dated [●]<u>July 10, 2023</u> (the "**Confidentiality Agreement**").  The terms of the Confidentiality Agreement shall survive the termination of this Agreement and continue in full force and effect thereafter and the Confidentiality Agreement shall not be modified, waived or amended without the written consent of the Company.  After the Closing Date, the Confidentiality Agreement shall be deemed to have been terminated by the parties thereto as it relates to the confidential information regarding the Company and shall no longer be binding. For the elimination of any doubt, it is understood and agreed that the Seller, as a debtor and

debtor in possession under the Bankruptcy Code, is required to disclose the terms of this Agreement to the Bankruptcy Court.

**Section 6.3**    <u>Conduct of the Business of the Company Pending the Closing</u>. The Company agrees that, except as (A) set forth on <u>Section 6.3</u> of the Disclosure Schedules, (B) may be required or expressly permitted by this Agreement or any other Transaction Agreement, (C) as required by any Order of the Bankruptcy Court (or as reasonably necessary in connection with the Bankruptcy Cases), (D) in connection with the taking of any Emergency Response or (E) required by Law, by a Governmental Entity, or by any Contract to which the Company is a party, during the period commencing on the date of this Agreement and ending at the earlier of (x) the Closing and (y) the valid termination of this Agreement pursuant to <u>Section 8.1</u>, <u>Section 8.2</u> or <u>Section 8.3</u>:

(a)    the Company shall conduct its operations in all material respects in the ordinary course of business (taking into account in each case the fact that (A) the Bankruptcy Cases commenced on the Petition Date, (B) the business of the Company has been and continues to be operated while in bankruptcy, and (C) the continuing operation of the business of the Company, including payments to vendors and suppliers, has been and will continue to be subject to the approval of the Bankruptcy Court); and

(b)    the Company shall not effect any of the following without the prior written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed; <u>provided</u>, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within five (5) Business Days from the date on which request for such consent is provided by the Company to Purchaser):

(i)    make any change in or amendment to its Organizational Documents;

(ii)    issue, pledge or sell, or authorize to issue, pledge or sell, any equity interests, shares of its capital stock, or any other ownership interests, as applicable, or issue, pledge or sell, or authorize to issue, pledge or sell, any securities convertible into or exchangeable for, or options, warrants or rights to purchase or subscribe for, or enter into any Contract with respect to the issuance or sale of, any shares of its equity interests, capital stock, or any other ownership interests, as applicable, including any "phantom" stock rights, stock appreciation rights, stock-based performance units or other equity-based compensation awards;

(iii)    adjust, split, subdivide, combine, redeem or reclassify, or purchase or otherwise acquire, any shares of its capital stock, equity interests or its other securities, as applicable;

(iv)    other than in the ordinary course of business or consistent with past practice, sell, license, lease, transfer, assign, abandon, or otherwise dispose of any of its properties or assets that are material to its business or mortgage, pledge or impose any Lien upon any of its properties or assets that are material to its business;

(v)    make, change or revoke any ~~material~~ Tax election ~~not required by Law (other than routine elections made in the ordinary course of business consistent with past~~

practice), file any Return, change any Tax accounting method, surrender any Tax refund, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating the Company, or settle or compromise any ~~material~~ Tax Liability ~~other than in the ordinary course of business~~; or

(vi)    commit or agree to take any of, the foregoing actions in respect of which it is restricted by the provisions of this Section 6.3.

**Section 6.4**    Reasonable Best Efforts.  Subject to the terms and conditions set forth herein, and to applicable legal requirements, each of the Company, Purchaser and Seller shall cooperate and use their respective reasonable best efforts to take, or cause to be taken, all necessary action, and do, or cause to be done, and assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Closing and the other transactions contemplated hereby, including the satisfaction of the respective conditions set forth in Article VII.  Notwithstanding the foregoing, the obligations of the Purchaser and Company under this Section 6.4 shall not require the Company or any of its Affiliates to expend any money, to commence any litigation or arbitration proceeding or to offer or grant any accommodation (financial or otherwise) to any third party.

**Section 6.5**    Indemnity; Directors' and Officers' Insurance; Fiduciary and Employee Benefit Insurance.  (a) ~~Purchaser agrees to cause the~~The Company ~~to ensure, and the Company immediately following~~from and after the Closing agrees to ensure, that all rights to indemnification and exculpation now existing in favor of any individual who, at or prior to the Closing, was a director, officer, employee or agent (including the Independent Agents) of ~~Seller or~~ the Company or who, at the request of ~~Seller or~~ the Company, served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise (collectively, with such individual's heirs, executors or administrators, the "**Indemnified Persons**") as provided in the ~~respective governing documents and indemnification agreements to which Seller or~~Organizational Documents of the Company ~~is a party or bound~~, shall survive the Closing and shall continue in full force and effect for a period of not less than ~~six~~five (6̶5) years from the Closing and such ~~indemnification agreements and the~~ provisions with respect to indemnification and limitations on liability set forth in such ~~governing documents~~Organizational Documents of the Company shall not be amended, repealed or otherwise modified; provided, that in the event any claim or claims are asserted or made within such ~~six~~five (6̶5) year period, all rights to indemnification in respect of any such claim or claims shall continue until final disposition of any and all such claims.~~  Neither Purchaser nor~~; provided, further that the Company shall ~~settle, compromise or consent to the entry of judgment in any Action or investigation relating to or involving any Indemnified Person or any such threatened Action or investigation without the written consent of such Indemnified Person.~~not be an indemnitor of first resort and each Indemnified Party shall be required to seek and exhaust all other sources of indemnification prior to seeking to make a claim for indemnification against the Company.

~~(b) From and after the Closing, Purchaser agrees to cause the Company, and the Company immediately following the Closing shall be liable, to indemnify, defend and hold harmless, to the fullest extent permitted under applicable Law, all Indemnified Persons with~~

-32-

respect to all acts and omissions arising out of such individuals' services as officers, directors, employees or agents of Seller or the Company or as trustees or fiduciaries of any plan for the benefit of employees of Seller or the Company, or taken at the request of the Company, in each case, at or prior to the Closing, including the execution of, and the transactions contemplated by, this Agreement. Without limitation of the foregoing, in the event any such Indemnified Person is or becomes involved, in any capacity, in any claim, action, proceeding or investigation in connection with any matter, including the transactions contemplated by this Agreement, occurring prior to, on or after the Closing (an "**Indemnified Person Claim**"), the Company, from and after the Closing, shall be obligated to pay, or cause to be paid, as incurred, such Indemnified Person's reasonable and documented legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith. The Company shall be obligated to pay, or cause to be paid, within thirty (30) days after any request for advancement, all reasonable and documented expenses, including attorneys' fees, which may be incurred by any Indemnified Person in enforcing this Section 6.5 or any action involving an Indemnified Person resulting from the transactions contemplated by this Agreement.

(c) Each Indemnified Person shall have the right (but not the obligation) to control the defense of, including the investigation of, any Indemnified Person Claim with counsel selected by such Indemnified Person; provided, however, that (i) Purchaser shall be permitted to participate in the defense of such Indemnified Person Claim at its own expense and (ii) Purchaser shall not be liable for any settlement effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed. In the event any Indemnified Person Claim is asserted or made, any determination required to be made with respect to whether an Indemnified Person's conduct complies with the standards set forth under applicable Law, the certificate of incorporation (or equivalent thereof) of the Company or any indemnification agreements or arrangements of the Company, as the case may be, shall be made by independent legal counsel mutually selected by such Indemnified Person and the Company. Each of Purchaser, Seller and the Indemnified Person shall cooperate, and cause their respective Affiliates to cooperate, in the defense of any Indemnified Person Claim and shall provide access to properties and individuals as reasonably requested and furnish or cause to be furnished records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

(b) (d) The provisions with respect to limitation of liabilities of Indemnified Persons and advancement of expenses and indemnification of the Indemnified Persons that are set forth as of the date of this Agreement in the certificate of incorporation (or equivalent thereof) of Organizational Documents of the Company are incorporated herein by reference and shall continue to apply after the date of this Agreement to the Indemnified Persons in their former capacities with the Company, and in each case this Section 6.5 shall not be amended, repealed or otherwise modified in a manner that would adversely affect the rights hereunder of the Indemnified Persons.

(c) (e) Notwithstanding any other provisions hereof, the obligations of Purchaser and the Company contained in this Section 6.5 shall be binding upon the successors and assigns of Purchaser and the Company. In the event Purchaser or the Company, or any of their respective its successors or assigns, (i) consolidates with or merges into any other Person or (ii) transfers all or substantially all of its properties or assets to any Person, then, and in each

case, proper provision shall be made so that the successors and assigns of ~~Purchaser or~~ the Company, as the case may be, honor the indemnification and other obligations set forth in this Section 6.5.

(d)    ~~(f)~~ The obligations of ~~Purchaser and~~ the Company under this Section 6.5 shall survive the Closing and shall not be terminated or modified in such a manner as to affect adversely any Indemnified Person to whom this Section 6.5 applies without the consent of such affected Indemnified Person (it being expressly agreed that the Indemnified Persons to whom this Section 6.5 applies shall be third-party beneficiaries of this Section 6.5, each of whom may enforce the provisions of this Section 6.5).

(e)    ~~(g)~~ Nothing in this Agreement is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to the Company or any of its directors or officers, it being understood and agreed that the indemnification provided for in this Section 6.5 is not prior to or in substitution for any such claims under such policies.

**Section 6.6**    Public Announcements.  Purchaser, Seller and the Company each agree to (a) reasonably consult with each other before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement, (b) provide to the other Contracting Parties for review a copy of any such press release or public statement and (c) not issue any such press release or make any such public statement prior to such consultation and review and the receipt of the prior consent of the other parties to this Agreement, unless required by applicable Law, in which case such party shall advise the other parties of such obligation and the Contracting Parties shall attempt to cause a mutually agreeable release or announcement to be issued; provided, however, that nothing in this Agreement shall restrict or prohibit Seller, the Company from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Bankruptcy Cases or making any other disclosures in respect of this Agreement required by any applicable Law or Orders.

**Section 6.7**    Transfer Taxes.

(a)    ~~Any~~The parties hereto agree that stamp, transfer, documentary, sales, excise and use, value added, registration and other similar Taxes and fees (including any penalties and interest) ~~incurred~~(collectively, the "**Transfer Taxes**") are not payable under applicable Tax Law in connection with this Agreement or any other Transaction ~~(collectively, the "Transfer Taxes") shall be paid by Purchaser and Purchaser shall, at its own expense, procure any stock transfer stamps required and properly file on a timely basis all necessary Returns and other documentation with respect to, any of the Transfer Taxes. Purchaser and the Seller shall cooperate in good faith to minimize, to the fullest extent possible under applicable Law, the amount of any such Transfer Taxes.~~. No party hereto shall take any contrary position on any Return or before any taxing authority unless otherwise required pursuant to a "determination" as such term is defined in Section 1313 of the Code. Consistent with the foregoing, Purchaser shall, at its own expense, prepare all necessary Returns or other documents with respect to ~~all such~~ Transfer Taxes and deliver a draft of such Returns to Seller at least ten (10) days prior to their due dates.  Purchaser shall ~~incorporate~~consider in good faith any reasonable comments from the Seller and shall file such Returns to the extent permitted under

-34-

applicable Tax Law. If any of these Returns are required under applicable Law to be filed by the Seller, Purchaser shall deliver such Returns to the Seller so that they are received no later than two (2) days prior to their due date so that the Seller can timely file such Returns. ~~Purchaser shall not settle any items for which the Seller is not indemnified by Purchaser without the consent of the Seller (such consent not to be unreasonably withheld or delayed). Purchaser shall indemnify and reimburse the Seller, its Affiliates and their respective Representatives for any Transfer Taxes that are paid by the Seller. Purchaser shall provide evidence of payment of Transfer Taxes to the Seller within ten (10) Business Days after any such payment is made. Any payment (or reimbursement) of Transfer Taxes made by Purchaser shall be treated by Purchaser and the Seller as additional Purchase Price. Any payments of Transfer Taxes to a taxing authority for Taxes that the Seller is obligated to pay pursuant to applicable Law shall be treated as a deduction for the Seller.~~

(b)     Each of the Seller and Purchaser agrees to furnish or cause to be furnished to the other party, upon reasonable request and at the cost and expense of the requesting party, as promptly as practicable, such information and assistance relating to the Company (including access to books and records) as is reasonably necessary for the preparation and filing of any Returns (including any claim for a Tax refund) by the Seller or Purchaser, the making of any election relating to Taxes by the Seller or Purchaser, the determination of liability for Taxes, the preparation for any audit by any Governmental Entity, and the prosecution or defense of any claim, suit or other Action relating to any Tax. The Seller shall give Purchaser thirty (30) days' written notice prior to transferring, destroying or discarding any such Tax records and, if Purchaser so requests, shall allow Purchaser to take possession of such Tax records.

**Section 6.8**     Submission for Bankruptcy Court Approval .

(a)     Seller and Purchaser each acknowledges that this Agreement and the sale of the Membership Interests to Purchaser are subject to Bankruptcy Court approval. Purchaser acknowledges that to obtain such approval, (i) Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Membership Interests (as further set out in Section 6.10) and (ii) the Purchaser must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to all obligations of the Company. Provided that Purchaser is selected as the winning bidder in respect of the Membership Interests at the Auction, if any, or if no Competing Bid is submitted with respect to the Membership Interests, each of Seller and Purchaser shall use their respective commercially reasonable efforts to have (y) the Sale Hearing, if necessary, prior to the applicable closing date set forth in the Bidding Procedures, and (z) the Sale Order entered no later than the applicable closing date set forth in the Bidding Procedures. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of such Orders and a finding of adequate assurance of future performance by the Purchaser of all obligations of the Company, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement. Seller shall give notice of the Transaction, including such additional notice as the Bankruptcy Court shall direct or as Purchaser may reasonably request, and provide appropriate opportunity for hearing, relating to this Agreement or the Transactions. Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent

-35-

practicable, to Purchaser prior to their filing with the Bankruptcy Court for Purchaser's prior review.

(b)    Each of Seller and Purchaser shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.  The Seller shall promptly provide Purchaser and its counsel with copies of all notices, filings and Orders of the Bankruptcy Court that Seller receives pertaining to the Sale Order or any other Order related to any of the Transactions, but only to the extent such papers are not publicly available on the Bankruptcy Court's docket or otherwise made available to Purchaser and its counsel.

(c)    If the Sale Order, or any other Orders of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

**Section 6.9**    Use of Proceeds.  Seller will apply the proceeds from the sale of the Membership Interests for the purposes identified in the Plan.

**Section 6.10**    Competing Bids.

(a)    Purchaser acknowledges that the Company and its Affiliates may take reasonable steps to obtain the highest or otherwise best price for the Membership Interest including giving notice thereof to the creditors of the West Madison Debtors and other interested parties, providing information about the Company's business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, if additional prospective bidders desire to place one or more Qualified Bids for the Membership Interest in accordance with the Bidding Procedures, conducting an auction in accordance with the Bidding Procedures Order (the "**Auction**").

(b)    The Bidding Procedures to be employed with respect to this Agreement and the Auction shall be those reflected in the Bidding Procedures Order.  Each of Purchaser and the Company agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as approved by the Bankruptcy Court.  Each of Purchaser and the Company agrees that this Agreement and the Transactions are subject to the right of the Company, the other West Madison Debtors and their Affiliates and Representatives to seek, solicit, invite, encourage, consider, discuss and negotiate higher or better Competing Bids in accordance with the Bidding Procedures Order and the Bidding Procedures.  From the date hereof (and any prior time) and until the completion of the Auction, the Company, the other West Madison Debtors and their Affiliates are permitted to, and are permitted to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with a Competing Bid or Alternative Transaction, including to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase any or all of the

Membership Interest (including supplying information relating to the business of the Company and the assets of the Company to prospective purchasers), and solely to the extent a Competing Bid or Alternative Transaction would reasonably be likely to result in a transaction that constitutes a Superior Transaction.

(c)    If an Auction is conducted, and Purchaser is not the prevailing bidder at the Auction but is the next highest bidder at the Auction, Purchaser shall serve as a back-up bidder (the "**Back-up Bidder**") and keep Purchaser's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon at the election of the Purchaser in its sole discretion in the Auction) open and irrevocable, and Purchaser shall not terminate this Agreement in accordance with Section 8.2(a) (as a result of any breach of Section 6.4 or Section 6.8) or Section 8.2(c), notwithstanding any right of Purchaser to otherwise terminate this Agreement pursuant to Article VIII hereof, until the earlier of (i) the End Date and (ii) the date of the consummation of an Alternative Transaction. Following the completion of the Auction and prior to the End Date, if the prevailing bidder in the Auction fails to consummate an Alternative Transaction, Purchaser (as the Back-up Bidder) will be deemed to have the new prevailing bid, and the Company will be authorized to, without further Order of the Bankruptcy Court, and Purchaser shall, consummate the Transactions on the terms and subject to the conditions set forth in this Agreement (as the same may be improved upon in the Auction by the Purchaser in its sole discretion).

(d)    Subject to the other provisions of this ~~Section 6.10~~Section 6.10(d), from the completion of the Auction until the earlier of the termination of this Agreement in accordance with its terms and the entry of the Sale Order, (i) Seller and the Company shall, shall cause each of their Affiliates to, and shall instruct and direct their respective Representatives to, immediately cease and terminate any ongoing solicitations with respect to any Alternative Transaction, and (ii) each of Seller and the Company shall not, shall cause each of their Affiliates not to, and shall instruct and direct their respective Representatives not to, other than to inform any Person of the provisions of this ~~Section 6.10~~Section 6.10(d), directly or indirectly, initiate or solicit any discussions, inquiries or negotiations in connection with any proposal, expression of interest or offer relating to an Alternative Transaction, or knowingly encourage any effort by any Person that is seeking to make, or has made, an Alternative Transaction Proposal.

(e)    Notwithstanding the foregoing clause (a), if, following the completion of the Auction until the earlier of the termination of this Agreement in accordance with its terms and the entry of the Sale Order, Seller, the Company or any of their Affiliates receive an unsolicited proposal, expression of interest or offer (whether written or unwritten) for an Alternative Transaction (an "**Alternative Transaction Proposal**") from any Person not solicited by Seller, the Company or any of their Affiliates in violation of ~~this Section 6.10~~Section 6.10(d), then Seller, the Company or any of their Affiliates (or any Representative thereof) may, directly or indirectly, (i) contact any Person that has made an unsolicited Alternative Transaction Proposal (and its advisors) for the purpose of clarifying, discussing or negotiating the proposal and any terms thereof and the likelihood of consummation, so as to determine whether such proposal constitutes, or could reasonably be expected to lead to, a Superior Proposal or (ii) if the Independent Agents shall have determined in good faith and after considering the advice of their outside counsel, that such Alternative Transaction Proposal, constitutes, or could reasonably be expected to result in, a Superior Transaction and that failure of Seller, the Company or any of its

Affiliates to pursue such Alternative Transaction Proposal could reasonably be expected to result in a breach of the Independent Agents' fiduciary duties under applicable Laws (a "**Superior Proposal**"), Seller, the Company or any of its Affiliates may, in response to such Superior Proposal, directly or indirectly: (x) furnish non-public information in response to a request therefor by such Person if such Person has executed and delivered to the Company a confidentiality agreement and if the Company also promptly makes such information available to the Purchaser, to the extent not previously provided to the Purchaser; and (y) engage or participate in discussions and negotiations with such Person regarding such Superior Proposal. Subject to applicable confidentiality restrictions, the Company shall provide (i) notice of all Alternative Transaction Proposals (whether oral or written) that constitute, or could reasonably be expected to result in, a Superior Proposal to the Purchaser within two (2) Business Days after the time such determination is made and (ii) a copy of each such Alternative Transaction Proposal.

(f)        Following the entry of the Sale Order and until the Closing or the earlier valid termination of this Agreement in accordance with its terms, Seller, the Company and their Affiliates are neither permitted to, nor permitted to cause their Representatives and Affiliates to initiate contact with, solicit or knowingly encourage, induce or facilitate any Competing Bid or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid.

(g)        The Seller and the Purchaser agree that the provisions of this Agreement, including this Section 6.10, are reasonable, were a material inducement to the Purchaser to enter into this Agreement and are designed to achieve the highest and best price for the Membership Interests.

**Section 6.11**   Contract Rejections.   At least twenty nine (29) days prior to the earlier of the Voting Deadline (as defined in the Plan) and the deadline for objecting to the Plan, Purchaser shall propose to Seller the list of Contracts to be assumed and rejected pursuant to the Plan Supplement, and Purchaser and Seller shall cooperate in good faith to finalize the Plan Supplement by no later than seven (7) days prior to the earlier of the Voting Deadline (as defined in the Plan) and the deadline for objecting to the Plan; provided that, at the Closing Date, Purchaser shall pay to Seller the aggregate amount of rejection damages payable in respect of the Contracts being rejected pursuant to the Plan; provided further, that Real Property Leases may not be rejected.

**Section 6.12**   Support for the Transactions.   The Purchaser agrees and shall cause its Affiliates to agree, during the period beginning on the date of this Agreement through the earlier of (x) the Closing Date and (y) the date this Agreement is validly terminated pursuant to its terms, to:cooperate and coordinate activities with the West Madison Debtors and their Affiliates and use its reasonable best efforts to pursue, support, obtain additional support for, implement, and consummate the transactions contemplated by this Agreement, and to execute and take all actions contemplated hereby and thereby and as necessary, or as may be required by order of the Bankruptcy Court, to support and achieve consummation of the transactions hereby contemplated hereby;

(b)        execute and deliver such other instruments and perform such acts, in addition to the matters specified herein, as may be reasonably appropriate or necessary, or as may

be required by order of the Bankruptcy Court, from time to time, to effect the transactions contemplated hereby, as applicable; *provided*, for the avoidance of doubt, that nothing herein requires Purchaser to comply with any order of the Bankruptcy Court that is inconsistent with this Agreement or the Plan and entered by the Bankruptcy Court without the prior written consent of Purchaser; and

(c)     promptly inform the West Madison Debtors' counsel identified in <u>Section 9.3</u> of this Agreement of any communication from Situs Holdings, LLC or any third-party with respect to any Alternative Transaction Proposal.

**Section 6.13**     <u>Negative Covenants</u>.  The Purchaser agrees and shall cause its Affiliates to agree, during the period beginning on the date of this Agreement through the earlier of (x) the Closing Date and (y) the date this Agreement is validly terminated pursuant to its terms, to not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions; <u>provided</u> that any action taken by Purchaser to enforce this Agreement shall not constitute a violation of this <u>Section 6.13(a)</u>;

(b)     object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Plan (including the payment in full or reinstatement of all administrative, priority, other secured, and general unsecured claims);

(c)     exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or interests in any of the West Madison Debtors;

(d)     solicit, propose, file, or support any Alternative Transaction Proposal or any chapter 11 plan other than the Plan;

(e)     take any other actions in contravention of this Agreement, the Plan or to the material detriment of the Transactions;

(f)     file any motion, application, pleading, other document, or proceeding with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(g)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement or the transactions contemplated herein against the West Madison Debtors or the other Contracting Parties other than to enforce this Agreement or the Plan or as otherwise permitted under this Agreement; or

(h)     file or support any motion, application, pleading, other document, or proceeding seeking, or file any joinder or other document supporting, the appointment of an examiner, the appointment of a trustee, to convert any of the Bankruptcy Cases to a case under

chapter 7 of the Bankruptcy Code, to seek discovery pursuant to rule 2004 or any other rule promulgated under the Federal Rules of Bankruptcy Procedure.

        **Section 6.14**  <u>Title Insurance; Survey</u>.  The Company has obtained from Old Republic National Title Insurance Company a commitment for title insurance (the "**Title Commitment**") bearing File Number NCT22011755 and an ALTA Survey (the "**Survey**") dated March 11, 2022, issued by Sarko Surveying, Inc. (the "**Surveyor**").  Purchaser shall be entitled to obtain, at its sole cost and expense and in its sole discretion, from the Title Company an update to the Title Commitment and an owner's and/or lender's policy of title insurance (each, a "**Title Policy**") insuring title to the Owned Real Property in favor of the Purchaser or any lender for the Owned Real Property, in each instance in an amount determined by Purchaser in its sole discretion, as well as an update to the Survey from the Surveyor.  The Title Policy may contain any endorsements that may be available and that Purchaser may desire and be subject only to Permitted Liens and such exceptions as Purchaser may approve.  The Company shall reasonably cooperate with Purchaser, the Title Company and the Surveyor in connection with Purchaser's efforts to obtain a Title Policy or an update to the Title Commitment (or any other title commitment from the Title Company) and the Survey, and the issuance of any Title Policy, including by providing any affidavits and other documents as may be reasonably required by the Title Company, the Surveyor and/or service provider (which shall include an "owner's affidavit" as provided in <u>Section 2.3(b)(ii)</u>).  Receipt by Purchaser of the Title Commitment, any update thereto, the Survey, any update thereto, and/or any Title Policy, in any form or forms whatsoever, shall be entirely elective on the part of the Purchaser and shall not constitute a condition to Closing or the performance by Purchaser of its obligations to proceed with Closing under this Agreement; provided, that if Purchaser does obtain a Title Policy or an update to the Title Commitment (or any other title commitment from the Title Company) and the Survey, Purchaser shall provide copies of the same to the Company.

        **Section 6.15**  <u>Tenant Estoppels</u>.  The Company will request from all Tenants, and use commercially reasonable efforts to obtain and provide to Purchaser at least five (5) Business Days prior to the Closing Date, an estoppel certificate substantially in the form of Exhibit ~~DB~~ attached hereto or in such other form expressly required under its Real Property Lease (collectively, the "**Estoppel Certificates**").  Purchaser shall have the right to review each Estoppel Certificate which the Company intends to deliver to each Tenant before the Company delivers the same to each such Tenant.  The Contracting Parties agree that the receipt of the Estoppel Certificates contemplated by this Section 6.15 shall not be a condition to Closing.

        **Section 6.16**  <u>Deliverables</u>.  At the Closing Date, upon the request of Purchaser, to the extent not in the possession or control of Purchaser as of the Closing Date, the Seller will use its reasonable best efforts to (and will direct the property manager for the Owned Real Property to) provide to Purchaser (or use its commercially reasonable efforts to cause the same to be located at the Owned Real Property as of the Closing Date) (i) all keys, lock or safe combinations or codes relating to the operation of the Owned Real Property; and (ii) all original tenant files, unexpired warranties and guaranties affecting the Owned Real Property, Permits for the Owned Real Property, real estate tax bills, water, sewer and utility bills for the Owned Real Property, Contracts, copies of financial records for the Owned Real Property and all other books and records of the Company, including those held by the property manager for the Owned Real Property, the Real Property Leases, all engineering, structural, geologic, environmental and

similar reports applicable to the Owned Real Property, a complete set of the plans and specifications with respect to the Owned Real Property, and any other material instruments and documents affecting the Owned Real Property, whether in the possession or control of the Company or its agents (including the property manager for the Owned Real Property); provided that for the foregoing clause (ii) shall include only the records, documents or files of the Company (the deliverables described in the foregoing clauses (i) and (ii), the "**Real Estate Deliverables**").  Delivery of the Real Estate Deliverables to Purchaser shall be effective and be deemed to have been satisfied if the Real Estate Deliverables have been left in the on-site office of the property manager for the Owned Real Property.  The provisions of this Section 6.16 shall survive the Closing.  Receipt by Purchaser of the Real Estate Deliverables contemplated by this Section 6.16 shall not constitute a condition to Closing or the performance by Purchaser of its obligations to proceed with Closing under this Agreement.

**Section 6.17**   Further Assurances.

(a)   Following the date of this Agreement and until the earlier of the Closing and the date on which this Agreement is terminated in accordance with Article VIII, the Seller, on the one hand, and Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the Transactions, including promptly furnishing the other with copies of notices or other communications received by the Seller, the Company or Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Entity with respect to the Transactions.

(b)   From time to time, on or after the Closing Date until the earlier of the six (6) months anniversary of the date hereof and the dissolution and liquidation of the Seller, the Seller shall execute and deliver such other instruments of transfer to Purchaser as are reasonably necessary and as Purchaser may reasonably request in order to more effectively vest in Purchaser all of the Seller's right, title and interest to the Membership Interests, free and clear of all Liens (other than Permitted Liens).

(a)   Nothing in this Section 6.17 shall (i) require the Seller or the Company to make any expenditure or incur any obligation on their own or on behalf of Purchaser, (ii) prohibit the Seller from ceasing operations or winding up its affairs following the Closing, or (iii) prohibit the Seller from taking such actions as are necessary to conduct the Auction, as are required by the Bankruptcy Court or as would otherwise be permitted under Section 6.3.

## ARTICLE VII

## CONDITIONS PRECEDENT

**Section 7.1**    Conditions to the Obligations of Each Party.    The respective obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction or (to the extent permitted by applicable Law) waiver by Purchaser, on the one hand, or Seller, on the other hand, at or before the Closing, of each of the following conditions:

(a)    Injunctions; Illegality.  No Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) shall be in effect that restrains, enjoins or otherwise prohibits the transactions contemplated hereby.

(b)    Sale Order. The Bankruptcy Court shall have entered the Sale Order.

(c)    Plan.  All conditions to the occurrence of the West Madison Sale Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Plan shall have been satisfied or waived (other than such conditions that, by their terms, are to be satisfied as of the occurrence of the West Madison Sale Effective Date of the Plan) in accordance with the terms of the Plan.

(d)    West Madison Sale Effective Date.  The West Madison Sale Effective Date shall have occurred, or shall be deemed to have occurred, concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan.

**Section 7.2**    Conditions to the Obligations of Purchaser.  The obligations of Purchaser to consummate the Closing are subject to the satisfaction or (to the extent permitted by applicable Law) waiver by Purchaser on or prior to the Closing Date of the following further conditions:

(a)    Performance.  All of the material covenants of the Company and Seller to be performed prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects.

(b)    Representations and Warranties.  ~~The~~Each of (i) the Fundamental Representations shall be true and correct other than *de minimis* inaccuracies, as of the Closing Date as if made at and as of such time (other than those made as of a specified date, which shall be true and correct as of such specified date (other than *de minimis* inaccuracies) and (ii) the other representations and warranties of the Company contained in Article III and the representations and warranties of Seller in Article IV (without giving effect to any materiality or Material Adverse Effect qualifications set forth therein) shall be true and correct as of the Closing Date as if made at and as of such time (other than those made as of a specified date, which shall be true and correct as of such specified date), except for such failures to be true and correct that do not have, individually or in the aggregate, a Material Adverse Effect.

(c)    Closing Deliveries. Purchaser shall have received the items to be delivered to it pursuant to Section 2.3(b).

**Section 7.3**    Conditions to the Obligations of Seller.  The obligations of Seller to consummate the Closing are subject to the satisfaction or (to the extent permitted by applicable Law) waiver by Seller on or prior to the Closing Date of the following further conditions:

(a)    Performance.  All of the material agreements and covenants of Purchaser to be performed prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects.

(b)    Representations and Warranties.  The representations and warranties of Purchaser contained in Article V (without giving effect to any materiality or Material Adverse Effect qualifications set forth therein) shall be true and correct in all respects at and as of the Closing Date as if made at and as of such time (other than those made at and as of a specified date, which shall be true and correct in all respects at and as of such specified date), except where the failure of such representations and warranties to be true and correct would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the ability of Purchaser to perform its obligations under this Agreement or consummate the transactions contemplated hereby.

(c)    Closing Deliveries.  The Seller shall have received the items to be delivered to it pursuant to Section 2.3(c).

**Section 7.4**    Frustration of Closing Conditions.  Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII to be satisfied if such failure was caused by such party's failure to act in good faith or such party's breach of any provision of this Agreement (including, without limitation, such party's failure to use its reasonable best efforts to cause the Closing to occur, as required by Section 6.4).

## ARTICLE VIII

## TERMINATION

**Section 8.1**    Consensual Termination; Illegality; End Date.  This Agreement may be terminated and the Transactions may be abandoned, at any time prior to the Closing:

(a)    by mutual written consent of the Company and Purchaser; and

(b)    by either Purchaser, on the one hand, or Seller, on the other hand, upon written notice to the other party, if

(i)    following the date of this Agreement, any Governmental Entity shall have issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated hereby; provided, that no party may terminate this Agreement pursuant to this Section 8.1(b)(i) if such party is in material breach of this Agreement;

(ii)    the Closing shall not have occurred on or prior to [———]August 31, 2023, which may be extended by the prior written consent of the Seller and the Purchaser (the "**End Date**"); provided, that (A) no party may terminate this Agreement pursuant to this Section 8.1(b)(ii) if such party is in material breach of this Agreement and (B) Purchaser shall not have the right to terminate this Agreement pursuant to this Section 8.1(b)(ii) in the event that the Company has initiated proceedings prior to the End Date to specifically enforce this Agreement while such proceedings are still pending.

**Section 8.2**    Termination by Purchaser.

This Agreement may be terminated by Purchaser upon written notice to Seller, upon the occurrence of any of the Events set forth in this Section 8.2, in each case prior to Closing; provided, however, that Purchaser may not seek to terminate this Agreement based upon a breach of this Agreement by Seller if such breach arises primarily out of Purchaser's own actions:

(a)    (i) any of the representations and warranties of the Company contained in Article III or any of the representations and warranties of the Seller contained in Article IV shall fail to be true and correct, or (ii) there shall be a breach by the Company or the Seller of any covenant or agreement of the Company in this Agreement that, in either case, (A) would result in the failure of a condition set forth in Section 7.2(a) or Section 7.2(b) and (B) which is not curable or, if curable, is not cured upon the occurrence of the earlier of (x) the thirtieth (30th) day after written notice thereof is given by Purchaser to the Company, and (y) the day that is five (5) Business Days prior to the End Date; provided, that Purchaser may not terminate this Agreement pursuant to this Section 8.2(a) if Purchaser is in material breach of this Agreement;

(b)    the (i) conversion of one or more of the Bankruptcy Cases of the West Madison Debtors to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Bankruptcy Cases of the West Madison Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of Purchaser;

(c)    subject to the limitations set forth in Section 6.10Section 6.10, (i) the Bankruptcy Court approves or authorizes an Alternative Transaction; or (ii) any of the West Madison Debtors enters into any Contract providing for the consummation of any Alternative Transaction or files any motion or application seeking authority to propose, join in or participate in the formation of, any actual or proposed Alternative Transaction;

(d)    following entry by the Bankruptcy Court of the Sale Order, such order is (i) amended, modified or supplemented in any way without Purchaser's prior written consent or (ii) voided, reversed or vacated or is subject to a stay;

(e)    the Confirmation Order is terminated, reversed, dismissed or vacated, by the Bankruptcy Court, or any such Order is modified or amended by the Bankruptcy Court after entry without the prior written consent of Purchaser in a manner that prevents or prohibits the consummation of the Transactions contemplated by this Agreement or the other Transaction Agreements in a way that cannot be remedied by the West Madison Debtors in a manner

-44-

reasonably acceptable to Purchaser (and such action has not been reversed or vacated within ten (10) calendar days after its issuance); or

(f)    within five (5) Business Days following the cure period set forth in Section 8.2(a) upon receipt by Purchaser of a Supplement pursuant to Section 9.15, if the Supplement gives rise to a breach that would entitle Purchaser to terminate this Agreement pursuant to Section 8.2(a) and such breach is not cured within the cure period set forth in such Section 8.2(a).

**Section 8.3**    Termination by the Company or Seller.

This Agreement may be terminated by the Company or Seller upon written notice to Purchaser upon the occurrence of any of the following Events, subject to the rights of the Company to fully and unconditionally waive, in writing, on a prospective or retroactive basis the occurrence of such Event; provided, however, that neither the Company nor Seller may seek to terminate this Agreement based upon a breach of this Agreement by Purchaser which arises primarily out of the Company's or Seller's own actions in material breach of this Agreement.

(a)    if: (i) any of the representations and warranties of Purchaser contained in Article V shall fail to be true and correct, or (ii) there shall be a breach by Purchaser of any covenant or agreement of Purchaser in this Agreement that, in either case, (A) would result in the failure of a condition set forth in Section 7.3(a) or Section 7.3(b) and (B) which is not curable or, if curable, is not cured upon the occurrence of the earlier of (x) the thirtieth (30th) day after written notice thereof is given by the Company or Seller to Purchaser and (y) the day that is five (5) Business Days prior to the End Date; provided, that neither the Company nor Seller may terminate this Agreement pursuant to this Section 8.3(a) if the Company is in material breach of this Agreement;

(b)    the Independent Agents determine in good faith, based upon advice of outside counsel, (a) that proceeding with the Transactions contemplated herein and in the Plan, and consummation of the Plan, would be inconsistent with the exercise of their fiduciary duties under applicable Law or (b) in the exercise of their fiduciary duties under applicable Law, to pursue an Alternative Transaction;

(c)    the Bankruptcy Court (or other court of competent jurisdiction) enters an Order (i) directing the appointment of an examiner (other than an independent fee examiner) with expanded powers or a trustee in any of the Bankruptcy Cases, (ii) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Bankruptcy Cases, or (iv) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement; or

(d)    the Confirmation Order is terminated, reversed, dismissed or vacated, by the Bankruptcy Court, or any such Order is modified or amended by the Bankruptcy Court after entry without the prior written consent of the Company in a manner that prevents or prohibits the consummation of the Transactions in a way that cannot be remedied in a manner reasonably

acceptable to Seller (and such action has not been reversed or vacated within ten (10) calendar days after its issuance); or

(e)      if: (i) all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied, or waived by Purchaser (other than (A) those conditions that by their terms cannot be satisfied until the Closing, but which conditions are, at the time the notice of termination is delivered by the Company to Purchaser, capable of being satisfied if the Closing were to occur at the time the Closing was required to occur pursuant to Section 2.3(a) and (B) those conditions that have not been satisfied, in whole or in part, as a result of a breach of this Agreement by Purchaser), (ii) the Company has confirmed in writing to Purchaser that it is ready, willing and able to effect the Closing and (iii) Purchaser does not consummate the Closing by the date the Closing is required to occur pursuant to Section 2.3(a).

**Section 8.4**    Effect of Termination.  In the event of the termination of this Agreement pursuant to Section 8.1, Section 8.2 or Section 8.3 by Purchaser, on the one hand, or the Company or Seller, on the other hand, written notice thereof shall forthwith be given to the other parties hereto specifying the provision hereof pursuant to which such termination is made, and this Agreement shall be terminated and become void and have no effect, and there shall be no Liability hereunder on the part of Purchaser, Seller or the Company, except that Section 2.4, Section 6.2, this Section 8.4 and Article IX shall survive any termination of this Agreement. Nothing in this Section 8.4 shall (i) relieve or release any party to this Agreement of any Liability or damages (which, solely in the case of the Company and Seller, the parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and may include to the extent proven the benefit of the bargain lost by the West Madison Debtors' stakeholders (taking into consideration relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party) arising out of such party's willful and material breach of any provision of this Agreement or the conscious participation in Fraud prior to such valid termination or (ii) subject to Section 9.12, impair the right of any party hereto to compel specific performance by the other party or parties, as the case may be, of such party's obligations under this Agreement.

## ARTICLE IX

### MISCELLANEOUS

**Section 9.1**    Fees and Expenses.  Except as expressly set forth herein, including in Section 6.5 and Section 6.7 all costs and expenses incurred in connection with this Agreement and the consummation of the Transactions shall be paid by the party incurring such costs and expenses.

**Section 9.2**    Extension; Waiver.  Subject to the express limitations herein, at any time prior to the Closing, the Contracting Parties may (a) extend the time for the performance of any of the obligations or other acts of the other Contracting Parties, (b) waive any inaccuracies in the representations and warranties contained herein by any other applicable party or in any document, certificate or writing delivered pursuant hereto by any other applicable party or (c) waive compliance with any of the agreements or conditions contained herein.  Any agreement on the part of any party hereto to any such extension or waiver shall be valid only if

set forth in an instrument in writing signed on behalf of such party.  No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed as a waiver of, or acquiescence in, any breach of any representation, warranty, covenant or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

Section 9.3    Notices.    Except as otherwise provided herein, all notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email transmission (with copies by overnight courier service or registered mail) to the respective parties as follows (or, in each case, as otherwise notified by any of the Contracting Parties) and shall be effective and deemed to have been given (a) immediately when sent by email between 9:00 A.M. and 6:00 P.M. (Eastern Time) on any Business Day (and when sent outside of such hours, at 9:00 A.M. (Eastern Time) on the next Business Day), and (b) when received if delivered by hand or overnight courier service or certified or registered mail on any Business Day:

(a)    If to Seller, and prior to the Closing, to the Company, at:

PWM Property Management LLC
c/o M3 Advisory Partners LP
1700 Broadway, 19th Floor
New York, New York 10018;

with a copy (which shall not constitute notice) to:

White & Case LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attention: Fan B. He
Email: fhe@whitecase.com

and

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attention: Bojan Guzina
        Gregory F. Pesce
Email:    bojan.guzina@whitecase.com
        gregory.pesce@whitecase.com

and

White & Case LLP

1221 Avenue of the Americas
New York, NY 10020
Attention: Adam Cieply
Email:    adam.cieply@whitecase.com

(b)    if to Purchaser or, after the Closing, the Company, at:

SinOceanic I Limited.
Clarendon House, 2 Church Street,
Hamilton, HM11, Bermuda
Attention: Mr. Liu Liang
[To come]Email: ll@sinoceanic.no;

with a copy (which shall not constitute notice) to:

Vedder Price P.C.
1633 Broadway, 31st Floor
New York, NY 10019
Attention: Michael Schein
        Alexander Berger
Email:    mschein@vedderprice.com
        aberger@vedderprice.com
[To come];

or to such other Person or address as any party shall specify by notice in writing in accordance with this Section 9.3 to each of the other parties.  Notices sent by multiple means, each of which is in compliance with the provisions of this Agreement will be deemed to have been received at the earliest time provided for by this Agreement.

Section 9.4    Entire Agreement.  This Agreement, together with the Exhibits hereto, the Disclosure Schedules and the other Transaction Documents, contains the entire understanding of the Contracting Parties with respect to the subject matter contained herein and supersedes all prior agreements and understandings, oral and written, with respect thereto, other than the Confidentiality Agreement [and the Guarantee].  This Section 9.4 shall not be deemed to be an admission or acknowledgement by any of the Contracting Parties that any prior agreements or understandings, oral or written, with respect to the subject matter hereof exist, other than the Confidentiality Agreement [and the Guarantee].

Section 9.5    Non-Recourse.  Except to the extent otherwise set forth in the Confidentiality Agreement [and the Guarantee], all claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and such representations and warranties are those solely of) the Persons that are expressly identified as parties in the preamble to this Agreement (the "**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder,

-48-

Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any Contracting Party, or any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any of the foregoing (collectively, the "**Nonparty Affiliates**"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as set forth in the Confidentiality Agreement [and the Guarantee]), and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, except to the extent otherwise set forth in the Confidentiality Agreement [and the Guarantee], each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

**Section 9.6**    Binding Effect; Benefit; Assignment.  This Agreement shall inure to the benefit of and be binding upon the Contracting Parties.  Except with respect to Sections 6.5, 6.5, 9.2, 9.5 6.5, 9.10 and 9.12 and this 9.6 of this Agreement, which shall inure to the benefit of the Persons benefiting from the provisions thereof, all of whom are intended to be third-party beneficiaries thereof, no other Person not party to this Agreement shall be entitled to enforce this Agreement.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Contracting Parties without the prior written consent of each of the other Contracting Parties; provided, however, that Seller may assign its rights and obligations under this Agreement to any of its Affiliates without prior written consent.  Any attempted assignment in violation of this Section 9.6 will be void.

**Section 9.7**    Survival. None of the representations, warranties, agreements or covenants set forth in this Agreement or in any certificate or document delivered at, or prior to, the Closing in connection with this Agreement shall survive the Closing Date, and thereafter none of the Company, Purchaser or Seller shall be under any Liability whatsoever with respect to any such representation, warranty, agreement or covenant.  Purchaser, Seller, and the Company shall have no post-Closing remedy for breaches of any representation, warranty, agreement or covenant set forth in this Agreement or in any certificate delivered at the Closing; provided, that notwithstanding the foregoing, the agreements and covenants set forth in Article I and this Article IX and Sections 2.2, 2.3, 2.4, 6.2, 6.5, 6.6, 6.7(a) and 8.4 shall survive such termination in accordance with their terms.  Without limiting the generality of the foregoing:

(a) Purchaser hereby waives any statutory and common law remedies, including remedies that may be available under Environmental Laws, with respect to matters relating to the transactions contemplated by this Agreement (including with respect to any environmental, health or safety matters);

(a)    (b) after the Closing, neither Purchaser nor any of its Affiliates or their respective former, current or future general or limited partners, equityholders, managers,

members, directors, officers, employees, agents and representatives may seek the rescission of the transactions contemplated by this Agreement;

(b)    ~~(c)~~ the provisions of, and the limitation of remedies provided in, this Section 9.7 were specifically bargained for between the parties hereto and were taken into account by the parties hereto in arriving at the Purchase Price, as may be adjusted pursuant to the terms of this Agreement;

(c)    ~~(d)~~ the Contracting Parties hereto have voluntarily agreed to define their rights, liabilities and obligations respecting the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of this Agreement; and

(d)    ~~(e)~~ the Contracting Parties hereto each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations and the parties hereto specifically acknowledge that no party hereto has any special relationship with another party hereto that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction; provided, however, that notwithstanding anything to the contrary set forth in this Agreement, no Party shall be precluded from bringing a claim for Fraud against any Party ~~based on such Party's conscious participation in Fraud~~.

**Section 9.8**    Amendment and Modification.    This Agreement may not be amended or modified except by a written instrument executed by all parties to this Agreement.

**Section 9.9**    Counterparts.    This Agreement may be executed and delivered (including via scanned pdf image or electronic signature software such as DocuSign) in several counterparts, each of which shall be deemed to be an original instrument, and all of which together shall be deemed to be one and the same agreement.

**Section 9.10**    Applicable Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION TO HEAR SUCH ACTION, SUIT OR PROCEEDING, ANY STATE OR FEDERAL COURT LOCATED IN DELAWARE COUNTY, DELAWARE, AND BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH

ACTION OR PROCEEDING IN THE MANNER PROVIDED IN <u>SECTION 9.3</u>, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

   **Section 9.11** <u>Severability</u>. If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein; <u>provided</u>, that notwithstanding anything in this Agreement to the contrary, the Contracting Parties intend that the remedies and limitations thereon (including <u>Section 9.5</u>, <u>Section 9.6</u>, <u>Section 9.7</u>, <u>Section 9.12</u> and <u>Section 9.13</u>) to each be construed as an integral provision of this Agreement and that such remedies and limitations shall not be severable in any manner that increases the liability or obligations of any member of the Pre-Closing Equityholder Group and no Contracting Party shall be required to take any action that would increase any such obligations or liabilities of any member of the Pre-Closing Equityholder Group.  Upon such a determination, the Contracting Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Contracting Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

   **Section 9.12** <u>Specific Enforcement</u>.

   (a) The Contracting Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached and that an award of money damages would be inadequate in such event.  Accordingly, it is acknowledged that the Contracting Parties and the third-party beneficiaries of this Agreement shall be entitled to equitable relief, without proof of actual damages, including an injunction or injunctions or Orders for specific performance to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including any Order sought by ~~the Company or the Seller~~one party to cause ~~Purchaser~~the other party to perform its agreements and covenants contained in this Agreement), in addition to any other remedy to which they are entitled at law or in equity as a remedy for any such breach or threatened breach.  Each Contracting Party further agrees that no Contracting Party or any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 9.12</u>, and each Contracting Party (i) irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument and (ii) agrees, subject only to the immediately succeeding sentence, to cooperate fully in any attempt by the Contracting Parties in obtaining such equitable relief.  Each Contracting Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.

(c)     The parties hereto agree that (i) by seeking the remedies provided for in this <u>Section 9.12</u> (including the commencement of legal proceedings), a party shall not in any respect waive its right to terminate this Agreement in accordance with the terms of <u>Article VIII</u> or waive its right to seek at any time any other form of relief that may be available to a party under this Agreement and (ii) nothing set forth in this <u>Section 9.12</u> shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this <u>Section 9.12</u> prior to or as a condition to exercising any termination right under <u>Article VIII</u> (and pursuing monetary damages following such termination).

**Section 9.13**   <u>Waiver of Jury Trial</u>.   EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES, AND AGREES TO CAUSE ITS SUBSIDIARIES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 9.14**   <u>Rules of Construction</u>.   The Contracting Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and have participated jointly in the drafting of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

**Section 9.15**   <u>Interpretation</u>.   The Disclosure Schedules relate to and qualify certain of the representations, warranties, covenants and obligations of the parties hereto in this Agreement and the Disclosure Schedules are not intended to broaden or constitute, and shall not be construed or otherwise be deemed to broaden or constitute, any representation, warranty, covenant or obligation of any party hereto or any other Person except to the extent expressly provided in this Agreement.  Matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules.  To the extent any such additional matters are included, they are included for informational purposes and do not necessarily include other matters of a similar nature.  In no event shall any disclosure of additional matters be deemed or interpreted to broaden or otherwise amend any of the covenants or representations or warranties in this Agreement.  To the extent that the Disclosure Schedules include brief descriptions or summaries of certain agreements and instruments, such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents and instruments described.  Headings and subheadings have been inserted in the Disclosure Schedules for convenience of reference only and shall to no extent have the effect of amending or changing the express description thereof as set forth in this Agreement.  Disclosure of any fact or item in this Agreement or any Disclosure Schedule referenced by a particular Section in this Agreement shall be deemed to have been disclosed with respect to every other Section in this Agreement to the extent that it is reasonably apparent from the face of such disclosure that such disclosure would apply to such other Sections.  Any matter, condition or set of facts which is more specifically (rather than generally or by implication) covered in any of the representations and warranties of <u>Article III</u>, <u>Article IV</u> or <u>Article V</u> shall be solely governed by such more specific representation and warranty without reference to or inclusion within a more generalized representation and warranty that but for this sentence could be applicable to such matter, condition or set of facts.  No reference to or disclosure of any item or other matter in this Agreement or the Disclosure Schedules or any Annexes or Exhibits attached hereto or thereto

shall be construed as an admission, representation or indication that such item or other matter is "material" or would have a Material Adverse Effect or that such item or other matter is required to be so referred to or so disclosed.  Each party hereto may, at its option, include in its Disclosure Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement or otherwise.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement or the Disclosure Schedules or any Annexes or Exhibits attached hereto or thereto is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the ordinary course of business or are material to the Company, and no Contracting Party shall use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement or the Disclosure Schedules or any Annexes or Exhibits hereto or thereto in any dispute or controversy between the Contracting Parties as to whether any obligation, item or matter not described or included in this Agreement or in any section of the Disclosure Schedules or any Annexes or Exhibits hereto or thereto is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or is within or outside of the ordinary course of business or material for purposes of this Agreement.  The information contained in this Agreement and in the Disclosure Schedules or any Annexes and Exhibits hereto or thereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Contracting Party to any third party of any matter whatsoever (including any violation of any Law or Order or breach of contract).  The Contracting Parties do not assume any responsibility to any Person that is not a party to this Agreement for the accuracy of any information set forth in the Disclosure Schedules.  The information set forth in the Disclosure Schedules was not prepared or disclosed with a view to its potential disclosure to others.  Subject to applicable Law, such information is disclosed in confidence for the purposes contemplated in this Agreement and is subject to the confidentiality provisions of any other agreements, including the Confidentiality Agreement, entered into by the Contracting Parties or their Affiliates.  Moreover, in disclosing the information in the Disclosure Schedules, each Contracting Party expressly does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed therein.  From time to time after the date hereof and prior to the Closing, the Company shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules by providing written notice to Purchaser in accordance with Section 9.3, which notice must state in bold font "Failure to Act within Five Business Days Will Waive Purchaser's Termination Right Under Section 8.2(f)" (each such supplement or amendment, a "**Supplement**"), and each such Supplement shall be deemed to be incorporated into and to supplement and amend the Disclosure Schedules for all purposes pursuant to this Agreement.  If Purchaser does not provide a written termination notice pursuant to Section 8.2(f) within five (5) Business Days after receipt of such Supplement, Purchaser shall be deemed to have waived its rights to terminate this Agreement pursuant to Section 8.2(f), solely with respect to the subject matter of such Supplement.

Section 9.16    Time of the Essence.  Time is of the essence in this Agreement.  If the date specified for giving any notice or taking any action is not a Business Day (or if the

period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next date which is a Business Day.

**Section 9.17**    <u>Control of Attorney-Client and All Other Privileges</u>.

(a)    The Purchaser agrees, on behalf of itself and its Affiliates, that all Deal Communications (including any Deal Communications between the Seller or any of its Affiliates and White & Case LLP and any other lawyer representing the Seller or any of its Affiliates) shall not be acquired by Purchaser and shall remain privileged and fully owned by the Seller and its Affiliates from and after the Closing except as otherwise expressly provided in this Agreement. For the period immediately prior to the Closing, the attorney-client and all other privileges available to the Seller and its Affiliates with respect to Deal Communications shall remain privileged and the expectation of client confidence belongs to, and shall remain controlled by, the Seller and will not pass to or be claimed by Purchaser or its Affiliates.  Any disclosure of Deal Communications shall be agreed as between Purchaser and the Seller to be inadvertent and in good faith mistake.

(b)    The Seller agrees that the Seller shall protect and shall not waive any attorney-client and other legal privileges available to the Seller and its Affiliates, and the Seller agrees that the Seller will make efforts that are satisfactory to Purchaser in its reasonable discretion to ensure that any such attorney-client and other legal privileges are protected and not waived notwithstanding the dissolution of the Seller after Closing.   This <u>Section 9.17(b)</u> is subject to compliance with the covenant set forth in <u>Section 9.17(a).</u>

(c)    Notwithstanding any other provision of this Agreement, the covenants set forth in <u>Section 9.17(b)</u> shall survive the Closing in accordance with the full performance of their terms.


\*      \*      \*      \*      \*

IN WITNESS WHEREOF, each of Purchaser, Seller and the Company has caused this Agreement to be executed by their respective officers thereunto duly authorized, all as of the date first above written.

[PURCHASER]SINOCEANIC I LIMITED

By:_____
     Name:
     Title:

181 WEST MADISON HOLDINGPWM PROPERTY MANAGEMENT LLC

By:_____
     Name:
     Title:

181 WEST MADISON PROPERTY LLC

By:_____
     Name:
     Title: